# EXHIBIT 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### VENEZUELA HOLDINGS, B.V., MOBIL CERRO NEGRO HOLDING, LLC, AND MOBIL CERRO NEGRO, LTD.

v.

### BOLIVARIAN REPUBLIC OF VENEZUELA

### (ICSID CASE NO. ARB/07/27)

### RESUBMISSION PROCEEDING

I hereby certify that the attached document is a true copy of the Tribunal's Award dated 10 July 2023.

Martina Polasek
Acting Secretary-General

Washington, D.C., 10 July 2023

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**VENEZUELA HOLDINGS, B.V., MOBIL CERRO NEGRO HOLDING, LLC, AND MOBIL CERRO NEGRO, LTD.**

Claimants

and

**BOLIVARIAN REPUBLIC OF VENEZUELA**

Respondent

**ICSID Case No. ARB/07/27
Resubmission Proceeding**

---

# AWARD

---

*Members of the Tribunal*
Prof. Nicolas Angelet, President
Mr. Stephen Drymer, Arbitrator
Prof. Andrea Giardina, Arbitrator

*Secretary of the Tribunal*
Ms. Alicia Martín Blanco

*Date of dispatch to the Parties:*

10 July 2023

## REPRESENTATION OF THE PARTIES

*Representing Venezuela Holdings, B.V.,*
*Mobil Cerro Negro Holding, LLC, and*
*Mobil Cerro Negro, Ltd.*:

Mr. Constantine Partasides KC
Mr. Gaëtan Verhoosel KC
Ms. Leilah Bruton
Three Crowns LLP
8-10 New Fetter Lane
London EC4A 1AZ
United Kingdom

Mr. Mihir Chattopadhyay
Mr. William Sullivan
Three Crowns LLP
3000 K Street NW
Suite 101
Washington, DC 20007
United States of America

Mr. Eugene J. Silva II
Senior Counsel, International Disputes Group
Exxon Mobil Corporation
22777 Springwoods Village Parkway
N1.4B.324
Houston, Texas 77389
United States of America

*Representing the Bolivarian Republic of*
*Venezuela*:

Mr. Reinaldo Enrique Muñoz Pedroza
Procurador General de la República
Mr. Henry Rodríguez Facchinetti
Gerente General de Litigio
Procuraduría General de la República
Av. Los Ilustres, cruce con
Calle Francisco Lazo Martí
Edificio Sede de la Procuraduría General de la
República
Urbanización Santa Mónica, Caracas
1040, Distrito Capital, Venezuela

Mr. Alfredo De Jesús S.
De Jesús & De Jesús, S.A.
Torre Luxor, Piso 3, Oficina 3B,
Urbanización Las Mercedes, Municipio Baruta,
Estado Miranda, Caracas, 1060, Venezuela
and
Edificio Magna Corp, Piso 5, Oficina 507
Calle 51 Este y Manuel María Icaza, Bella
Vista,
Ciudad de Panamá, Panama

Dr. Alfredo De Jesús O.
Ms. Déborah Alessandrini
Alfredo De Jesús O. – Transnational
Arbitration & Litigation
Quai de l'Île 13
1204 Geneva, Switzerland

Ms. Marie-Thérèse Hervella
Ms. Eloisa Falcón López
Ms. Erika Fernández Lozada
Ms. Daniela Brito Pusic
Alfredo De Jesús O. – Transnational
Arbitration & Litigation
20, rue Quentin Bauchart
75008 Paris, France

i

**TABLE OF CONTENTS**

I.      INTRODUCTION AND PARTIES ................................................................. 1

II.     PROCEDURAL HISTORY........................................................................... 3

III.    SUBMISSIONS OF THE PARTIES ............................................................. 9

    A.    The Claimants' submissions................................................................. 9

    B.    The Respondent's submissions .......................................................... 19

IV.     *RES JUDICATA* OF THE FIRST AWARD AND THE ANNULMENT DECISION........ 30

    A.    The Annulment Decision's *res judicata* effect................................... 31

        (1)    The interpretation of the Annulment Decision's *dispositif*.................... 31

        (2)    The scope of the Annulment Decision's *res judicata* effect................. 34

    B.    The First Award's *res judicata* effect............................................... 36

V.      THE CNAA BEFORE THE BIT AND THE FIRST AWARD ......................... 37

    A.    Rules and principles governing the interpretation of the CNAA ................. 39

    B.    CNAA Clause 15.1............................................................................. 42

        (1)    General............................................................................................. 42

        (2)    "Mitigate"........................................................................................ 43

        (3)    "Any damages"................................................................................. 44

        (4)    "Shall".............................................................................................. 45

        (5)    "Restore the economic benefit" ....................................................... 46

        (6)    Set-off and reimbursement............................................................... 48

        (7)    Chronology ...................................................................................... 48

        (8)    Conclusion ....................................................................................... 49

    C.    CNAA Clause 15.2............................................................................. 49

        (1)    General............................................................................................. 49

        (2)    Clause 15.2.a – the compensation cap ............................................. 49

        (3)    Clause 15.2.b – inapplicability of the compensation mechanism........... 50

        (4)    Conclusion ....................................................................................... 52

    D.    The Congressional Conditions and corresponding CNAA provisions........... 52

        (1)    CNAA Clause 2.1.b ......................................................................... 52

        (2)    Congressional Condition 18 and CNAA Clause 18.4.......................... 54

        (3)    Congressional Condition 18 and CNAA Clause 18.3.......................... 57

        (4)    Congressional Condition 20 and CNAA Clause 15.2.......................... 60

E.  Further arguments of the Parties ................................................................. 61

F.  A regime limited to *lawful* expropriations?.................................................. 64

G.  General Conclusion on the CNAA ............................................................... 67

VI.  COMPENSATION PURSUANT TO THE BIT AND THE FIRST AWARD ................... 68

A.  The applicable sources of law ...................................................................... 69

(1)  The different normative regimes and Article 27 VCLT ....................... 69

(2)  Applicable sources of law ................................................................... 71

B.  The Respondent's principal defense ("threshold issue") ............................. 72

C.  The CNAA, the BIT and the First Award .................................................... 73

D.  The bundle of rights constituting the investment and the ensuing calculation method 76

(1)  The bundle of rights constituting the investment................................. 77

(2)  The ensuing calculation method ......................................................... 78

E.  Application of the calculation method in the light of the First Award......................... 80

(1)  Is the CNAA risk covered by the discount applied by the First Tribunal?........... 81

(2)  The evaluation of the CNAA risk by the experts before the First Tribunal and by the Respondent in the present proceeding ........................................... 83

(3)  The critical date and its implications ................................................. 86

F.  Evaluation of the compensation due ............................................................ 92

(1)  Evaluating the risk ............................................................................. 92

(2)  Concrete application: the amount of *uncapped* cash flow (first element of an offer) ................................................................................................. 100

(3)  Concrete application: the *capped* amount (second element of an offer) ............ 102

(4)  The total amount .............................................................................. 103

G.  Formulation of the Resubmission Tribunal's *dispositif* ............................. 104

VII.  COSTS AND EXPENSES.................................................................................... 105

A.  Applicable law............................................................................................ 106

B.  The outcome of the proceeding .................................................................. 107

C.  The Respondent's failure to make advance payments ................................. 108

D.  Other circumstances related to the behaviour of the Parties ...................... 108

(1)  The arguments of the Parties on the merits........................................ 108

(2)  The costs of the hearing .................................................................... 110

(3)  The length of the proceedings and the constitution of the Tribunal .................. 110

(4)  The challenge proceedings................................................................. 111

iii

(5)  The document production proceedings ................................................................ 112

E.  Conclusion on costs and interest ................................................................. 112

VIII. AWARD ................................................................................................................. 115

## TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| *Ad hoc* Committee or Committee | *Ad hoc* Committee constituted on 8 May 2015 |
| Annulment Decision | *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment, 9 March 2017 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| BIT | Agreement on Encouragement and Reciprocal Protection of Investments Between the Kingdom of the Netherlands and the Republic of Venezuela, entered into force on 1 November 1993 |
| C-[#] | Claimants' Exhibit |
| CNAA | Cerro Negro Association Agreement |
| Claimants' Memorial | Claimants' Memorial on the Merits dated 29 June 2021 |
| Claimants' Reply | Claimants' Reply on the Merits dated 7 April 2022 |
| Claimants' Submission on Costs | Claimants' Submission on Costs dated 10 March 2023 |
| CL-[#] | Claimants' Legal Authority |
| First Award | *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award, 9 October 2014 |
| First Tribunal | Arbitral tribunal constituted on 8 August 2008 |
| Hearing | Hearing on the Merits held on 29-30 September 2023 |
| ICC Award | *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF/CA, Final Award, 23 December 2011 |

| | |
|---|---|
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits dated 6 December 2021 |
| Respondent's Rejoinder | Respondent's Rejoinder on the Merits dated 19 May 2022 |
| Respondent's Submission on Costs | Respondent's Submission on Costs dated 10 March 2023 |
| RL-[#] | Respondent's Legal Authority |
| Tribunal | Arbitral tribunal constituted on 17 August 2020 |

## I.    INTRODUCTION AND PARTIES

1.    This is a case on resubmission after the partial annulment of an ICSID arbitral award. On 9 October 2014, an ICSID Arbitral Tribunal composed of H.E. Judge Gilbert Guillaume, President, Professor Gabrielle Kaufmann-Kohler, Arbitrator and Dr. Ahmed Sadek El-Kosheri, Arbitrator (the "**First Tribunal**"), rendered an arbitral award (the "**First Award**") in the case of *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/07/27)[1], based on the Agreement on Encouragement and Reciprocal Protection of Investments Between the Kingdom of the Netherlands and the Republic of Venezuela, which entered into force on 1 November 1993 (the "**BIT**").

2.    The First Tribunal decided as follows:

> *"404. For the foregoing reasons, The Tribunal unanimously decides as follows:*
>
> *(a) the Tribunal has no jurisdiction over the claim arising out of the increase in the income tax rate for the participants to the Cerro Negro Project;*
>
> *(b) the Tribunal has jurisdiction over the remaining claims, i.e.:*
>
> *a.    the claim arising out of the imposition of the extraction tax on the Cerro Negro Project;*
>
> *b.    the claim arising out of the production and export curtailments imposed on the Cerro Negro Project in 2006 and 2007; and*
>
> *c.    the claim arising out of the expropriation of the Claimants' investments in the Cerro Negro and La Ceiba Projects;*
>
> *(c) the Respondent shall pay to the Claimants the sum of US$ 9,042,482 (nine million, forty two thousand, four hundred and eighty two United States*

---

[1] The claimants in the proceeding on the merits before the First Tribunal were Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd. and Mobil Venezolana de Petróleos, Inc. Mobil Venezolana de Petróleos Holdings, Inc. and Mobil Venezolana de Petróleos, Inc. are not parties to this resubmission proceeding because the portion of the First Award related to their claims, which were related to the La Ceiba project (First Award, §404.f and Request for Resubmission, §16), were upheld by the *Ad hoc* Committee. This is not in dispute between the Parties.

*dollars) in compensation for the production and export curtailments imposed on the Cerro Negro project in 2006 and 2007;*

*(d) the Respondent shall pay to the Claimants the sum of US$ 1,411.7 million (one thousand, four hundred and eleven million, seven hundred thousand United States dollars) in compensation for the expropriation of their investments in the Cerro Negro Project;*

*(e) the Tribunal takes note in both cases of the Claimants' representation that, in the event of favourable award, the Claimants are willing to make the required reimbursements to PDVSA. Double recovery will thus be avoided;*

*(f) the Respondent shall pay to the Claimants the sum of US$ 179.3 million (one hundred seventy nine million, three hundred thousand United States dollars) in compensation for the expropriation of their investments in the La Ceiba Project;*

*(g) these sums shall be paid to the Claimants net of any Venezuelan tax;*

*(h) these sums shall be increased by annual compound interest on their amount at the rate of 3.25% from 27 June 2007 up to the date when payment of this sums has been made in full;*

*(i) each Party shall bear its own costs and counsel fees;*

*(j) the Parties shall equally share the fees and expenses of the Tribunal and the costs of the ICSID Secretariat; and*

*(k) all other claims are rejected."*

3.      On 9 March 2017, an ICSID *Ad hoc* Committee composed of Sir Franklin Berman, President of the Committee, Tan Sri Cecil Abraham, Member of the Committee and Professor Dr. Rolf Knieper, Member of the Committee (the "***Ad hoc* Committee**" or the "**Committee**") rendered a decision (the "**Annulment Decision**") partially annulling the First Award.

4.      The *Ad hoc* Committee decided as follows:

*"196. On the basis of the reasoning above, the Committee decides: -*

*1) the request for the annulment of the Award on account of the Tribunal's assumption of jurisdiction is rejected;*

2

> *2) the request for the annulment of the Award on account of the Tribunal's refusal to order document production is rejected;*
>
> *3) the request for the annulment of the portion of the Award dealing with compensation for the expropriation of the Cerro Negro Project is upheld in part, as follows: paragraph 404(d) of the Award is annulled, together with certain paragraphs in Sections V, VI, and VIII of the Award bearing directly on the assessment of compensation and the basis therefor, that is to say paragraphs 216-218, paragraphs 223-225, and paragraphs 373-374;*
>
> *4) for the avoidance of doubt, the Committee specifies that the following parts of the Award are not affected by sub-paragraph 3) above, namely paragraphs 297-306, paragraphs 307-367, the first sentence of paragraph 368, paragraphs 386-400, and paragraph 403, as well as paragraphs 184-213 and the Decision on Jurisdiction of 10 June 2010;*
>
> *5) in accordance with the terms of paragraph 10.a of Procedural Order No. 2 of 28 July 2015, the stay of enforcement laid down in that Order will cease to have effect on the date of issue of the present Decision;*
>
> *6) each Party shall bear the costs of the preparation and presentation of its own case. The costs of the annulment proceedings, including the fees and expenses of the Members of the Committee and the costs of the Centre, shall be shared equally between the Applicant and the Respondents."*

5.    On 26 September 2018, Venezuela Holdings, B.V., Mobil Cerro Negro Holding, LLC, and Mobil Cerro Negro, Ltd. (the "**Claimants**") filed a Request for Resubmission against the Bolivarian Republic of Venezuela (the "**Respondent**") with ICSID.

## II.    PROCEDURAL HISTORY

6.    The Request for Resubmission, filed on 26 September 2018 and supplemented by letter of 22 October 2018, was registered by ICSID on 24 October 2018.

7.    On 12 November 2018, the Centre informed the Claimants and the Respondent (together the "**Parties**") that Mr. Stephen Drymer, a national of Canada, had accepted his appointment by the Claimants as an arbitrator in this case.

8.    On 30 January 2019, the Centre informed the Parties that Prof. Andrea Giardina, a national of Italy, had accepted his appointment by the Respondent as an arbitrator in this case.

9.  On 21 March 2019, the Respondent, represented by Mr. Reinaldo Enrique Muñoz Pedroza, *Procurador General de la República* (Attorney General of the Republic), informed the Centre that it had instructed the law firm De Jesús & De Jesús, S.A. as well as Mr. Alfredo de Jesús Salvatori and Mr. Alfredo de Jesús O. to represent it in this proceeding. The Respondent also notified the Centre that the power of attorney previously issued to the law firm Curtis, Mallet-Prevost, Colt & Mosle LLP as well as Mr. George Kahale III had been revoked.

10. By letter of 27 March 2019 to ICSID, Mr. José Ignacio Hernández G., identifying himself as *Procurador Especial de la República Bolivariana de Venezuela* (Special Attorney General of the Bolivarian Republic of Venezuela), requested that any notice or communication from ICSID to the Respondent should be addressed to him and that "ICSID should not consider valid any instruction or communication submitted as of 5 February 2019 by any other person -different than me- who pretends to act on behalf of the Republic of Venezuela".

11. On 13 February 2020, the Claimants notified the Centre of the Parties' failure to agree on the appointment of the President of the Tribunal and requested that the President be appointed by the Chairman of the Administrative Council of ICSID pursuant to Article 38 of the ICSID Convention and Rule 4(1) of the ICSID Arbitration Rules. On 21 February 2020, law firm De Jesús objected to the Claimants' request and invited them to agree with the Respondent on the appointment of the President of the Tribunal with the assistance of Mr. Drymer and Prof. Giardina. On 26 February 2020, the Claimants reiterated their request to the Chairman. On 2 March 2020, the Centre confirmed that since the request to the Chairman had been made more than 90 days after the dispatch of the notice of registration without the Tribunal having been constituted, the Chairman would proceed to appoint the President of the Tribunal from the ICSID Panel of Arbitrators, in accordance with ICSID Article 38. On 12 August 2020, the Centre informed the Claimants as well as the Respondent represented by Mr. Pedroza that it had proposed the appointment of Prof. Nicolas Angelet, a national of Belgium.

12.    On 13 August 2020, the Centre confirmed that the Chairman had appointed Prof. Angelet as the President of the Tribunal.

13.    On 17 August 2020, the Secretary-General, in accordance with Rule 6 of the ICSID Arbitration Rules, notified the Claimants as well as the Respondent represented by Mr. Pedroza that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Alicia Martín Blanco, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

14.    On 26 August 2020, the Claimants requested "that the issue of which of Venezuela's purported representatives are properly authorized to represent Venezuela in these proceedings be determined by the Tribunal as a threshold issue and in advance of the First Procedural Session". On 27 August 2020, law firm De Jesús requested that the Claimants' application be dismissed summarily as "there simply is no issue of representation to be determined by the Arbitral Tribunal". The Claimants submitted further comments on 28 August 2020.

15.    On 1 September 2020, the Tribunal decided that it could not summarily dismiss the Claimants' request and that a decision on the proper representation of the Respondent (the "**Preliminary Issue**") would be in the interest of the Parties and the integrity of the proceeding.

16.    On 27 September 2020, Mr. Enrique Sánchez Falcón, writing "in [his] capacity as Special Attorney General of the Bolivarian Republic of Venezuela", addressed the Centre to represent the Respondent in the present proceeding.

17.    On 8 October 2020, the Tribunal held its first session by videoconference, separately from the preliminary procedural consultation with the Parties.

18.    On 5 November 2020, Mr. Falcón notified the Secretary-General of the appointment of "Curtis, Mallet-Prevost, Colt & Mosle LLP as counsel for Venezuela in the above-referenced case, with George Kahale, III as lead counsel".

19.    On 10 November and 1 December 2020, counsel for the Claimants, for Mr. Pedroza and for Mr. Falcón made written submissions on the Preliminary Issue.

20.    On 1 March 2021, the Tribunal rendered its "Decision on the Respondent's Representation in this Proceeding". The Tribunal decided that the Preliminary Issue was properly before the Tribunal, that the Tribunal had jurisdiction to decide it, and that without prejudice to a possible agreement for the constitution of a coordinated or joint defence team, Mr. Falcón's request to represent the Respondent was denied, as well as the request to suspend the proceeding, that Messrs. Hernández and Falcón were to bear their own costs and expenses, and that all other questions concerning the costs and expenses were reserved for subsequent determination.

21.    On 24 March 2021, the Tribunal held a preliminary procedural consultation with the Parties, and on 29 March 2021, the Tribunal issued Procedural Order No. 1 containing the Parties' agreements and the Tribunal's decisions on procedure.

22.    On 29 June 2021, the Claimants submitted their Memorial (the "**Claimants' Memorial**"), together with Exhibits C-15 through C-90, and Legal Authorities CL-1 through CL-5.

23.    On 13 July 2021, the Respondent submitted a Proposal for the disqualification of Mr. Drymer on the basis, in substance, that Mr. Drymer had accepted to sit as an arbitrator appointed by unrelated claimant parties in two other cases not related to the present proceeding brought against the Bolivarian Republic of Venezuela. The Centre noted the suspension of the proceeding pursuant to Arbitration Rule 9(6). On 23 August 2021, the two unchallenged members of the Tribunal, Prof. Angelet and Prof. Giardina, rendered a "Decision on the Proposal for the Disqualification of Arbitrator Mr. Stephen Drymer". The Proposal for disqualification was rejected and all questions concerning the costs and expenses in connection with the proceeding on the Proposal were reserved for subsequent determination.

24.    On 21 September 2021, after various exchanges, the Tribunal issued Procedural Order No. 2, establishing an adapted procedural calendar reflecting the suspension of the proceeding.

25.     On 15 October 2021, the Respondent submitted a second proposal for the disqualification of Mr. Drymer, arguing in substance that the circumstances in which Arbitrator Drymer had resigned from one of the other arbitrations against Venezuela had exacerbated its concerns as to the appropriateness of his participation in the present proceeding. Also on this occasion, the Centre noted the suspension of the proceeding pursuant to Arbitration Rule 9(6). By decision of 10 November 2021, the two unchallenged arbitrators rejected the second proposal for disqualification as unfounded and reserved all questions concerning the costs and expenses in connection with the proceeding on the Second Proposal for subsequent determination.

26.     On 24 November 2021, the Tribunal issued Procedural Order No. 3 setting out the adapted schedule for the arbitration.

27.     On 6 December 2021, the Respondent submitted its Counter-Memorial (the "**Respondent's Counter-Memorial**"), together with Exhibits R-1 through R-36, and Legal Authorities RL-1 through RL-24.

28.     On 10 January 2022, the Respondent submitted the "Bolivarian Republic of Venezuela's Redfern Schedule", comprising the "Claimants' General and Specific Objections of 27 December 2021", and "The Bolivarian Republic of Venezuela's Redfern Schedule of 10 January 2022 with Replies to Claimants' Objections".

29.     On 9 February 2022, the Tribunal issued Procedural Order No. 4 on document production.

30.     On 7 April 2022, the Claimants submitted their Reply (the "**Claimants' Reply**"), together with Exhibits C-91 through C-97, and Legal Authorities CL-6 through CL-17.

31.     On 19 May 2022, the Respondent submitted its Rejoinder (the "**Respondent's Rejoinder**"), together with Exhibits R-43 through R-62, and Legal Authorities RL-26 through RL-31.

32.     On 6 September 2022, the Tribunal issued Procedural Order No. 5 on the organization of the hearing.

33.    On 6 September 2022, the Tribunal sent the Parties a list of "issues on which it invites the Parties to comment" at the hearing.

34.    On 20 September 2022, having been informed that Prof. Giardina was suffering from an incapacity to travel to Paris to participate in an in-person hearing as originally envisaged, and after having heard the Parties at length and in detail, the Tribunal decided to maintain the hearing dates and to hold a hybrid hearing, with the President, the Secretary and the Parties participating in person and both co-arbitrators participating remotely.

35.    On 29 and 30 September 2022, the hearing was held in the just-mentioned format at the Westin Paris Vendôme Hotel in Paris, France. In addition to the Members and Secretary of the Tribunal (Prof. Giardina and Mr. Drymer participating remotely), the following individuals were present at the hearing:

For the Claimants:

Mr. Constantine Partasides KC
Mr. Gaëtan Verhoosel KC
Ms. Leilah Bruton
Mr. Mihir Chattopadhyay
Ms. Kelly Renehan
- Three Crowns LLP

Mr. Robert Wood
Mr. Eugene J Silva II
- ExxonMobil Corporation

For the Respondent:

Dr Alfredo De Jesús O
Mr. Pierre Daureu
Mr. Victor Datry
Ms. Daniela Brito Pusic
- Alfredo De Jesús O | Transnational Arbitration & Litigation

Mr. Henry Rodriguez Facchinetti
- Attorney General's Office

36.    On 19 January 2023, the Tribunal issued Procedural Order No. 6 entitled "Decision on the Respondent's Request for the Production of Documents Identified as Privileged by the

Claimants". The Respondent's request to order the production of the documents listed in the Claimants' privilege log was rejected as unfounded, and the Tribunal reserved all questions concerning the costs and expenses for subsequent determination.

37.    On 10 March 2023, the Parties simultaneously filed their submissions on costs (the "**Claimants' Submission on Costs**", together with Legal Authorities CL-19 through CL-25; and the "**Respondent's Submission on Costs**", together with Legal Authorities RL-32 through RL-35.  On 24 May 2023, the Claimants filed an Updated Submission on Costs to reflect a payment of advances on costs made by them in substitution for the Respondent.

38.    The Tribunal declared the proceedings closed on 14 June 2023.

## III.    SUBMISSIONS OF THE PARTIES

39.    The Tribunal will address the Parties' submissions in detail in its analysis. At this stage, the submissions can be summarized as follows.

### A.    THE CLAIMANTS' SUBMISSIONS

40.    The Claimants have, in substance, submitted as follows.

41.    _First,_ the facts are not in dispute.[2]  In particular:

-    After its investments in Venezuela were expropriated in 1975, Mobil considered reinvesting in the country on the occasion of the "_Apertura Petrolera_" in 1994, provided it obtained sufficient incentives and assurances.[3]

-    A deal was reached for an investment in the "Cerro Negro Project", based on Conditions enunciated by the Venezuelan Congress, on the one hand (the "**Congressional Conditions**" or the "**Conditions**")[4] and an agreement between Mobil

---

[2] Claimants' Reply, §§8 ff.
[3] Claimants' Memorial, §§21 ff.
[4] Claimants' Memorial, §§41 ff.

and Lagoven, a subsidiary of the Venezuelan State company PDVSA, on the other hand: the Cerro Negro Association Agreement or the "**CNAA**"[5].

- Clause 15 of the CNAA notably provided, in substance, that in case of discriminatory measures taken by the Venezuelan State, Mobil would under a series of enumerated conditions be compensated by Lagoven.[6]

- After Mr. Hugo Chávez was elected President of Venezuela in December 1998, Venezuela "train[ed] its sights" on the Cerro Negro Project among others. It initiated a series of measures starting with the 2001 Hydrocarbons Law which negatively affected Mobil's investment, fiscal measures, production and export curtailments,[7] and culminating in the expropriation of the Cerro Negro Project.[8]

- This caused the Claimants to initiate ICSID arbitration proceedings on the basis of the Netherlands-Venezuela BIT (the "**BIT**") as well as an ICC arbitration in application of Clause 15 of the CNAA and the CNAA compensation mechanism set out therein (the "**CNAA Compensation Mechanism**"). The latter resulted in the award of approximately USD 747 million in damages (the "**ICC Award**").[9] The former resulted in the First Award of 9 October 2014 which was subsequently partially annulled by the *Ad hoc* Committee in a decision dated March 9, 2017 (the "**Annulment Decision**").[10]

42.    *Second*, the resubmission proceeding is limited to the determination of the fair market value of the Claimants' investment, which was not and could not have been determined by the *Ad hoc* Committee.[11]  In particular:[12]

---

[5] Exhibit C-37 and R-2.

[6] Claimants' Memorial, §§46 ff.

[7] Claimants' Memorial, §§72 ff.

[8] Claimants' Memorial, §§84 ff.

[9] Claimants' Memorial, §§101 ff. The abovementioned amount is the compensation due to the Mobil parties after set-off of Lagoven's counterclaims.

[10] Claimants' Memorial, §§106 ff.

[11] Claimants' Memorial, §140; Claimants' Reply, §9 ff.; Hearing Transcripts, Day 1, pp. 13-18, 43-51.

[12] Claimants' Reply, §§22 ff., §§95-96.

- Since the authority given to *ad hoc* committees is that of nullity and not of substantive revision, the *res judicata* effect of annulment decisions is limited to their *dispositif*.

- The *Ad hoc* Committee's decision's reasons cannot, in any event, be accorded a *res judicata* effect which is denied by the Committee itself.

43.   <u>*Third*, the Respondent's "threshold" argument that the damage sustained by the Claimants has been compensated through the CNAA Compensation Mechanism in accordance with the ICC Award, so that there is no further damage to be 'mitigated' or otherwise compensated by means of the ICSID proceeding against the Respondent, is unfounded</u>. In substance:[13]

- This issue cannot be decided on a "threshold" basis because it goes at the heart of the matter in this proceeding, namely whether the CNAA Compensation Mechanism had the effect of inoculating Venezuela against a claim for compensation under international law.

- The Claimants' ICSID claim is not a claim under the CNAA but under the BIT.

- The Claimants have only recovered limited compensation under the CNAA.

- The obligation to 'mitigate' under the CNAA extends to "any" damage, not only to damages contemplated by the terms of the CNAA.

- In any event, the Respondent's characterization of the ICC Award rendered pursuant to the CNAA compensation mechanism is misleading.

44.   <u>*Fourth*, the Respondent owes compensation for the expropriation</u>:[14]

- It results from the non-annulled parts of the First Award that the Respondent owes compensation in accordance with Article 6.c of the BIT, that is, the fair market value

---

[13] Claimants' Reply, §§25 ff.
[14] Claimants' Memorial, §§145 ff.; Claimants' Reply, §§36 ff.; Hearing Transcripts, Day 1, pp. 17 ff.

of the Claimants' investment, which according to the First Award must be identified on the basis of a "willing buyer, willing seller" analysis.[15]

- The fair market value must be determined by reference to the bundle of rights granted to the Claimants under the CNAA, which grant the Claimants an unencumbered right to the proceeds of the Cerro Negro Project for the thirty-five-year term of the CNAA.[16]

- It follows that the Tribunal must adopt the DCF calculation arrived at by the First Tribunal.[17]

45.    _Fifth_, the Claimants' rights are not limited by the Congressional Conditions. In substance:[18]

- Having been the subject of negotiation between the parties to the CNAA, the relevant Congressional Conditions were absorbed into the CNAA.

- In any event, the Conditions do not mandate the application of the CNAA Compensation Mechanism to limit the Respondent's responsibility for breach of the BIT. In particular, the Conditions do not alter the applicable fair market value standard of compensation under international law. Neither of the Conditions at issue – the Eighteenth and Twentieth Conditions – even mentions international law.

- The Eighteenth Condition sets forth that nothing in the CNAA could restrict Venezuela's sovereign power, which means that the State had the right to expropriate, but not that it was dispensed with paying compensation as required under international law.

- Unlike what the Respondent asserts, the Twentieth Congressional Condition does not establish that the Claimants should not be deemed to have suffered any damages if the CNAA compensation is paid. The Twentieth Condition rather makes clear that the

---

[15] Claimants' Memorial, §§147 ff.; Claimants' Reply, §§36 ff.
[16] Claimants' Reply, §§39 ff.; Hearing Transcripts, Day 1, pp. 19, 24-25.
[17] Claimants' Reply, §46.
[18] Claimants' Memorial, §§158 ff.; Claimants' Reply, §§50 ff.; Hearing Transcripts, Day 1, pp. 52-62.

indemnity provision to be included in the CNAA would not apply in circumstances where the price of oil was above the "maximum price" specified in the CNAA.

- If the Claimants had waived their right to claim compensation under international law, this would have had to be reflected in the CNAA by way of an express waiver. Absent such a waiver, application must be made of the principle that a State may not rely on the provisions of its internal law as justification for a failure to comply with its international obligations, namely the obligation to make full reparation for an internationally wrongful act for which it is responsible.

46.    _Sixth_, the Claimants' rights under the BIT are not limited by the CNAA. In substance:[19]

- The payment of compensation by Venezuela under the BIT is distinct from the compensation owed by PDVSA under the CNAA.[20]

    The claim submitted to and determined by the First Tribunal was for breach by the Respondent of the BIT, not for breach by PDVSA of the CNAA.

    The Respondent is neither a party to, nor a beneficiary of, the CNAA. The CNAA expressly states that the agreement "is not intended to confer any benefits upon, or to create any rights in favor of any Person or entity other than the Parties and the Association Entities".

    The CNAA also provides, as required by the Eighteenth Congressional Condition, that the CNAA, as well as the activities and operations contemplated therein, shall in no event impose obligations on the Respondent or limit the exercise of its sovereign powers. By the same token, it follows that the agreement does not reduce the Respondent's corresponding obligation to compensate for internationally cognizable harm arising from the exercise of its sovereign powers.

---

[19] Claimants' Memorial, §168 ff.; Claimants' Reply, §§60 ff.; Hearing Transcripts, Day 1, pp. 19 ff., 30 ff., 87 ff.
[20] Claimants' Memorial, §168 ff.

The CNAA compensation provides the Claimants with a contractual remedy against PDVSA in relation to the project, *in addition to* its rights under international law. This does not absolve the Respondent of its separate obligation to provide just compensation under the BIT. The CNAA Compensation Mechanism is the very opposite of an exclusive remedy in that (i) it expressly contemplates that the Claimants may also claim compensation for damages under international law in another forum against the State; and (ii) it does not limit the fact or amount of compensation that might be obtained in pursuit of such other remedies against the State in a different forum on a different legal basis.

- Given that the First Tribunal already factored the risk of expropriation into the discount rate that it applied to calculate the fair market value of the Cerro Negro Project, a further reduction of the value of the Project in light of the CNAA compensation would effectively reduce the Claimants' compensation twice.[21]

- Mobil's interest in the Cerro Negro Project was not limited to the CNAA compensation:[22]

  o The Claimants' bundle of rights is not limited to the CNAA compensation. It is not only the Claimants' contractual rights to the CNAA compensation that have been expropriated, but the entirety of their interests in the project, including their right to take their share of production and monetize it. The BIT valuation must encompass all of those rights.

  o Nothing in the CNAA caps the Claimants' entitlement to profits if oil prices increase.

  Clause 13 of the CNAA makes detailed provision for the determination of the fair market value of the parties' participating interests in the project if Veba Oel seeks

---

[21] Claimants' Memorial, §179.

[22] Claimants' Memorial, §§58 ff., §§168 ff.; Claimants' Reply, §§60 ff.; Hearing Transcripts, Day 1, pp. 19 ff., 30 ff. Hearing Transcripts, Day 2, pp. 8 ff. In summarizing this submission, the Tribunal has adapted the order of the arguments in the Claimants' Reply so as to regroup the various points regarding the scope of the CNAA.

to transfer its interest to a third party or if one participant in the project seeks to acquire the interest of a second participant after that second participant has undergone a change of control. Yet Clause 13 does not indicate that the fair market value of a party's interest would be limited by the Threshold Cash Flow.

There is nothing Clause 15.1(a) of the CNAA that limits the Claimants' right to recover "any damages" suffered as a result of a Discriminatory Measure. The only limitation in Clause 15.2(a) relates to *PDVSA-CN's* obligation to compensate. In line with this, Clause 15.2 is actually entitled "Limitation on Lagoven CN's [i.e., PDVSA-CN's] Obligation".

Clause 15.2(b) of the CNAA makes clear that PDVSA-CN has no obligation to pay any indemnity for Discriminatory Actions that occur after the Venezuelan State reduces its interest in the project. If the Claimants' right to compensation were limited to the CNAA compensation, Venezuela could avoid paying any compensation at all by reducing its interest before expropriating the project. Such a result would be patently absurd.

The meaning of the relevant provisions of the CNAA is clear and does not require interpretation on the basis of extrinsic evidence.

o   If the Respondent's analysis were right, it would mean that the CNAA intended to distinguish between different classes of shares, which it clearly does not.

o   In effect, the Base Price of USD 27/barrel had been exceeded since 2004 and the Claimants accordingly earned higher revenues based on the higher price.

-   The Claimants did not agree to limit their compensation in the event of an expropriation. In substance:[23]

---

[23] Claimants' Memorial, §§180, 188 ff.; Claimants' Reply, §§85 ff.

o  This would require that the CNAA compensation was exclusive in nature *and* that the Claimants had waived all other remedies, present and future, under all sources of law.

o  Clause 15.1(a) of the CNAA provides for the investor's affirmative obligation to pursue any available legal recourse to mitigate any damages it has suffered. It necessarily follows that the CNAA compensation was the opposite of an exclusive remedy in the event of an expropriation. The Respondent's position is also at odds with the negotiating history of the CNAA.

The Respondent errs in relying on the reasons of the Annulment Decision in this regard, since the Annulment Decision states in the clearest possible terms that the Committee "has no need to decide the point".[24] In any event, the Committee's reasons on which the Respondent seeks to rely are contradicted by the terms of the CNAA itself. Clause 15.1(a) contemplates the scenario in which the Claimants would receive compensation from Venezuela *after* receiving compensation from PDVSA-CN. The "aim" of the separate legal action is not to mitigate the liability of Lagoven/PDVSA, it is to mitigate "any damages suffered as a result of the Discriminatory Measure". Unlike what the Respondent asserts, this is not contradicted by statements made by the Claimants in the jurisdictional phase of the First Arbitration.

Clause 15.1(a) of the CNAA also provides that any net benefits received by the investor as a result of the pursuit of the aforesaid legal actions shall be (i) applied against any amount ultimately determined to be owed by Lagoven/PDVSA pursuant to this Clause or (ii) reimbursed to Lagoven/PDVSA if Lagoven/PDVSA has previously made payments to the investor with respect to the Discriminatory Measure in question. In this way, the CNAA expressly recognized that the compensation obtainable from Venezuela for a Discriminatory Measure might exceed that which could be recovered from Lagoven/PDVSA under the CNAA.[25]

---

[24] Annulment Decision, §163.
[25] Claimants' Memorial, §§62-63.

o It is incorrect that the CNAA compensation must be an exclusive remedy because, at the time of the execution of the CNAA, Mobil enjoyed no treaty protection.

Prior to executing the CNAA, Mobil was aware that it could benefit from the protection of a bilateral investment treaty in the future. If Mobil had agreed to waive all available remedies, present and future, then one would expect to see clear language to that effect. It is notable that the Respondent never objected to the jurisdiction of the First Tribunal on the basis that Mobil had somehow waived its rights to recourse against Venezuela for an expropriation. Also, the BIT is clear that its protections apply "to investments which have been made before"[26] to its entry into force.

The Common Security Agreement that Mobil (MCN) and PDVSA-CN entered into in 1998 for the financing of the Cerro Negro Project contemplates arbitration against Venezuela as a means to pursue and collect "Expropriation Compensation", thus demonstrating that the parties were aware of the possibility of future recourse to investor-State arbitration.

Even if there were no available "international" law remedies against Venezuela at the time of the CNAA, the Claimants could still pursue domestic law remedies against the State, confirming that the CNAA compensation was not an exclusive remedy.

o The Claimants could not have agreed to limit their international right to compensation in an agreement with PDVSA because Venezuela was not a party to that agreement and could not enjoy any benefits under that agreement.

o The contours of the investment and how it is to be valued have nothing to do with whether the Respondent can rely on the CNAA Compensation Mechanism to constrain its liability under the BIT.

---

[26] BIT, Article 10.

47.    *Seventh*, the CNAA Compensation Mechanism <u>does not represent the fair market value of</u> <u>the investment in accordance with a 'willing seller, willing buyer' analysis.</u> In substance:[27]

-    The CNAA Compensation Mechanism can enhance the value of the Claimants' rights, but not reduce them. The value of the CNAA compensation, as a contractual right, cannot represent the entire value of the bundle of rights enjoyed by Mobil under the CNAA. Were it otherwise, it would lead to the absurd result that if the CNAA did not contain the compensation mechanism, the project would have no value.

-    No willing buyer and willing seller would transact on the basis of Venezuela's interpretation of the CNAA Compensation Mechanism. A willing buyer would not assume that all net cash flows in excess of the CNAA compensation would be taxed away by Venezuela the day after purchase. A willing seller, absent duress, would never sell for the value of the CNAA compensation where, even in the worst-case scenario, it would receive that limited compensation from PDVSA in any event after enjoying unlimited cash flows for each day that the Cerro Negro Project was not expropriated.

-    The Respondent is wrong in arguing that the First Tribunal determined that compensation for the expropriation must be calculated as of 26/27 June 2007 and that, as of that date, any willing buyer would have known that expropriation was imminent. This argument ignores Article 6.c of the BIT and corresponding principles of international law according to which compensation shall represent the market value of the investments affected "immediately before the measures were taken or the impending measures became public knowledge, whichever is the earlier".[28]

-    The First Tribunal factored in political risk in its determination of the discount rate, which was left undisturbed by the Decision on Annulment. However, no willing buyer would have equated the fair market value of that investment with the CNAA

---

[27] Claimants' Memorial, §§181 ff.; Claimants' Reply, §§109 ff.; Hearing Transcripts, Day 1, pp. 64 ff.; Hearing Transcripts, Day 2, pp. 22 ff.

[28] This summary brings together the arguments set out in the Claimants' Reply at §§111-115, 119-120, respectively, which the Claimants bring separately in response to the Respondent's arguments but which the Claimants answer in the same way by reference to Article 6.c of the BIT.

compensation on the assumption that expropriation had already occurred and all that was left was the CNAA compensation.

48.   *Eighth*, the Respondent's DCF analysis, which aims at factoring the limitation on compensation from the CNAA into the First Tribunal's DCF analysis, is irrelevant.[29] The Tribunal's mandate is to answer a single, binary question: whether a willing buyer and willing seller of Mobil's interest in the  project would have transacted at (i) a price equal to the fair market value as determined by the First Tribunal; or (ii) a price equal to the remedy owed by PDVSA under the terms of the CNAA.

49.   On these bases, the Claimants request the Tribunal to order the Respondents to pay Claimants USD 1,411.70 million, all of the costs and expenses of the resubmitted dispute on a full indemnity basis, plus interest on all damages, costs, and expenses, as well as post-award interest from 27 June 2007 on the amount awarded until full payment thereof, at an annual compound rate of 3.25%; and any such other and further relief that the Tribunal may deem appropriate in the circumstances.

**B.   THE RESPONDENT'S SUBMISSIONS**

50.   Without prejudice to the more detailed analysis contained in later sections of the Award, the Respondent's submissions can be summarized as follows.

51.   *First*, since the Claimants already received compensation pursuant to the CNAA, there is no further damage to mitigate in the present proceeding and the Claimants' claim must be summarily dismissed. In substance:[30]

-   The Claimants have themselves declared that the ICSID proceeding was "the prior filed case for the purpose of mitigating the damages in [the ICC] case" in accordance with Clause 18 of the CNAA.

    The aim of the CNAA-mandated mitigation proceeding is to lessen the damages payable thereunder, not to expand the underlying right to compensation.

---

[29] Claimants' Reply, §§121 ff.
[30] Respondent's Counter-Memorial, §§12 ff.; Respondent's Rejoinder, §§11 ff.

- The Twentieth Congressional Condition establishes that Mobil should not be deemed to have suffered any damages at any time when it was receiving income from the project equal to a price of crude oil above the maximum price specified in the CNAA. That "maximum price" or "Threshold Price" is the very basis upon which the ICC Tribunal determined Mobil's compensation for the 2007 expropriation.

- The Claimants' arguments that the limitation on compensation cannot apply in the present proceeding, which is brought under the BIT and not the CNAA, that the Respondent cannot rely on the CNAA to which it is not a party, and that the Congressional Authorizations cannot be relied upon on the international plane, have all been rejected by the *Ad hoc* Committee.

- The ICC Tribunal established that it was the common intention of the parties to the CNAA that the State company, PDVSA, would provide a capped compensation in case of expropriation pursuant to the compensatory provisions of Clause 15 of the CNAA. The Claimants fail to bring any evidence on the negotiation history of the project showing that the CNAA compensation was an "extra layer of protection", that is, an additional, contractual remedy against PDVSA independent from remedies available against the State under international law.

- It is partly because the First Tribunal disregarded the limitation on compensation, and because of the First Tribunal's misconception of what constituted the Claimants' bundle of rights, that the *Ad hoc* Committee partially annulled the First Award.

52. *Second*, the limitation on compensation was an express condition to the authorization of the project by the Respondent. In substance:[31]

- Upon its decision to invest in the project in the early 1990s, Mobil, which had experienced nationalization in Venezuela in 1975, was determined to negotiate specific arrangements dealing with the possibility of sovereign measures adversely affecting

---

[31] Respondent's Counter-Memorial, §§19 ff.; Respondent's Rejoinder, §§101 ff.; Hearing Transcripts, Day 1, pp. 130-131, 134 ff.; Hearing Transcripts, Day 2, pp. 44-46, 50, 54 ff., 62 ff.

the project economics. The basic legal structure on compensation that Mobil negotiated, under which no compensation was due if the price of crude oil exceeded an express cap, was an essential condition to the project's authorization by the Venezuelan Congress.

- The 1996 Heads of Agreement between Lagoven and Mobil already provided for a limitation of liability under which the foreign party would be deemed not to have suffered what was defined as a "Material Adverse Impact" when the price of crude oil exceeded a price to be specified in the CNAA. This mechanism aimed at ensuring that the State would be able to capture the benefit of "excess" or "windfall" profits generated by high oil prices, while at the same time protecting cash flows that would be generated by ordinary prices. It was expressly linked to the fact that it was envisaged at the time that Venezuela, through Lagoven, would hold between 49% and 51% of the project.

- The Congressional Conditions expressly reserved the State's sovereign powers to change its domestic law (the Eighteenth Condition) and provided for a mechanism which clearly established the principle that compensation of the foreign party was limited pursuant to a formula based on the price of crude oil (the Twentieth Condition).

- The CNAA subsequently established that the Cerro Negro Project was to be carried out in accordance with the Congressional Conditions. Article 23.11 of the CNAA provided that "[t]his Agreement, as well as the activities and operations contemplated hereby, shall in no event impose any obligation on the Republic of Venezuela or limit the exercise of its sovereign rights. In addition, Article 23.11 of the CNAA made it clear that the Republic did not guarantee any obligations undertaken by any party under the agreement. In sum, if a "Discriminatory Measure" from Venezuela resulted in "Material Adverse Impact", the "Foreign Party" was entitled to receive compensation from the State entity (PDVSA) capped at the Threshold Cash Flow. However, the "Foreign Party" was not entitled to compensation if Venezuela reduced its participation in the Project or if the "Foreign Party" received the Threshold Cash Flow irrespective of whether any "Discriminatory Measure" had taken place. This meant that the only

cash flow protected under the Cerro Negro Association Agreement was the Threshold Cash Flow.

- The above is confirmed by the evidence of the Claimants' own witnesses and experts, the evidence of the Respondent's witness, and what the Respondent refers to as the "piecemeal factual evidence adduced by the Mobil Parties over the last 15 years before being ordered to produce all documents in their possession discussing the Limitation on Compensation between 1 January 1995 and 30 October 1997",[32] in respect of which the Tribunal is requested to draw all appropriate adverse inferences against the Claimants.[33]

- The operation of the limitation on compensation was confirmed by the ICC Tribunal.

53. *Third,* while the First Tribunal ignored the limitation on compensation, the Annulment Decision confirmed the Respondent's position and invalidated the Claimants' position. In substance:[34]

- The First Tribunal did not address the Respondent's contention that the rights attached to the investment for which the Claimants seek compensation were framed by the CNAA. The First Tribunal erred in postulating that Clause 15 of the CNAA contemplated two separate avenues for the Claimants to claim compensation, one against Lagoven/PDVSA, which was bound by the CNAA limitation on compensation; and another against the Respondent to which the limitation did not apply.

The *Ad hoc* Committee upheld the Respondent's position that the First Tribunal had manifestly exceeded its powers by failing to apply the applicable law and the special agreements relating to the Claimants' investment, notably the CNAA, thereby disregarding the basic terms and conditions on which that investment was authorized; and that the First Tribunal had failed to state reasons for setting aside altogether the

---

[32] Respondent's Rejoinder, §80.

[33] Respondent's Rejoinder, §§84 ff.

[34] Respondent's Counter-Memorial, §§65 ff.; Respondent's Rejoinder, §§27 ff.; Hearing Transcripts, Day 1, pp. 184-186.

potential relevance of the CNAA Compensation Mechanism for the purpose of applying the provisions of the BIT. The *Ad hoc* Committee rightly considered, notably, as follows.

- The First Tribunal incorrectly read out of Article 9.5 of the BIT, both the "special agreements relating to the investments" and Venezuelan law. It also added references to customary international law to the list of sources of applicable law when it ruled that the effect of the Congressional Authorization and the CNAA must be governed by international law or that said body of rules cannot exempt or excuse the Respondent from its obligations under the BIT or under customary international law.

- The principle that a State may not invoke its domestic law to avoid its international obligations presupposed a conflict between domestic and international norms. No such conflict existed in the case at hand. The First Tribunal's assumption that there was a conflict between Venezuelan law (as requiring the application of the limitation on compensation) and the BIT, was directly contradicted by the First Tribunal's prior determination that the 2007 expropriation was lawful.

- The *res inter alios acta* principle adopted by the First Tribunal (i.e., that the CNAA could not be invoked by the Respondent as it was not a party to the agreement) was not germane to the real point at issue, namely what was the investment that had been expropriated and how was it to be valued for compensation purposes.

- At no stage did the First Tribunal discuss why the CNAA limitation on compensation could not bear any relevance in the assessment of the market value of the Claimants' investment. To determine that the Eighteenth and Twentieth Congressional Conditions did not displace Venezuela's international obligations was not at all synonymous with determining that they had no relevance for the ascertainment of the content and consequences of those obligations.

- Property was not a quantity that was, or could be, created by international law. An investment consisted of rights created under national law.

- These reasons of the Annulment Decision notwithstanding, the Claimants reiterate the same four lines of arguments advanced in previous stages of the dispute before both the First Tribunal and the *Ad hoc* Committee: (i) the *res inter alios acta* argument according to which the Republic could not oppose the application of the compensation mechanism, as it is not a party to the CNAA; (ii) the "non-exclusive remedy" argument based on an erroneous reading of CNAA Clause 15 and a non-existent obligation under international law to compensate investors for the nationalization of rights that they do not hold; (iii) the "national law" argument based on the rule of customary international that a "party may not invoke the provisions of its internal law as justification for its failure to perform a treaty", according to which the Respondent could not invoke the CNAA limitation on compensation since it would run against its international obligations; and (iv) the "treaty claims/contract claims" argument that the limitation on compensation could not operate at the level of international law. Each one of these arguments has been expressly rejected by the *Ad hoc* Committee.

- While the Claimants criticize and try to narrow down the consequences of the Annulment Decision, they do not have the right to retry their original or annulment cases in this resubmitted proceeding. The Tribunal cannot ignore the findings of the *Ad hoc* Committee. Such a possibility would threaten the integrity of the ICSID system, allowing investors to re-litigate their claims for eternity.

54. *Fourth*, the scope of the resubmission proceeding consists in implementing the limitation on compensation in the DCF analysis upheld by the First Tribunal.[35]

- In paragraph 196.4 of the Annulment Decision, the *Ad hoc* Committee held that only the first sentence of paragraph 368 of the First Award remained unaffected. This means *a contrario* that the second sentence of that paragraph was indeed annulled by the Committee. The Committee thus made it clear that while the applicable discount rate was upheld (first sentence), the arithmetical result of the DCF quantification could not be upheld (second sentence).

---

[35] Respondent's Counter-Memorial, §§118 ff.; Hearing Transcripts, Day 1, pp. 165-167.

- The issue that the Tribunal must determine is the effect of the limitation on compensation on the market value of the Claimants' investment.

- The *Ad hoc* Committee has dismissed the Claimants' arguments that (i) the limitation on compensation is contractual in nature and cannot apply to the State's responsibility under the BIT and (ii) that the limitation on compensation forms part of the Respondent's domestic law and cannot exempt or excuse the Respondent from its obligations under international law. None of these arguments address the Respondent's position that a State must be deemed entitled to have the basic conditions on which a foreign investment is authorized, respected.

- As established by the First Tribunal, a willing buyer would have necessarily taken into account the risk of potential expropriation and would therefore have valued the investment by reference to the CNAA limitation on compensation.

55. *Fifth*, the market value of the Claimants' investment pursuant to Articles 6 and 9.5 of the BIT is determined by the CNAA and the Congressional Authorization and corresponds in essence to the protected (capped) cash flow based on the threshold price of USD 27 per barrel. In substance:[36]

- Whereas international law generally governs the standard of compensation for the expropriation of an investment by a sovereign State, the nature and scope of an investment and the rights attached thereto are determined pursuant to the national law that creates said investment and/or rights.

  The nature and scope of the expropriated rights for which the Claimants seek compensation under Article 6 of the BIT are defined by Venezuelan domestic law, and in particular by the Congressional Authorization and the CNAA. The Tribunal must apply the Congressional Conditions and the CNAA pursuant to Article 9.5 of the BIT. The CNAA and in particular the limitation on compensation qualifies as a special agreement applicable to the Claimants' investment in the terms of Article 9.5 of the

---

[36] Respondent's Counter-Memorial, §§138 ff.; Respondent's Rejoinder, §§101 ff.

BIT and must therefore be given full effect when valuing the "market value" of the investment pursuant to Article 6 of the BIT.

- The Claimants are wrong in arguing that the cash flow deriving from the CNAA limitation on compensation cannot equate to the entire value of the contract on the ground that this would lead to the absurd result that if the CNAA did not contain the limitation on compensation, the project would have no value.  In fact, absent the limitation, the Claimants' potential compensation would be unrestricted.

    The Claimants are also wrong in arguing that applying the limitation on compensation would improperly double-count the risks faced by the project. The limitation on compensation is not a risk "faced by the project".

- Pursuant to the CNAA and the Congressional Authorization, the Claimants were only entitled to the SCO Protected Cash Flow, that is the Synthetic Crude Oil Threshold Cash Flow (defined in the CNAA as, in substance, the cash flow equivalent to the Threshold Price of USD 27 per barrel), adjusted for transportation and quality differentials.

    The purpose of the CNAA compensation mechanism was to ensure that the State would be able to capture the benefit of "excess" or "windfall" profits generated by high oil prices, while at the same time protecting cash flows generated by ordinary prices.

    Absent the possibility to bring a treaty claim against the Venezuelan State, Mobil negotiated an arbitration agreement with Lagoven coupled with Lagoven's limited obligation to compensate Mobil for the Venezuelan State's "Discriminatory Measures". Nothing corroborates the Claimants' position that this compensation mechanism was negotiated as an "additional layer of protection".

    The *Ad hoc* Committee found that the Claimants' interpretation of the CNAA as a non-exclusive additional protection was not compatible with the terms of Clause 15 of the CNAA, which make clear that the purpose of any recourse the Claimants could initiate against Venezuela would be to mitigate Lagoven's liability under the CNAA.

26

56.    *Sixth,* a willing buyer would have only agreed to pay the equivalent of the SCO Protected Cash Flow to acquire the Claimants' interest in the project. In substance:[37]

-    The First Tribunal found that the standard of "just compensation" of Article 6 of the BIT corresponded to the amount that a willing buyer would have been ready to pay to a willing seller on 27 June 2007 in order to acquire the Claimants' investment. This finding was not annulled by the *Ad hoc* Committee.

-    A willing buyer would notably take into consideration the nature of the investment, the circumstances in which it would operate in the future and its specific characteristics. Any such willing buyer would have performed a normal due diligence in the course of which it would have reviewed the Congressional Authorization, the CNAA, as well as all relevant key documents, such as the Heads of Agreement. An informed, prudent and reasonable willing buyer would have reached the conclusion that the Venezuelan State was free to capture through taxes or otherwise all cash flow in excess of the SCO Protected Cash Flow under the CNAA limitation on compensation.

-    The Claimants are wrong in arguing that a willing buyer would not have assumed that all net cash flows in excess of the CNAA protected cash flow would have been "taxed away by Venezuela the day after purchase". As the First Tribunal held "it is precisely at the time before an expropriation (or the public knowledge of an impending expropriation) that the risk of a potential expropriation would exist, and this hypothetical buyer would take it into account when determining the amount he would be willing to pay in that moment". Moreover, on 26 June 2007, the process established under Presidential Decree No. 5.200 to migrate the Cerro Negro association to a mixed company was ending. Any willing buyer would have rightly assumed that expropriation was imminent. In any event, it is absurd to suggest that a hypothetical buyer would not have factored the political risk of expropriation into its decision.

---

[37] Respondent's Counter-Memorial, §§185 ff.; Respondent's Rejoinder, §§166 ff.; Hearing Transcripts, Day 1, pp. 171 ff.

- The Claimants are wrong in arguing that no willing seller would have sold its interest in the project for the value of the CNAA protected cash flow "where, even in the worst case scenario, it would receive that [cash flow] from PDVSA in any event after enjoying unlimited cash flows for each day that the Cerro Negro Project was not expropriated". In circumstances where the First Tribunal held that the 2007 expropriation was lawful, there is no reason to ignore that on 26 June 2007, a willing buyer would have been aware that it would not enjoy "unlimited cash flows" since the migration process was ending. In fact, the day just before, a signing ceremony for the migration process of the other associations of the Orinoco belt was held in Caracas which BP, Chevron, Total, Statoil, and Eni all attended. Hence, on 27 June 2007 any reasonable willing buyer would have considered it best to conclude a transaction for no more than the value of the CNAA protected cash flow.

- The Claimants are wrong in arguing that the First Tribunal's reference to the situation on 26/27 June 2007, must be read in light of the "*international practice*" as per which the acts of the expropriator preceding the expropriation that adversely affect the value of the investment must be ignored. First, the First Tribunal found that the 2007 Expropriation was lawful. Second, the case law to which the Claimants refer relates to measures taken "shortly ahead" of the expropriation, that "intended to diminish the value" of the investment. This is not the case here.

- The Claimants are wrong in arguing that "a willing buyer would never purchase an asset that was about to be expropriated". The question is not what a willing buyer would have made *in abstracto* but how a hypothetical willing buyer would have valued *in concreto* Mobil's interest in the project on 26/27 June 2007. At that date, the expropriation was not "a fatality". A willing buyer could have decided to purchase the 41.33% Mobil's interest in the project taking into account the CNAA limitation on compensation. It could then have finalized the migration process through negotiations with a view to maintaining up to a 40% ownership interest in the project and benefiting from high crude oil prices.

- The Claimants are wrong in arguing that a hypothetical willing seller would not have accepted to divest its interest in the project taking into account the CNAA limitation on compensation on the ground that that would have entailed the seller foregoing its right under the BIT to recover the "market value" of its interest. The CNAA limitation on compensation did entail a limit to the Claimants' right to seek relief in the event of expropriation. A willing seller would not have refused to sell based on the speculative chance that it might circumvent that contractual limit and obtain compensation additional to that due under the CNAA.

57.    _Seventh_, factoring the limitation on compensation into the First Tribunal's DCF analysis leads to a total compensation of USD 485,846 million. In substance:[38]

- It follows from the reports of the Respondent's experts before the First Tribunal that the CNAA limitation on compensation affects only one of the parameters of the First Tribunal's DCF analysis in Annex 1 of the First Award, namely the projected price of SCO oil for each year between 2007 and 2035. Therefore, the First Tribunal's DCF calculation must be made anew, using the parameters and assumptions established by the First Tribunal, while revising the "SCO Price" parameter based upon the CNAA limitation on compensation. This is what the Respondent refers to as the "Finalized DCF".

- By suggesting that the Tribunal's mandate is limited to upholding either the First Tribunal's DCF calculation or the ICC Tribunal's calculation, the Claimants wrongly imply that the Tribunal would have the power to replace the First Tribunal's DCF with the calculation the ICC Tribunal has made based on arguments and documents that have not been brought before the Tribunal.

- Taking into consideration the CNAA limitation on compensation, the market value of the Claimants' investment is of USD 485.846 million.

---

[38] Respondent's Counter-Memorial, §§197 ff.; Respondent's Rejoinder, §§169 ff.; Hearing Transcripts, Day 1, pp. 182 ff.

58.    On these bases, the Respondent requests the Tribunal to a) dismiss the Claimants' claims summarily considering that Mobil already received compensation for the 2007 Expropriation, or in the alternative b) dismiss the Claimants' claim for payment of USD 1,411.7 million; and c) determine the "market value" of the Claimants' interest in the project pursuant to Articles 6.c and 9.5 of the Treaty, based on the Finalized DCF; and as a consequence d) declare that no compensation is due to the Claimants pursuant to paragraph 381 of the First Award, and in any event e) order the Claimants to pay, jointly and severally, all costs, legal fees and expenses incurred by the Respondent, and f) declare that the amount awarded to the Respondent under item (e) above shall bear interest, at the rate the Tribunal may consider appropriate, as from the date of the Award on costs and until complete payment. g) order any additional measure it may deem appropriate; and h) reject all other claims from the Claimants.

*

59.    In its analysis below, the Tribunal will address the Parties' submissions in more detail in the context of the three main issues to be decided by the Tribunal:

-    First, the scope of the *res judicata* effect of the Annulment Decision and of the non-annulled parts of the First Award, which determine the Tribunal's jurisdiction.

-    Second, the interpretation of the CNAA and more specifically the question whether the compensation mechanism in Clause 15 of the CNAA was exclusive in nature, meaning that the Claimants had no additional recourse against the State to recover additional compensation.

-    Third, how their respective views on the above issues determine the compensation, if any, to be awarded by the Tribunal pursuant to the BIT.

## IV.    *RES JUDICATA* OF THE FIRST AWARD AND THE ANNULMENT DECISION

60.    The present award must respect *res judicata* from two different perspectives. First, since the First Award has been only partially annulled, the parts of the First Award that have not

been annulled remain *res judicata* in the present proceeding. Second, the *Ad hoc* Committee's Annulment Decision itself has *res judicata* effect, the scope of which has extensively been debated by the Parties. The Tribunal will address these two *res judicata* effects in reverse order.

A.    THE ANNULMENT DECISION'S *RES JUDICATA* EFFECT

61.    That the Annulment Decision's *dispositif* has *res judicata* effect is self-evident and not disputed by the Parties. A first question in dispute is concerned with the interpretation of the Annulment Decision's *dispositif* and more specifically the relationship between the dispositive paragraphs identifying the annulled and the non-annulled parts of the First Award. A second question in dispute is whether the Annulment Decision's *res judicata* effect extends to all or some of the Decision's reasons.

(1)    The interpretation of the Annulment Decision's *dispositif*

62.    The Annulment Decision's *dispositif* contains a sub-paragraph 196.3 identifying the passages from the First Award that are annulled, and then, "for the avoidance of doubt", a sub-paragraph 196.4 identifying passages that are "not affected" by sub-paragraph 196.3:

> *"3) the request for the annulment of the portion of the Award dealing with compensation for the expropriation of the Cerro Negro Project is upheld in part, as follows: paragraph 404(d) of the Award is annulled, together with certain paragraphs in Sections V, VI, and VIII of the Award bearing directly on the assessment of compensation and the basis therefor, that is to say paragraphs 216-218, paragraphs 223-225, and paragraphs 373-374;*
>
> *4) for the avoidance of doubt, the Committee specifies that the following parts of the Award are not affected by sub-paragraph 3) above, namely paragraphs 297-306, paragraphs 307-367, the first sentence of paragraph 368, paragraphs 386-400, and paragraph 403, as well as paragraphs 184-213 and the Decision on Jurisdiction of 10 June 2010"*

63.    The Tribunal observes that the enumeration in sub-paragraph 4) of the "parts of the Award … not affected by sub-paragraph 3)" is not the mirror image of the list of "annulled" paragraphs set out in sub-paragraph 196.3. The Respondent has argued that the scope of annulment must be determined on the basis of the second list and more specifically, that since the second list identifies "the first sentence of paragraph 368" of the First Award as

not affected, it follows *a contrario* that the second sentence of paragraph 368 has been annulled.[39] The Claimants, by contrast, consider that this passage has "been left intact" by the Annulment Decision.[40]

64.    The question is whether it is the object and function of sub-paragraph 196.4 to identify the non-annulled passages of the First Award so as to determine the scope of the annulment on the same footing as sub-paragraph 196.3. The Tribunal finds that this is not the case for the following reasons:

-    First, the discrepancy between the two lists is not a matter of mere clerical detail. The second list does not mirror the first one *at all*, so that there is no room for considering that the *Ad hoc* Committee intended to make a "mirror-image" list but then made either a clerical or substantive error. The following table identifies the paragraphs annulled according to sub-paragraph 196.3 (column 1), then the paragraphs that are not annulled, as a mirror-image of the list in sub-paragraph 196.3 (column 2) and finally the paragraphs and sentence identified in sub-paragraph 196.4 as not affected (column 3):

| Annulled per §196.3 | Non annulled as mirror-image | Not affected per §196.4 |
|---|---|---|
| | Decision on jurisdiction of 10 June 2010 | Decision on jurisdiction of 10 June 2010 |
| | §1-216 | 184-213 |
| §216-218 | | |
| | §219-222 | |
| §223-225 | | |
| | §226-372 | §297-306, 307-367, 368 first sentence |
| §373-374 | | |
| | §374-403 | §386-400, 403 |

---

[39] Respondent's Counter-Memorial, §§121-123.

[40] Claimants' Memorial, §§107-108 and further §138.

| §404.d | | |
| | §404 a, b, c, e-k | |

It is manifestly not the function of the list in the third column to exhaustively identify the non-annulled parts of the First Award. For instance, it would be manifestly absurd and unreasonable to consider that the *Ad hoc* Committee intended to annul paragraphs 1 to 183 of the First Award, or paragraph 402 which merely enunciates the Respondent's position on costs, or paragraphs 404 a, b, c, and e-k of the *dispositif*.

- Second, sub-paragraph 196.4 does not identify paragraphs that are "not annulled", but paragraphs that are "not affected". This term is manifestly not the mirror-image of the term "annulled" used in sub-paragraph 196.3 and which reflects the core function of *Ad hoc* Committees. This indicates that the *Ad hoc* Committee likely intended merely to highlight specific passages among those which it had not annulled in order to emphasize that they should not be put to doubt or revisited upon resubmission. Whatever the real or purported function of such an emphasis, it does not determine the scope of the annulment.

- Third, sub-paragraph 196.4 starts with the terms "for the avoidance of doubt". This indicates that sub-paragraph 196.4 is subordinate to sub-paragraph 196.3. Sub-paragraph 196.4 is there to serve the application of sub-paragraph 196.3, not *vice versa*.

65. On these bases, the Tribunal concludes that the annulled passages of the First Award are those listed in sub-paragraph 196.3 of the Annulment Decision's *dispositif*, and not those that might be identified on the basis of an *a contrario* reading of sub-paragraph 196.4 thereof.

66. The Tribunal will revert below[41] to the Respondent's argument regarding the second sentence of paragraph 368 of the First Award.

---

[41] *Infra,* §244.

**(2)    The scope of the Annulment Decision's *res judicata* effect**

67.    As concerns the scope of its *res judicata* effect, it is of note that the Annulment Decision is multilayered. It comprises the *dispositif* which notably identifies the annulled parts of the First Award (§196.3), and a section entitled "Decision" (Section V, §188 ff.) which contains the *Ad hoc* Committee's "conclusions" (§188) and identifies the applicable grounds of annulment, namely a 'manifest excess of power' under Article 52(1)(b), and a 'failure to state reasons' under Article 52(1)(e) of the ICSID Convention (§§188-189). These conclusions are preceded by elaborate reasons.

68.    The Claimants' position is that, since the authority given to *ad hoc* committees is that of nullity and not of substantive revision, the *res judicata* effect of annulment decisions is limited to their *dispositif*.[42] By contrast, the Respondent in its written submissions extensively relied on the Annulment Decision's reasons and argued in substance that this Tribunal should base its award on those reasons, in terms that suggested their legal bindingness.[43]

69.    By email of 6 September 2022, the Tribunal invited the Parties to address at the hearing, a.o., the *res judicata* effect of annulment decisions in the light of doctrinal writings, some of which consider that *res judicata* extends to the annulment decisions' reasons, while others do not.[44] At the hearing, the Tribunal invited the Respondent to comment on the possible implications of extending *res judicata* effect to the Annulment Decision's reasons. The Tribunal observed that the Annulment Decision seemed to exclude customary international law from the law applicable under the BIT and wondered whether this would prevent the Tribunal from applying the law of State responsibility.[45] The Respondent thereupon clarified its position to the effect that the Annulment Decision's *res judicata*

---

[42] E.g., Claimants' Reply, §§22 ff., notably §24.

[43] E.g., Respondent's Counter-Memorial, §115: "The Mobil Parties may express their disagreement with the Decision on Annulment … However, this does not give them the right to retry their original or annulment cases in this resubmitted proceeding. Nor does this give room to the Arbitral Tribunal to ignore the findings of the Committee. Such a possibility would indeed threaten the integrity of the ICSID system, where States could be dragged for eternity with annulled and invalid stratospheric claims raised by claimants trying their luck over and over before new arbitral tribunals". Cf. Also Respondent's Rejoinder, §§28 ff. notably §30 referring to procedural fairness.

[44] Questions to the Parties to be addressed at the hearing, transmitted by email of 6 September 2022.

[45] Hearing transcripts, Day 2, p. 36, ll. 25 ff.

effect was limited to its *dispositif* – its reasons rather benefiting from "persuasiveness" without being legally binding.[46]

70. In terms of principle, the Tribunal considers there is some merit in the arguments of both Parties. On the one hand, as the Respondent observed in its written submissions, extending *res judicata* beyond the mere *dispositif* of annulment decisions potentially serves the finality of settlement of disputes under the ICSID Convention. On the other hand, the Claimants correctly observe that ICSID *ad hoc* committees do not have a power of substantive revision. This latter argument, correct as it is, does not *per se* constitute an absolute bar to extending *res judicata* beyond the *dispositif*. There may in principle be room for considering that the *res judicata* effect of annulment decisions may extend to some, but not necessarily all of their reasons in certain circumstances and depending on the annulment decision itself. This is aptly illustrated by the Annulment Decision in the present instance.

71. On the one hand, the *Ad hoc* Committee's identification of the grounds of annulment ('manifest excess of power' and 'failure to state reasons') is a finding the *Ad hoc* Committee was obliged to make under the ICSID Convention. It is the immediate and necessary underpinning of the annulment – a "*motif décisoire*" if ever there were one. The grounds of annulment could have been, but have not been, inserted in the Annulment Decision's *dispositif*. There are sound reasons to consider that the *Ad hoc* Committee's findings in that respect, nevertheless, *res judicata*. This prevents this Resubmission Tribunal from deciding the relevant issues in exactly the same manner as the First Tribunal.

72. On the other hand, the Annulment Decision indeed contains a series of reasons that pertain to the merits of the case and on which the Respondent relies in its arguments on the merits before this Resubmission Tribunal. Cases in point are the Annulment Committee's discussion on the principle that internal law may not be invoked to avoid international obligations,[47] and its analysis of Clause 15 of the CNAA.[48] However, it is noted that after

---

[46] Hearing transcripts, Day 2, p. 85, ll. 10 ff.

[47] Annulment Decision, §§161 ff.

[48] Annulment Decision, §163.

having addressed these issues, the *Ad hoc* Committee itself clarified that it did not purport to decide on issues pertaining to the merits and that lied beyond its competence:

> "*190. <u>The Committee should not be understood by this Decision to be determining in what way either the Price Cap or the outcome of the ICC arbitration should be brought to bear on the assessment of compensation in the present dispute. That would lie beyond its competence</u>, and is in any event a decision which the Committee is in no position to make. The Committee's decision is directed simply at the a priori exclusion in the Award of certain essential elements from the process of arriving at the compensation due pursuant to the terms of Article 6 of the BIT.*"[49]

As the Claimants correctly observe,[50] the *Ad hoc* Committee's decision's reasons cannot, in any event, be accorded a *res judicata* effect which is denied by the Committee itself.

73.    In conclusion, the Tribunal finds that it is legally bound by the *dispositif* of the Annulment Decision as well as by the *Ad hoc* Committee's findings on the applicable grounds of annulment at paragraph 188 of its Decision, but not by the reasons pertaining to the merits of the case.

## B.    THE FIRST AWARD'S *RES JUDICATA* EFFECT

74.    As to the *res judicata* effect of the non-annulled portions of the First Award, the Claimants refer to the general international law principle of *res judicata* and to ICSID Arbitration Rule 55(3) to conclude that "the non-annulled portions of the First Award cannot be revisited and are binding on the Parties and this Tribunal".[51] This is not disputed by the Respondent.

75.    This, however, does not dispense resubmission tribunals from considering the non-annulled parts of the award to determine what exactly remains to be decided anew. This includes interpreting the non-annulled parts in the way most consistent with the annulment decision *and* with the ensuing duty of the resubmission tribunal to reconsider the annulled

---

[49] Annulment Decision, §190. Emphasis added. See also *op. cit.*, §163: "The Committee has no need to decide the point" of the exclusive or non-exclusive nature of the CNAA compensation mechanism.
[50] Claimants' Reply, §§95-96.
[51] Claimants' Memorial, §139.

parts. At the same time, the non-annulled parts of a first award cannot be rewritten, glossed over, or wished away.

76. Without prejudice to the detailed analysis below, the Tribunal notes at this stage that the non-annulled parts of the First Award contain two findings that are essential to the Tribunal's reconsideration of the case in its annulled parts:

- First, the Claimants' investment was *lawfully* expropriated.[52] As set out in later parts of the award, this is of particular importance. At this stage, the Tribunal notes that the Claimants, who argued before the First Tribunal that the expropriation was unlawful,[53] appear to have some difficulty in fully accepting the lawfulness of the expropriation.[54]

- Second, the compensation due must be determined on the basis of the market value of the investment as provided in Article 6 of the BIT, on 27 June 2007, on the basis of a "willing buyer" and a Discounted Cash Flow analysis.[55]

  What remains to be considered is, as results from the above quoted paragraph 190 of the Annulment Decision, whether and if so, how, either the CNAA Price Cap or the outcome of the ICC Arbitration should be brought to bear on the assessment of compensation, that is, on a willing buyer's analysis.

  *

## V.    THE CNAA BEFORE THE BIT AND THE FIRST AWARD

77. Consistent with the facts of the case and the structure of the Parties' submissions, the Tribunal will now proceed with determining whether, at the time it was entered into – that is, before the entry into force of the BIT, the CNAA compensation mechanism was

---

[52] First Award, §§305-306.

[53] First Award, i.a., §300.

[54] Claimants' Reply, §26.b: "… Mobil's claim … is a claim for compensation for the injury caused to Mobil by Venezuela's breach of the Treaty"; Claimants' Reply, §58, relying on the principle that a State may not rely on the provisions of its internal law as justification for failure to comply with its obligation "to make full reparation for any internationally wrongful act for which it is responsible".

[55] First Award, notably §§307 ff., 314.

exclusive or not. The question is whether the CNAA mechanism provided for the sole compensation the Claimants were entitled to in case of expropriation by the Respondent, as the Respondent argues, or whether it constituted a minimal and non-exclusive compensation, as the Claimants argue.

78.     The Tribunal stresses that this section is concerned with the interpretation of the CNAA in isolation from the BIT, or in other words, before the BIT came into force, and before the First Award was rendered. Whether and, if so, how the BIT and the First Award's *res judicata* effect subsequently affected the rights and obligations of the Parties will be determined at a later stage.

79.     For the reasons set out below, the Tribunal finds on balance that the CNAA compensation mechanism was – with even greater certainty with respect to a *lawful* expropriation, as in the present case – an exclusive mechanism, dispensing the Respondent from paying any compensation additional to the capped amount due under the CNAA. The Tribunal will further observe that, while both Parties rightly regard the interpretation of the CNAA by the Tribunal as an essential step in the decision on compensation, a willing buyer of the Claimants' investment would not, in any event, base its offer on a tribunal's binding and final finding as to the exclusive or non-exclusive nature of the CNAA, which would not be available to it at the time of making the offer. Rather, a willing buyer would base its offer on a risk assessment of the probability that the CNAA would ultimately be found to be an exclusive or non-exclusive mechanism. In that respect, the Tribunal finds, for the reasons set out below, that a willing buyer would have considered the risk of the CNAA being qualified as an exclusive mechanism, as very high.

80.     The Tribunal will first set out the rules and principles governing the interpretation of the CNAA in accordance with the applicable law (A). The Tribunal will then interpret CNAA Clause 15.1 (B), CNAA Clause 15.2 (C), the Congressional Conditions and corresponding CNAA provisions (D) and other arguments that have been discussed by the Parties (E). The Tribunal will complement this with an interpretation restricting the CNAA mechanism's exclusive nature to lawful expropriations (F), before concluding (G).

## A. RULES AND PRINCIPLES GOVERNING THE INTERPRETATION OF THE CNAA

81.    Clause 18.1 of the CNAA explicitly provides that it "shall be governed by and interpreted in accordance with the laws of the Republic of Venezuela". This is undisputed. The Tribunal must therefore turn to the rules and principles of Venezuelan law governing contract interpretation to determine the scope of the CNAA and more specifically whether the CNAA compensation mechanism was exclusive or not.

82.    The Parties have debated at some length about the applicable principles of interpretation.

83.    The Claimants argue that "the meaning of the relevant provisions of the CNAA is clear and does not require interpretation on the basis of extrinsic evidence" and that this is especially the case where the CNAA expressly provides in Clause 23.2 that: "This Agreement (including the Annexes and Schedules which are part of this Agreement) sets forth the entire agreement among the Parties as to matters covered herein …".[56] The Claimants observe that this principle of interpretation has been recognized by the ICC Tribunal in charge of applying the CNAA compensation mechanism. The ICC Tribunal stated that it was its task "to apply the Parties' common intention, *as reflected in the* [*CN*]*AA*".[57]

84.    At the hearing, the Claimants further specified that Article 12 of the Venezuelan Code of Civil Procedure provides as follows: "In the interpretation of contracts or acts that are obscure, ambiguous or deficient, judges shall be subject to the parties' purpose and intention taking into account the requirements of the law, the truth and good faith".[58] The Claimants thereby disputed the Respondent's assertion that recourse to extrinsic evidence as to the parties' purpose and intention taking into account good faith, etc., was required in

---

[56] Redfern Schedule, "Claimants' General and Specific Objections of 27 December 2021", §4; Claimants' Reply, §79.

[57] Redfern Schedule, "Claimants' General and Specific Objections of 27 December 2021", §5. Emphasis in the original.

[58] Hearing Transcripts, Day 2, pp. 72-73. An identical quote of the same provision is to be found in the Redfern Schedule, "Bolivarian Republic of Venezuela' Redfern Schedule of 10 January 2022 with Replies to Claimants' Objections", §13, by reference to the ICC Award, *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF/CA, Final Award, 23 December 2011, Exhibit CL-4, §82, which indeed contains an identical quote. The Tribunal considers the wording of Article 12 of the Venezuelan Code of Civil Procedure to be undisputed, established and to govern the interpretation of the CNAA.

all instances of contract interpretation rather than, as the Claimants asserted, only in case of obscurity, ambiguity or deficiency.

85.    The Respondent disputes the Claimants' argument based on Clause 23.2 of the CNAA ("Integrity of the Agreement"). In Venezuela's view, Article 23.2 is a "standard integration clause [which] merely reflects the facts that prior informal understandings and oral agreement (if any) were superseded by the terms and provisions of the CNAA, its Annexes and Schedules". It "cannot and does not purport to exclude as such any recourse to general principles of contract interpretation under applicable law".[59]

86.    The Respondent also disputes that the ICC Tribunal would have ruled out the importance of negotiation documents. It argues that the ICC Tribunal "expressly acknowledged the application of the principle set forth under the Venezuelan Code of Civil Procedure that '[i]n the interpretation of contracts or acts that are obscure, ambiguous or deficient, judges shall be subject to the parties' purpose and intention taking into account the requirements of the law, the truth and good faith'".[60] The Respondent observes that the ICC Tribunal held the following:

> "The Tribunal's task is to apply the Parties' common intention, as reflected in the [CNAA]. The [CNAA] must be interpreted according to the plain and ordinary meaning of the Parties' terms, considering the agreement as a whole in its general context. In this case, the evidence shows and it is undisputed that the [CNAA] was negotiated in the context of a previous nationalization/expropriation of foreign oil companies in Venezuela in 1975, and government attempts to attract these companies to return to Venezuela to invest in order to assist in the development of the oil industry, in particular in the extra-heavy crude oil in the Orinoco Belt.
>
> Here, the Parties' intention, particularly considered in the context of the previous expropriation and the contractual scheme of the [CNAA], including Article 15 and the definition of 'Discriminatory Measures', was clearly to provide indemnification where expropriation, whether partial or complete, occurred. In the Tribunal's view, good faith interpretation of the [CNAA]

---

[59] Redfern Schedule, "Bolivarian Republic of Venezuela' Redfern Schedule of 10 January 2022 with Replies to Claimants' Objections", §13

[60] Redfern Schedule, "Bolivarian Republic of Venezuela' Redfern Schedule of 10 January 2022 with Replies to Claimants' Objections", §13.

> *requires the application of the compensatory provisions of Clause XV in the case of a complete expropriation, as occurred here."*[61]

87. At the hearing, the Respondent further argued that Venezuelan contract law is civil law, and as such, attaches great importance to the interpretation in good faith of the common intent of the parties "that gives birth to something bigger than themselves" rather than conceiving of contracts "as the product of the contrast … of two egoisms".[62] Asked by the Tribunal whether there was any threshold requirement for a finding that the plain language is not clear enough before a tribunal should look beyond the text, or whether it is required in all instances, the Respondent answered that it was required in all instances, and "especially in a case like this one, when you have a clause that has to be read in accordance to the [congressional] conditions as per article 2 of the CNAA".[63]

88. Having considered the Parties' arguments, the Tribunal finds as follows.

89. *First*, the Claimants are right in asserting that Article 12 of the Venezuelan Code of Civil Procedure mandates an inquiry into "the parties' purpose and intention taking into account the requirements of the law, the truth and good faith" (only) when the contract is "obscure, ambiguous or deficient".[64] It follows that such an inquiry is not of general application.

90. *Second*, this nevertheless reflects what the Respondent refers to as a civil law approach to interpretation, which can in certain circumstances lead to consecrating contractual obligations found beyond the "four corners" or the "black-letter" terms of the contract. When the terms of the contract are obscure, ambiguous or deficient, the default position is certainly *not* that there is no obligation under the contract; rather, additional inquiry is mandated. In that respect, the Tribunal also adopts an interpretative approach similar to that taken by the ICC Tribunal, which, while noting that its task was to "apply the Parties' common intention, as reflected in the [CNAA]" and to interpret the CNAA "according to

---

[61] *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF/CA, Final Award, 23 December 2011, Exhibit CL-4, §§597-598 (emphasis added), quoted in the Respondent' Rejoinder, §18. Also Rejoinder, footnote 221.
[62] Hearing Transcripts, Day 2, pp. 47-50.
[63] Hearing Transcripts, Day 2, pp. 65-66.
[64] Hearing Transcripts, Day 2, p. 73.

the plain and ordinary meaning of the Parties' terms, considering the agreement as a whole …" also resorted to the history and context of the CNAA to find that the compensation mechanism also applied in the case of "complete expropriations".

91.     *Third*, along these lines, the Respondent is right in arguing that the "Integrity of the Agreement" provision in Clause 23.2 of the CNAA does not displace the application of principles of contract interpretation. The Tribunal also observes that Clause 23.2 does not, in any event, include the Congressional Conditions.

92.     *Fourth*, Clause 2.1.b of the CNAA provides that the Project shall be carried out "in accordance with the requirements set forth in the Organic Law and the Conditions". These two sources are therefore rendered applicable by the CNAA itself. They apply even where the contract has not been found to be obscure, ambiguous, or deficient.

93.     On these bases, the Tribunal proceeds with interpreting the CNAA to determine the exclusive or non-exclusive nature of the CNAA compensation mechanism.

**B.     CNAA CLAUSE 15.1**

**(1)     General**

94.     Clause 15 of the CNAA is entitled "Consequence of Governmental Measures" and provides for the conditions under which the Foreign Parties (including the Claimants) may obtain compensation from Lagoven in case of a "Discriminatory Measure" which may result in a "Materially Adverse Impact" within the meaning of the CNAA.

Clause 15.1 ("General") *sub* a, provides that if a Foreign Party determines that a "Discriminatory Measure" which may result in a "Materially Adverse Impact" has occurred, it shall give notice to Lagoven. The further procedure is as follows:

> *"To the extent any legal recourse is available to reverse or obtain relief from such Discriminatory Measure, the Foreign Party shall commence and pursue legal actions to mitigate any damages suffered as a result of the Discriminatory Measure. If Lagoven CN concurs that the Discriminatory Measure has occurred and has resulted in a Materially Adverse Impact, Lagoven CN shall cooperate with the Foreign Party in the pursuit of the aforesaid legal actions and the Parties shall negotiate in good faith the*

> compensatory damages and/or possible modifications to the Agreement in order to restore the economic benefit that the Foreign Party would have received had the Discriminatory Measure not occurred. And further:
>
> Any net benefits received by the Foreign Party as a result of the pursuit of the aforesaid legal actions … shall be (i) applied against any amount ultimately determined to be owed by Lagoven CN pursuant to this Clause or (ii) reimbursed to Lagoven CN if Lagoven CN has previously made payments to the Foreign Party with respect to the Discriminatory Measure in question."

Clause 15.1 ("General") *sub* b provides in substance that the existence of a Discriminatory Measure and of a Materially Adverse Impact as well as the ensuing damages and recommendations on amendments to the Agreement that would restore the economic benefit, may be determined by arbitration.

Clause 15.1 ("General") *sub* c provides in substance that if the Discriminatory Measure is reversed or ceases to be in effect, the obligation to pay compensation or the modification of the Agreement shall also cease to be in effect (etc.).

### (2)    "Mitigate"

95.    As concerns Clause 15.1.a, the Respondent argues that, according to *Black's Law Dictionary*, the word "mitigate" means "make less severe or intense" and that the Claimants admitted before the First Tribunal that the object of the ICSID arbitration was to mitigate the damages at issue in the ICC arbitration – and therefore, not to obtain additional damages.[65] At the hearing, the Tribunal asked whether the term "mitigation" refers to the avoidance of damage rather than to the reparation thereof.[66] The Claimants responded that the ordinary meaning of "to mitigate" is "to alleviate or give relief from", which meaning is confirmed by the fact that Clause 15.1.a further refers to recourses "to reverse or obtain relief".[67] The Claimants also observed that Clause 15 further provides that the benefits resulting from those efforts at mitigation are applied against amounts owed

---

[65] Respondent's Counter-Memorial, §§182-183 and Black's Law Dictionary (9th ed., West 2009) (Excerpt), RL-18, p. 1093.
[66] Hearing Transcripts, Day 1, pp. 193-194.
[67] Hearing Transcripts, Day 2, p. 8.

by Lagoven or resulting in a reimbursement to Lagoven, which evidences that financial compensation is considered as a form of mitigation.[68]

96.    The Tribunal is convinced by the Claimants' argument that "to mitigate" can refer to the financial compensation of damage as much as to the avoidance thereof, notably through restitution. However, the Tribunal is equally convinced by the Respondent's argument that "to mitigate" means "to make less severe" or, in other words, to reduce. Both interpretative elements can combine to the effect that the reduction of damage may be achieved either by restitution or by financial compensation.

### (3)    "Any damages"

97.    The Claimants have further emphasized that Clause 15.1.a refers to "any damages", which in their view indicates that there is no limitation to the damages the Claimants may obtain in addition to the capped compensation due by Lagoven.[69] The Respondent objects that the term "any" does not serve the Claimants' case as it does not mean "all damages" but is essentially equivalent to "damages, if any".[70] The Tribunal considers that the Claimants are right in arguing that (leaving aside what has been said hereabove on the term "mitigate") the term "any" indicates that the damages that can be obtained outside the CNAA compensation provision are not limited. At the same time, the term also indicates that such damages are indeterminate. At the hearing, the Claimants aptly observed that it could be both.[71] Therefore, there is nothing in the term that limits the Claimants' right to recover damages from the State, but neither is there anything in the term that *positively* confirms that the compensation mechanism is non-exclusive.

98.    Along the same lines, the Claimants have argued that Clause 15.1.a is not concerned with "the mitigation of the contractual liability of PDVSA-CN under the CNAA; rather, it is the mitigation of 'any damages' suffered by Mobil as a result of the Discriminatory Measure. Thus, the CNAA expressly recognizes that Mobil may suffer damages beyond those

---

[68] Hearing Transcripts, Day 2, pp. 8-9.
[69] Claimants' Reply, §71.
[70] Respondent's Rejoinder, §145.
[71] Hearing Transcripts, Day 2, pp. 9-10.

compensable under the PDVSA Partial Indemnity …".[72] While this argument is grammatically correct, it does not preclude that the mitigation of "any damages" was aimed at mitigating Lagoven's liability. After all, Lagoven's liability is what Clause 15 is about. As set out hereafter, this is confirmed by the fact that Clause 15.1.a provides for mitigation as an *obligation* for the foreign investor.

### (4)    "Shall"

99.     A further characteristic of CNAA Clause 15.1.a is that the foreign investor "shall" – not "may", but "shall" – commence and pursue legal actions to mitigate the damages. As argued by the Respondent, "Mobil had *the obligation* to attempt to 'mitigate' … Lagoven-CN's compensation liability".[73] The Claimants equally observe that there is an obligation to mitigate and posit that given their "affirmative obligation to seek relief beyond the PDVSA Partial Indemnity, it necessarily follows that the PDVSA Partial Indemnity was the opposite of an exclusive remedy in the event of an expropriation".[74]

100.    The Tribunal does not subscribe to the Claimants' deduction. The reasoning implicit in the Claimants' position seems to be that, if an obligation to take legal action exists, there is *a fortiori* a right to do so, and that right must exist in the foreign investor's interest. This, however, misses the point of such legal action's object and purpose. The legal action's object and purpose is to reduce the damage caused by Discriminatory Measures of the Venezuelan State. It makes no sense to oblige the foreign investor to reduce the damage *in the foreign investor's own interest*. Accordingly, the wording indicates that the legal actions are conceived as an obligation towards Lagoven to limit the damages it will have to pay to compensate for discriminatory measures of the Venezuelan State. The implication, then, is the opposite of what the Claimants assert: the legal actions are not conceived as a right of the foreign investor to recoup additional damages.[75]

---

[72] Claimants' Reply, §§3, 99.b.

[73] Respondent's Counter-Memorial, §183. Emphasis added.

[74] Claimants' Reply, §§88-89.

[75] This remains unaffected by the fact that Lagoven must then cooperate in the legal actions taken by the investor. The legal actions to be taken by the investor are conceived in the interest of Lagoven as the liable party, which is an expression of the principle of good faith between the parties. And in the same way as the investor is not allowed to

(5)    **"Restore the economic benefit"**

101.   A further question is whether the *legal terminology* of CNAA Clause 15 – the specific legal concepts used to set out the parties' rights and obligations – is indicative of the exclusive or non-exclusive nature of the mechanism.

102.   The Tribunal asked at the hearing whether the reference made in Clause 15 to "discriminatory measures" and to a "material adverse effect" could be interpreted to the effect that, absent such measures or effects, the foreign investor recognizes that it has nothing to complain of – whether against Lagoven or otherwise, against the State.[76]

103.   In their answer, the Claimants notably argued that "unless the terms of that contract state as much", "there can be no necessary implication that limits the remedy offered by PDVSA somehow also to apply to remedies that may be available separately under different legal instruments against the State, which was not a party to that agreement", that there is "a contractual definition of a discriminatory action … because it is defining a contractual liability for a third party, PDVSA, for the actions of the State, and so it does not, need not, indeed cannot define what is an expropriation at international law", and that likewise, if the threshold of 5% material adverse effect is not met, the foreign investor does not have a claim against PDVSA/Lagoven, but "there is nothing in the Association Agreement that inhibits Mobil from bringing a claim against the State for the governmental measure that causes that loss up to the 5%".[77]

104.   The Tribunal considers that the Claimants are essentially right in arguing that the CNAA provides contractual definitions for its own purposes, which do not *per se* relate to international law outside the contract. By contrast, the Claimants' argument is unconvincing with respect to the threshold of 5% material adverse damage which determines the existence of a "Materially Adverse Impact" as defined in CNAA Clause 1. The definition conveys an admission that the effect qualifies as *de minimis* under the

---

stand idle and wait for Lagoven to pay damages, Lagoven is not allowed to stand idle and wait for the investor to mitigate the damages. But this is only a corollary to the investor's obligation to mitigate, which is in the interest of Lagoven as the liable party.

[76] Hearing Transcripts, Day 1, pp. 195-196.

[77] Hearing Transcripts, Day 2, pp. 11-13.

contract – that is, it does not affect the foreign investor's economic benefit under the contract in a manner that requires restoration. If that is the case, the foreign investor could find it very hard indeed to convince a tribunal that the damage nevertheless qualifies as an expropriation within the meaning of international law or otherwise warrants compensation under international law.

105.    This is all the clearer where Clause 15 provides that the parties shall negotiate in good faith the compensatory damages and/or possible modifications to the CNAA "in order to restore the economic benefit" the foreign investor would have received absent the Discriminatory Measure. If the negotiations fail, the restorative measures are to be decided by arbitration.[78] This suggests that Clause 15 is intended to (in effect) wipe out the consequences of the Measure and provide fair compensation (in case of a lawful expropriation) or full reparation (in case of an unlawful expropriation)[79]. In that context, the question of additional compensation does not arise because the parties to the CNAA are deemed to have accepted in advance that the Clause 15 procedure compensates for the damage the foreign investor may originally have suffered.

106.    As the Respondent has rightly argued, the same is true of Congressional Condition 20, which will be analysed below.[80] The fact that this condition was set by the Venezuelan Congress shows that it was not only conceived as a limitation of Lagoven's responsibility but – to use the Claimants' words – as the equivalent of a "statutory limitation on the damages that Mobil would be deemed to have suffered as a result of the expropriation of its investment".[81]

---

[78] Clause 15.1.b in fact contemplates that the project will continue in that it refers to "an award for damages to compensate the Foreign Party for the economic consequences of the Discriminatory Measure suffered by it to date and recommendations on amendments to the Agreement that would restore the economic benefit …". In the present instance, the ICC Arbitral Award rendered pursuant to Clause 15.1.b awarded damages also for future losses until the end of the contract period. *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF/CA, Final Award, 23 December 2011, Exhibit CL-4.

[79] The question whether the CNAA covers both these hypotheses is discussed below, Section F.

[80] See below, §§139 ff.

[81] Claimants' Reply, §57.

**(6)      Set-off and reimbursement**

107.    The set-off provision in CNAA Clause 15 to which the Claimants refer[82] is to the same effect. Clause 15 provides in the relevant sentence that any net benefits received by the investor as a result of the pursuit of legal 'mitigation' actions "shall be … applied against any amount … owed by Lagoven" or "reimbursed to Lagoven CN if Lagoven CN has previously made payments" to the investor with respect to the Discriminatory Measure.  If the net benefits from legal action against the State must be "reimbursed" to Lagoven, this indicates that these net benefits are considered to limit the damages to be paid by Lagoven, not to exceed them. The phrase could of course be interpreted as meaning "reimburse in whole or in part". But the fact that it is not formulated in that way is again an indication that the parties to the CNAA only considered the hypothesis that the damages obtained through 'mitigation' action would be lesser than those paid by Lagoven.

**(7)      Chronology**

108.    A further element is the chronology in Clause 15.1. Clause 15.1.a first provides that the Claimants shall seek to mitigate the damage. Only then does Clause 15.1.a provide that the parties shall negotiate compensatory damages and/or possible modifications to the CNAA. And only then does Clause 15.1.b provide for the possibility of arbitration against Lagoven. The *Ad hoc* Committee suggested this was an indication that the mitigation does not come over and above compensation by Lagoven, but as a preliminary obligation to limit the damage recoverable against Lagoven.[83] The Tribunal considers that the chronology in Clause 15 again provides an indication – but nothing more – that the alternative remedies available to the Claimants are only aimed at limiting the damages owed by Lagoven. This is so, irrespective of the fact that, as the Claimants correctly observe, Clause 15.1.a contemplates the situation where the mitigation action would ultimately result in an allocation of damages *after* the foreign investor had obtained compensation from Lagoven.[84] While the mitigation action may indeed take more time than the payment of compensation by Lagoven, the relevant point is that Clause 15.1 indicates that the

---

[82] Claimants' Memorial, §174; Claimants' Reply, §99.a. See also Section 7 hereinafter.
[83] Annulment Decision, §163.
[84] Claimants' Reply, §99.a.

mitigation action should be *initiated as a first step* in the process. This is what justifies the qualification of the mitigation action as a *preliminary* obligation as opposed to an additional one.

**(8)  Conclusion**

109.  In conclusion, CNAA Clause 15.1 contains a series of indications that the CNAA compensation mechanism was exclusive, in the sense that it dispensed the Venezuelan State from paying compensation additional to the capped amount paid by Lagoven. While none of these elements is decisive when taken in isolation, their accumulation indicates that the mechanism was meant to be exclusive. In other words, while the provisions may be "obscure, ambiguous or deficient" insofar as they are non-conclusive when taken in isolation, their combination indicates "the parties' purpose and intention". As discussed hereinafter, this finds further and strong confirmation in still other provisions of the CNAA.

**C.   CNAA CLAUSE 15.2**

**(1)  General**

110.  Clause 15.2 ("Limitation on Lagoven CN's Obligation") provides for two situations in which Lagoven shall not be obliged to compensate the Foreign Parties for Discriminatory Measures:

-   *sub* a: if, in substance, the price of brent crude exceeds the Base Price as defined in the CNAA.

-   *sub* b: if, in substance, the Venezuelan State reduces its direct or indirect interest to (i) less than 12.5% of the Project or (ii) less than 49.9% of Lagoven CN or its successor in the Project.

**(2)  Clause 15.2.a – the compensation cap**

111.  CNAA Clause 15.2.a provides that Lagoven shall not be further obliged to compensate the foreign investor for Discriminatory Measures if, in substance, the price of brent crude exceeds the Base Price as defined in the CNAA.

112.    The Claimants correctly observe that this provision is concerned with Lagoven's obligation to compensate, as the title "Limitation on Lagoven CN's Obligation" confirms.[85] It is, however, another question whether this provision on the limitation of Lagoven's obligations is, or is not, revelatory of the Venezuelan State's obligations.

113.    The Claimants' position that the CNAA compensation mechanism is non-exclusive implies that if the price of brent crude exceeds the Base Price, Lagoven has no further obligation to pay compensation, but the State itself is not necessarily dispensed from paying damages in accordance with international law. The Tribunal considers it illogical that the rise of the oil price would dispense Lagoven *only* from paying compensation. As a partner in the Project, Lagoven CN's revenues increase as the oil price increases. That the oil price exceeds the Base Price is therefore no reason to dispense Lagoven from its undertaking to compensate for Discriminatory Measures. By contrast, the provision makes sense if, as the Respondent argues,[86] Clause 15.2.a was meant to allow the Venezuelan State to capture "windfall profits" generated by an increase in price above the Base Price without compensation. In other words, Clause 15.2.a only makes sense if the CNAA compensation mechanism is an exclusive one, so that both Lagoven and the Venezuelan State are dispensed from paying compensation for the capture of "windfall profits" above the Base Price.[87]

### (3)    Clause 15.2.b – inapplicability of the compensation mechanism

114.    Clause 15.2.b, in turn, provides that the CNAA compensation mechanism becomes inapplicable if the State reduces its interest in the project or in Lagoven below a certain threshold. The Claimants argue that, if the CNAA compensation mechanism were

---

[85] Claimants' Reply, §§73-74.

[86] *I.a.*, Respondent's Counter-Memorial, §§5, 35, 168 ff.

[87] This is not to say that there would otherwise exist an international obligation to compensate for the capture of windfall profits. Tax measures are lawful in principle, but they may trigger a violation of international investment law under specific circumstances. The First Tribunal has stated at §286 of the First Award that "under international law, a measure which does not have all the features of a formal expropriation may be equivalent to an expropriation if it gives rise to an effective deprivation of the investment as a whole. Such a deprivation requires either a total loss of the investment's value or a total loss of control by the investor of its investment, both of a permanent nature".

exclusive in nature, this would lead to the absurd result that, if the State so reduced its interest, the Claimants would have no remedy at all.[88]

115.    In its Rejoinder, the Respondent objects thereto that it is far from absurd that Lagoven would not owe any compensation for the consequences of State action in such a scenario.[89] This is correct but does not answer the Claimants' point that they would receive no compensation from anyone.

116.    The Respondent adds that the Claimants would still have access to local remedies "as well as any remedy in the international plane on which they could rely".[90] The second limb of this argument is mistaken because (as the Respondent also argues) Congressional Condition 18 was to the effect that, before the BIT and the First Award, the Claimants had no international remedy whatsoever.[91] It remains, however, that it is not absurd or abnormal that the Claimants would have no international remedy whatsoever, and neither is it absurd or improbable that the Claimants would have signed up to the CNAA in these circumstances: Congressional Condition 18 and CNAA Clause 18.3, to which the Tribunal will revert below,[92] evidence that they did. And they did so because they were granted the other, extraordinary remedy against Lagoven.

117.    As importantly, the Claimants' argument is unfounded for another, alternative reason. As the Respondent stated at the hearing, "in case the State stops to own majority within the [state] companies, … the overall compensation structure would fall".[93] In other words, if the State reduced its interest in Lagoven below the threshold mentioned in CNAA Clause 15.2.b, the compensation mechanism would not be further applicable so that the Claimants would be liberated from its exclusive nature. Accordingly, there is no basis to discard the CNAA compensation mechanism's exclusive nature on the basis of the absurd consequences alleged by the Claimants. Quite the opposite, Clause 15.2.b is in line with

---

[88] Claimants' Reply, §77. Hearing Transcripts, Day 1, p. 22.

[89] Respondent's Rejoinder, §157.

[90] *Ibid.*

[91] Congressional Condition 18 notably provides that "the exercise of [sovereign powers by Venezuela] … shall not give rise to any claim, regardless of the nature or characteristics of the claim, by other states or foreign powers".

[92] See *infra*, §§134 ff..

[93] Hearing Transcripts, Day 1, p. 189.

the above consideration that the Claimants were granted the extraordinary remedy against Lagoven because they would have no international remedy against the State, and conversely, that they would have no international remedy against the State because they had an extraordinary remedy against Lagoven.

**(4)    Conclusion**

118.    In conclusion, the exclusive nature of the CNAA compensation mechanism finds further confirmation in CNAA Clause 15.2, which reflects the '*quid pro quo*' at the basis of the compensation mechanism:

- The CNAA compensation mechanism was capped to allow the State to capture 'windfall profits', which in turn implied that the Claimants would have no additional remedy against the State.

- The Claimants were granted an extraordinary remedy against Lagoven because they would have no remedy against the State, and *vice versa*.

The Tribunal regards these contractual provisions as evidencing the parties' purpose and intention.

**D.    THE CONGRESSIONAL CONDITIONS AND CORRESPONDING CNAA PROVISIONS**

119.    The above is still further confirmed by Congressional Conditions 18 and 20 and the corresponding provisions of the CNAA.

**(1)    CNAA Clause 2.1.b**

120.    CNAA Clause 2.1.b provides that the Project shall be carried out by the parties under the terms and conditions set forth in the CNAA "and in accordance with the requirements set forth in the Organic Law and the (Congressional) Conditions".

121.    It follows that the Claimants err in arguing that the CNAA was approved by the Venezuelan Congress as being in line with the Congressional Conditions, so that the Conditions have been 'absorbed' by the CNAA in the sense of being deprived of independent meaning and

cannot be relied upon in addition to the terms of the CNAA itself.[94] As the Respondent rightly argues, such 'absorption' is contradicted by CNAA Clause 2.1.b,[95] and it will be seen hereinafter that the combined reading of the CNAA and the Conditions is of major relevance. While, as the Claimants observe, CNAA Clause 23.2 expressly provides that the Agreement including the Annexes and Schedules "sets forth the entire agreement among the Parties as to matters covered herein",[96] Clause 2.1.b is an integral part of the CNAA so that the Congressional Conditions are not to be discarded as extrinsic evidence, quite the opposite.

122. It also follows that the Claimants err in arguing that "Mobil could not have agreed to limit its international right to compensation in an agreement with PDVSA because Venezuela was not a party to that agreement and could not enjoy any benefits under that agreement" (also referred to as the *res inter alios acta* argument).[97] As a matter of principle, agreements can accord rights to third parties or dispense them from obligations. In the present instance, Venezuela sets out its requirements in the Congressional Conditions, and those were accepted by the Claimants when they subscribed to Clause 2.1.b of the CNAA.[98] This indisputably gave rise to a legal relationship between the Claimants and the Venezuelan State with respect to the project. As set out hereafter, this legal relationship consisted in the Claimants' waiving the possibility of international action against the Venezuelan State.[99]

123. Irrespective of their specific requirements, the reference thus made to the Congressional Conditions is essential because these Conditions are what they say they are: *conditions* set by the Venezuelan Congress for foreign investors to be admitted in the petroleum industry, contrary to what prevailed under Venezuelan law before the "Apertura Petrolera".[100] While

---

[94] Claimants' Reply, §51, referring to Resolution authorizing the execution of the Association Agreement, Official Gazette No. 36,313, 15 October 1997, Exhibit C-36.

[95] Respondent's Rejoinder, §§113-114.

[96] Claimants' Reply, §79 and footnote 130. It is further observed that, contrary to what the Claimants assert (*ibid.*), the text of the CNAA is not clear in the Claimants' position.

[97] Claimants' Reply, §106. Also Claimants' Memorial, §§140, 144.

[98] Respondent's Counter-Memorial, §§47-48.

[99] See below, §§124--133 with respect to CNAA Clauses 18.4 and 23.5.

[100] See i.a., Respondent's Counter-Memorial, §21 ff.

drafts of the Conditions may have been discussed with or between the Claimants and Lagoven, it follows from the enactment of the Conditions by the Venezuelan Congress and from the subsequent validation of the CNAA by the Congress[101] that the Claimants were only allowed to invest on the strict terms enunciated by the Congress, which they accepted.

### (2)    Congressional Condition 18 and CNAA Clause 18.4

124.    Congressional Condition 18 provides, in the translation provided by the Respondent,[102] as follows:

> *"The Association Agreement, and all activities and operations conducted under it, shall not impose any obligation on the Republic of Venezuela nor shall they restrict its sovereign powers, the exercise of which shall not give rise to any claim, regardless of the nature or characteristics of the claim, by other states or foreign powers."*

125.    The language of Condition 18 is broad and inclusive. It is replete with wording that is typically used to indicate that a provision is unreserved and unconditional: "all", "any obligation", "regardless of …".

126.    The phrase "activities and operations conducted under [the Association Agreement] shall not impose any obligation on the Republic … nor shall they restrict its sovereign powers" is quasi-identical to CNAA Clause 18.4, which provides as follows:

> *"This agreement, as well as the activities and operations contemplated herein, shall in no event impose obligations on the Republic of Venezuela or limit the exercise of its sovereign powers."*

127.    The Claimants rely on the terms "[t]his agreement … shall in no event … limit the exercise of its sovereign powers" and argue that this allows Venezuela to expropriate the Claimants'

---

[101] Resolution authorizing the execution of the Association Agreement, Official Gazette No. 36.313, 15 October 1997, Exhibit C-36.

[102] Respondent's Exhibit R-3. The Tribunal observes that the Claimants' translation (Claimants' Exhibit C-35) presents differences of detail from the above translation. These differences have not been discussed by the Parties which, more generally, have not disputed their respective translations, and the Tribunal finds that the differences are irrelevant to the issues presently discussed. The differences in the Claimants' translation are identified in italics hereinafter: "The Association Agreement, and all activities and operations conducted under it, shall not impose any obligation on the Republic of Venezuela nor shall they restrict its sovereign powers, the exercise of which shall not *cause* any claim, regardless of the nature or characteristics of the claim, *from* other states or foreign powers."

investment, as it did, provided it pays compensation.[103] The Claimants do not quote nor analyse the remaining wording of Clause 18.4, according to which "the activities and operations contemplated … shall in no event impose obligations on … Venezuela". In the light of this additional wording, Clause 18.4 is very broad in two respects. First, it does not only provide that the *agreement* does not impose obligations on the State. It provides that the same applies for "activities and operations" that are "conducted under" the CNAA (Condition 18) and "contemplated [t]herein" (CNAA Clause 18.4). Second, it does not only provide that the exercise of Venezuela's sovereign rights shall not be limited. It also provides that such activities and operations shall "in no event" "*impose obligations*" on Venezuela.

128.   When they were invited to comment on this phrase at the hearing, the Claimants argued as follows:

> *"In response, I would say of course it is not our case that the agreement or the activities and operations under it impose an obligation on the State. The obligation that is imposed here is by the Treaty, to compensate for an expropriation, and so there is no imposition of an obligation arising from the contract or the activities thereunder. The obligation is imposed by the Treaty, and we are well beyond matters of jurisdiction, we are well beyond matters of liability, we are simply asking the single question raised by those nine paragraphs identified in the Committee's Annulment.*
> *And the obligation imposed by the Treaty and international law is to provide just compensation for an expropriation, and just as the agreements do not impose obligations, the underlying words, Mr President, so it does not afford rights that release the State from the obligations imposed by international law. One must go with the other.*
> *So that provision is neutral, it takes Venezuela nowhere, which is why it did not feature in the lengthy presentation we heard from Venezuela's counsel yesterday."[104]*

129.   The Claimants thus argue that the obligation they rely upon is imposed by the BIT, not by the CNAA or the performance of the contractual obligations – the activities or operations – conducted under it or contemplated therein. The impact of the BIT will be analysed below. Leaving this question aside, the Claimants' observation that the provision is

---

[103] Claimants' Reply, §54. See also Claimants' Memorial, §170.
[104] Hearing Transcripts, Day 2, pp. 14-15.

"neutral" as regards Venezuela's obligations under international law testifies to the interpretative problem faced by the Tribunal. Taken literally, the provision that "the activities and operations … shall in no event impose obligations" is meaningless. Activities of private parties by their nature cannot impose obligations on a third party. Yet, the phrase must be given a useful and effective meaning, different from and additional to 'the agreement does not impose obligations on the State'. The terms "activities shall not impose obligations" must therefore be interpreted as meaning that the State shall not incur any obligation with respect to the activities, albeit under the agreement or under international law. This means that the compensation mechanism in the CNAA is exclusive in nature with respect to such activities.

130.    That, as the Claimants observed at the end of the above quoted statement, the Respondent did not at any point rely on Clause 18.4, is irrelevant because – irrespective of the fact that this is an issue of law[105] and that the Tribunal is presumed to know the law – the Respondent relies on the corresponding provision in Congressional Condition 18, to which the Tribunal will revert below, and in any event interprets the clause in its entirety in the manner presently considered by the Tribunal.

131.    It follows that, unlike what the Claimants argue,[106] the CNAA does contain an express waiver by the Claimants of international rights they may have had at the time of signing the CNAA (without prejudice to the impact of the BIT and of the First Award). That waiver is contained in Clause 18.4, the express terms of which cannot be interpreted otherwise, lest they be deprived of any useful and effective meaning. In addition, the Tribunal considers that the Claimants err in arguing that the waiver should necessarily be express. As a rule, waivers of international rights may be either express or implied. What matters is that the will of the party concerned be established, albeit on the basis of a domestic instrument.

---

[105] It is not in dispute that the CNAA is a 'special agreement' within the meaning of Article 9.5 of the BIT identifying the applicable law. See Respondent's Counter-Memorial, §184 and the Claimants' declaration at the hearing, Hearing Transcripts, Day 1, pp. 95-97.

[106] Claimants' Reply, §§58, 67, 91 ff.

132.    Along the same lines, the Claimants err in arguing that the CNAA cannot limit their right to claim against the Venezuelan State, since Clause 23.5 provides that the CNAA "is not intended to confer any benefits upon, or to create any rights in favor of any Person or entity other than the Parties and the Association Entities".[107] It is sufficient to note that Clause 23.5 cannot be interpreted in a manner that deprives the terms of Clause 18.4 (which is clearly about the rights and obligations of the State as a third party) of their clear and effective meaning.

133.    It follows that CNAA Clause 18.4 consecrates the exclusive nature of the CNAA compensation mechanism.

### (3)    Congressional Condition 18 and CNAA Clause 18.3

134.    In addition, Congressional Condition 18 contains further wording not replicated in the CNAA, namely that "the exercise of [sovereign powers by the State of Venezuela] shall not give rise to any claim, regardless of the nature or characteristics of the claim, by other states or foreign powers"[108].

135.    The Respondent argues that the Claimants thereby accepted to waive the only additional protection they had at the time of signing, namely diplomatic protection. This, the Respondent argues, is in line with the compensation mechanism's exclusive nature.[109] The Claimants object that the words of the Congressional Condition are clear on their face, and that they were in any event already contemplating investment arbitration at the time, which belies the Respondent's position.[110]

136.    At the hearing, the Tribunal asked whether, in the light of contemporaneous documents submitted to it,[111] the investment arbitration envisaged at the time was not against Lagoven

---

[107] Claimants' Memorial, §169. Cf. also the formula used by the Claimants at the hearing: "*it does not afford rights that release the State from the obligations imposed by international law*". Hearing Transcripts, Day 2, p. 15.

[108] Respondent's translation in Exhibit R-3. For the Claimants' translation, see *supra*, §124.

[109] Respondent's Counter-Memorial, §173.

[110] Hearing Transcripts, Day 1, pp. 58-59.

[111] Notably Mobil Presentation, *Venezuelan Synthetic Crude Oil – Executive Committee Presentation*, 7 August 1996, Exhibit C-93; Mobil's Questions and Answers, October 1997, Exhibit C-94; and *Mobil Corporation et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Transcript of Hearing on Jurisdiction, 23 September 2009, Exhibit R-50.

(in accordance with Article 25.3 of the ICSID Convention) rather than against the State itself.[112] The Claimants denied this[113] by reference to the last sentence in the relevant document, which reads as follows:

> *"Mobil negotiated a 'second bite' at international arbitration in the Association Agreement under ICSID rules should an ICC arbitration be unenforceable.*
> *Arbitration pursuant to ICSID overcomes both the Constitutional challenge and Code of Civil Procedure issue.*
> *Mobil is currently working to register Lagoven/PDVSA with ICSID.*
> *In addition, there is a Bilateral Investment Treaty currently being negotiated which may provide for international arbitration."*[114]

The first sentence from this quote makes it clear that the Claimants essentially looked for investment arbitration as additional protection in case an award obtained against Lagoven in a contractual arbitration could not be enforced in Venezuela. This is confirmed by an ExxonMobil note of 23 April 1997 which reads as follows:

> *"the SCO contract is of 'national public interest.' If Mobil were to win an arbitration award outside Venezuela against PDVSA/Lagoven, this phrase could give a Venezuelan court the right not to permit Mobil to enforce a judgement, based on Article 127 of the constitution."*[115]

Whether investment arbitration was considered against Lagoven or against the State, it was concerned with the hypothesis that an award against Lagoven under the CNAA issued by an institution other than ICSID might not be enforceable in Venezuela.[116]

---

[112] Hearing Transcripts, Day 1, pp. 196-197.

[113] Hearing Transcripts, Day 2, pp. 18-19.

[114] Mobil Presentation, *Venezuelan Synthetic Crude Oil – Executive Committee Presentation*, 7 August 1996, Exhibit C-93, p. 6. Emphasis added.

[115] Mobil Internal Memorandum regarding the status of the conditions precedent in the Heads of Agreement, 23 April 1997, Exhibit R-50, p. 3.

[116] Claimants' Reply, §105.c, further refers to the Common Security Agreement among Mobil Cerro Negro Holding, Ltd., et al., 18 June 1998, Exhibit C-96. However, this document does not contradict the above. Section 6.07 refers to the possibility "to institute proceedings (whether before a court or judge or by way of arbitration or otherwise) to enforce such claim, execute judgments or awards made pursuant thereto and collect and receive Expropriation Compensation". Annex A, p. A-8, provides that "'Expropriation Compensation' means (a) all value … paid or payable by Venezuela or its agencies or instrumentalities, in whole or partial settlement of claims, whether or not resulting from judicial proceedings and whether paid or payable within or without Venezuela, as compensation for or in respect of an Expropriatory Event …". These very broad provisions can refer to mitigation action taken against the State, as they can refer to damages due by Lagoven. There is no implication regarding action against the State to recoup additional damages.

137.    This was actually explicitly contemplated in CNAA Clause 18.3, which reads as follows:

> "*18.3 Alternative Mechanism for the Resolution of Disputes*
>
> *In the event that any arbitration or award effected pursuant to the provisions of Section 18.2 is declared invalid or unenforceable in Venezuela* for any reason, the Parties agree that, upon the request from anyone of the Parties*, the disputes arising out of or concerning this Agreement shall be submitted to binding arbitration before the International Centre for settlement of Investment Disputes ("ICSID")* in accordance with its arbitration rules in effect at the time of the relevant dispute .... "[117]

This shows that the Claimants pursued, and obtained from Lagoven, the possibility to bring proceedings against Lagoven in ICSID arbitration. This was not only something the Claimants pursued in parallel to the negotiations. It was part of the negotiations up to the actual contract. Conversely, it also makes clear what the Claimants did not obtain during these negotiations: ICSID arbitration against the State (and even less so, arbitration against the State for *additional* damages). This could have been agreed upon by contract with the State in the same way as ICSID arbitration against Lagoven. It was not. If the Claimants were contemplating investment arbitration against the State to complement the CNAA compensation with compensation payable by the State under international law, as the Claimants assert, they failed to concretize this at the time of signing the CNAA through a parallel agreement with the State. They signed up to an arrangement (which is trilateral to the extent it refers to the Congressional Conditions) providing exclusively for investment arbitration against Lagoven. In the light of the Claimants' stated wish to gain all possible protection, the Tribunal considers that there is little or no doubt that the Claimants would have entered into an agreement with the State to provide for additional ICSID protection if that had been possible. The texts before the Tribunal indicate that it was not.

138.    Accordingly, Congressional Condition 18 and CNAA Clause 18.3 confirm the exclusive nature of the CNAA compensation mechanism.

---

[117] Emphasis added.

### (4)    Congressional Condition 20 and CNAA Clause 15.2

139.    Congressional Condition 20 further provides that "it shall not be considered that a Party has suffered an adverse and significant economic consequence"[118] if a certain oil price is reached. This formulation implies that the foreign investor shall be deemed not to have suffered damage, so that there is no factual basis for *any* claim, albeit against Lagoven or against the Venezuelan State. This is again an indication that the CNAA compensation mechanism was meant to be exclusive.

140.    It is true that CNAA Clause 15.2 is formulated differently, stating that Lagoven "shall not have the obligation to compensate". This, however, leaves the above conclusion from Congressional Condition 20 unaffected. This is the logical consequence for Lagoven of the fact that the foreign investor has not suffered significant damage. Also, as noted earlier, Clause 15.1.a is to the effect that negotiations or arbitration are supposed to "restore the economic benefit" for the foreign investor.

141.    The very object of Congressional Condition 20 as reflected in CNAA Clause 15.2.a is also of major importance. The "price cap" mechanism reflects the Respondent's objective to be able to capture windfall profits.[119] This cap as a mechanism allowing the State to capture windfall profits would make no sense if the Claimants could freely claim additional compensation from the State. At the same time, these provisions reflected a reasonable compromise or "give and take": in case of Discriminatory Measures taken by the State, the foreign investor would obtain an extraordinary recourse against the state corporation Lagoven, which it would not have absent a specific provision to that effect, but it would get nothing more. That this was the reasonable compromise arrived at is confirmed by the respective positions of the Claimants and the Respondent evidenced by the materials and declarations before the Tribunal. The Claimants would not invest in Venezuela again absent a solid protection against expropriation. The Respondent, for its part, was willing to give a limited protection only (as evidenced by Congressional Condition 20) and did not

---

[118] Respondent's translation, Exhibit R-3. Claimants' translation in Exhibit C-35 reads as follows, with the added italics identifying the differences with the Respondent's translation: "it shall not be considered that *the* Party has suffered an *economically* adverse and significant consequence".

[119] See also Minister Bernard Mommer, *Venezuela, Política y Petróleos,* Cuardernos del Cendes, Año 16, No. 42 (1999), Exhibit R-12.

want to become itself involved in international disputes over the investment (as evidenced by Congressional Condition 18). In these circumstances, the CNAA compensation mechanism as a solid and extraordinary, but exclusive, protection mechanism constituted a natural and reasonable middle-ground. The Tribunal finds that this founded the purpose and intention of the parties to the CNAA.

## E.    FURTHER ARGUMENTS OF THE PARTIES

142.    For the sake of completeness, the Tribunal addresses hereinafter various arguments brought by the Parties that have not been specifically addressed hereabove.

143.    *First*, in their Request for Resubmission, the Claimants argued that "[u]nder the clear terms of the CNAA, MCN had an uncapped right to 100% of its share of the production from the Cerro Negro Project".[120] This does not warrant a finding that the CNAA compensation mechanism was non-exclusive in nature. As discussed, the CNAA provision granting the Claimants an uncapped right to revenues must be read in conjunction with the other provisions, notably Clauses 15 and 18. Based on these clauses combined, the Claimants were entitled to 100 pct. of the revenue from their share in the production, unless and until the State would take a Discriminatory Measure, which would trigger the compensation mechanism and its cap.

144.    *Second*, the Claimants have argued that the CNAA compensation mechanism must be non-exclusive because "[a] different answer would mean that the fair market value of an investment in Venezuela's oil sector not protected by a contractual indemnity from PDVSA would be nil—a manifest nonsense".[121] As the Respondent observes,[122] this is incorrect. Absent the contractual indemnity, the question whether it is exclusive or not, would not arise. The Claimants would have an unrestricted right to claim in accordance with international or domestic law.

---

[120] Claimants' Request for Resubmission, §7.

[121] Claimants' Request for Resubmission, §7.

[122] Respondent' Counter-Memorial, §160.

145.   *Third*, the Claimants argue that "reducing the value of Mobil's investment to the value of the PDVSA Partial Indemnity would improperly double-count the risks faced by the Project", because the "high discount rate applied by the Guillaume Tribunal in its DCF calculation of fair market value already accounts for taxation and expropriation risk".[123] This argument is concerned with the impact of the First Award and will be discussed below.

146.   *Fourth*, the Claimants argue in their Request for Resubmission that "in a passage that was not annulled [footnote 46: First Award §§371-372], the First Tribunal noted that the limitation of PDVSA's liability by reference to a 'price cap' within the PDVSA Partial Indemnity was not imposed by the Framework of Conditions, but by the CNAA. In other words, irrespective of whether domestic legislation *could* do so as a matter of international law, the legislation *did not* fix the amount of compensation that would be owed by Venezuela for an expropriation and thus could not constitute 'applicable law' to that question".[124] This argument is unfounded in more than one respect:

-    The non-annulled paragraph 372 of the First Award states that "[i]n accordance with the Twentieth Condition of the Congressional Authorization, Clause 15(2)(a) of the Agreement fixes a price cap for the compensation". Paragraph 373, which has been annulled, then further states that "the Twentieth condition of the Congressional Authorization does not impose *a specific* price cap, but provides for a price cap to be established in the Association Agreement".[125] The First Tribunal' statement that the price cap is not enunciated in the Congressional Conditions but in the CNAA, is thus to be found in an *annulled* paragraph of the First Award.

-    The First Award does not contain the statement on "applicable law" presented by the Claimants. This is the Claimants own unexplained deduction, which the Tribunal regards as unfounded.

---

[123] Claimants' Memorial, §15.d.

[124] Claimants' Request for Resubmission, §38. Emphasis in the original.

[125] Emphasis added.

-    In any event, the Claimants confirmed at the hearing that the CNAA constitutes a "special agreement" within the meaning of Article 9.5 of the BIT identifying applicable law.[126] The argument made in their Request for Resubmission is thus moot.

147.    *Fifth*, the Claimants assert that PDVSA attempted in vain to include in the Heads of Agreement a provision pursuant to which it could purchase Mobil's interest in the project at a commercial value corresponding to the SCO Protected Cash Flow. This is said to show that Mobil "rebuffed any attempt to link the value of its investment to a particular oil price".[127] The Respondent correctly objects that this assertion is contradicted by the draft agreement of 11 July 1996, entitled "*Mobil* Draft"[128], which detailed the buy-out option.[129] More importantly, the parties to the CNAA could very well have rejected a cap on the price to be paid by Lagoven in case of buy-out, while providing for a cap in case of expropriation by the State. This would be in line with the system's function as a capture of windfall profits.

148.    *Sixth*, the Claimants argue that, if the mechanism were exclusive, the agreement would differentiate between classes of shares – those of PDVSA having much higher value than those of the foreign investors.[130] The Respondent correctly objects that it does not assert that Mobil forewent its entitlement to revenues, but that it consented to the State's right to capture all revenues beyond the protected cash flow.[131] As long as the State takes no confiscatory action, the Claimants' shares have the same value as those of PDVSA.

149.    *Seventh*, the Claimants argue that "[e]ven if there were no available 'international' law remedies against Venezuela at the time of the CNAA, MCN could still pursue domestic law remedies against the State, confirming that the PDVSA Partial Indemnity was not an exclusive remedy".[132] The availability of domestic remedies, however, does not allow for

---

[126] Hearing Transcripts, Day 1, pp. 95-97.

[127] Claimants' Reply, §79 ff.:

[128] Emphasis added.

[129] Respondent's Rejoinder, §159; Mobil Draft of Exhibit D to the Heads of Agreement, 11 July 1996, Exhibit R-64.

[130] Claimants' Reply, §§64-65.

[131] Respondent's Rejoinder, §163.

[132] Claimants' Reply, §105.d.

concluding that the Claimants were entitled to obtain damages from the State, *additional* to the capped compensation due by Lagoven. It does not mean that no legal action could be taken against the State – for purposes of mitigation as defined above. While, as discussed in later parts of this award, international remedies may by their nature confer a right to additional compensation, this is not intrinsically the case of domestic law remedies, which may be limited to cessation or mitigation. The availability of domestic remedies therefore does not support the Claimants' position that they were entitled to additional damages.

## F.   A REGIME LIMITED TO *LAWFUL* EXPROPRIATIONS?

150.   As already mentioned, the Claimants' arguments occasionally qualify the expropriation as unlawful, suggesting that their position as to the exclusive or non-exclusive nature of the CNAA compensation mechanism may be inspired, in whole or in part, by their initial position (subsequently rejected by the First Tribunal) that the expropriation was unlawful.[133] Against this background, the Tribunal has further considered whether the CNAA should be interpreted as providing more specifically for the exclusive compensation mechanism in case of *lawful* expropriation, without prejudice to further legal action the foreign investors may take in case of *unlawful* expropriation or other violations of international law.

151.   Irrespective of the CNAA, there may be sound reasons to consider under applicable domestic or international law, notably a general principle of law, that in some instances a State which violates its international obligations is not entitled to rely on a liability limitation clause. The CNAA compensation mechanism itself might be similarly restricted, or it could be interpreted in the light of such a legal principle.

152.   CNAA Clause 15 contemplates acts of the Venezuelan State that qualify as "Discriminatory Measures", which at first suggests their unlawfulness under international law. However, the notion of "Discriminatory Measures" is contractually defined in Clause

---

[133] See *supra*, §76.

1 and at variance with international law.[134] Further, Clause 15 provides for procedural guarantees and a compensation mechanism to "restore the economic benefit" for the investor. This indicates that it contemplates expropriations *made lawful – or prevented from becoming unlawful* – by the payment of compensation on the basis of an impartial procedure that is contractually considered to restore the *status quo ante*.

153. CNAA Clause 18.4 provides that the "activities and operations contemplated [in the CNAA]" shall not impose obligations on Venezuela. The Tribunal has reasoned above that this means that Venezuela does not incur any obligation in relation to the activities or operations of the parties by virtue of the CNAA, that is, in relation to the project *per se*. From the perspective presently discussed, the main effectiveness of CNAA Clause 18.4 can also be found in combination with CNAA Clause 15, which contemplates activities and operations *by the Venezuelan State*, and more specifically *lawful* expropriations by the Venezuelan State. According to this interpretation, Clause 18.4 is to the effect that the CNAA provides for the exclusive compensation mechanism in case of *lawful* expropriation, without prejudice to further legal action the Claimants may take in case of unlawful expropriation or other violations of international law.

154. This interpretation is compatible with the further terms of CNAA Clause 18.4, according to which the agreement etc. shall in no event "limit the exercise of [Venezuela's] sovereign powers". According to the Claimants, this means Venezuela is entitled to expropriate but obliged to compensate.[135] The phrase "exercise of sovereign powers" can indeed be interpreted as encompassing lawful expropriations but not unlawful expropriations or other violations of international law.

155. This interpretation is also compatible with the waiver of diplomatic protection resulting from Congressional Condition 18 combined with CNAA Clause 2.1.b. This waiver is broad in that it applies "regardless of the nature or characteristics of the claim". Still, it remains

---

[134] It is of note that the ICC Tribunal found the expropriation to constitute a Discriminatory Measure as defined in CNAA Clause 1 because "Decree-Law 5200 was 'not generally applicable to Companies in the Republic of Venezuela', even if the change in operatorship was carried out in every EHO [Extra-Heavy Crude Oil] project in the Orinoco Oil Belt" (ICC Award, §443 and further §445).

[135] Claimants' Reply, §54.

limited to "activities and operations conducted under" the CNAA, which would apply to lawful expropriations but not to unlawful ones. The Spanish, authentic version of the Congressional Conditions favours this interpretation as it refers to "*actividades y operaciones conducidas conforme a él*", that is, in conformity with the CNAA.[136] Again, therefore, the waiver would prevent diplomatic protection with respect to the amount of compensation due in case of an expropriation conducted in accordance with the terms of the CNAA, but not with respect to violations of international law by the Venezuelan State.

156.   It is also of note that, insofar as the Tribunal could ascertain, the Respondent never argued that the Claimants' fair and equitable treatment claims were precluded by the exclusive nature of the CNAA compensation mechanism. The First Tribunal only addressed the Respondent's argument regarding the exclusive nature of the mechanism with respect to the Claimants' expropriation claim, after having dealt with and partly upheld their other claims.[137] Along the same lines, the Claimants observed at the hearing that there were "other claims … that were not annulled, fair and equitable treatment claims, for example, in relation to other governmental measures, that were successful, whether or not they came within the definition of 5% material adverse effect, because that is a separate regime".[138] Under the interpretation presently considered, these claims could be successful indeed, not because they did not reach the 5% threshold,[139] but because they were claims for violations of international law.

157.   This alternative interpretation of the CNAA is of direct relevance in the present instance. The First Tribunal found, based on the facts before it, that the case had to be treated as an expropriation *with* compensation and as a *lawful* expropriation.[140] This is, as noted above, *res judicata* for the Resubmission Tribunal. In these circumstances, the CNAA

---

[136] Congressional Authorization of the Framework of Conditions for the Cerro Negro Association Agreement, Official Gazette No. 36.224, 10 June 1997, Exhibit R-3, p. 3 of the PDF, translated as "conducted under it" at p. 10 of the PDF. Again, this interpretive element should not be accorded too much weight, since CNAA Clause 18.4, which was subsequently approved by the Venezuelan Congress, uses the slightly different terms "*contemplada en el mismo*", "contemplated" in the English version.

[137] First Award, §§369 ff.

[138] Hearing Transcripts, Day 2, p. 13.

[139] See *supra*, §§103-105.

[140] First Award, §§305-306.

compensation mechanism also provides for the exclusive remedy in the interpretation presently discussed.

### G. GENERAL CONCLUSION ON THE CNAA

158. It follows from the above that, in the light of all the available interpretative elements, the CNAA compensation mechanism provided – without prejudice to the subsequent impact of the BIT and of the First Award's *res judicata* effect – for an exclusive compensation mechanism, in that the foreign investors were not entitled to claim compensation from the Venezuelan State additional to that due by Lagoven pursuant to Clause 15 of the CNAA.

159. A combined interpretation of all the relevant provisions in the CNAA and the Congressional Conditions shows, and the broader context and history confirm, that at the time of its signing, the CNAA precluded any claim being brought against the Venezuelan State with respect to the project. The legal regime is of course multi-layered and complex, and the CNAA is the product of negotiations and not a scholarly work. Accordingly, as the Tribunal has indicated in its analysis hereabove, there are at times uncertainties and tensions in or between the provisions, meaning that the contract is in some respects "obscure, ambiguous or deficient". Such uncertainties and tensions cannot, however, detract from the finding based on the combined interpretative elements: in CNAA Clause 15.1, in CNAA Clause 15.2, in CNAA Clause 18 and in the Congressional Conditions, having also regard to the broader context and history, which together establish "the parties' purpose and intention taking into account the requirements of the law, the truth and good faith" as required by Article 12 of the Venezuelan Code of Civil Procedure.

160. Having made this finding, the Tribunal has envisaged an alternative interpretation, according to which the CNAA compensation mechanism would be the exclusive remedy in case of lawful expropriations only, without prejudice to other action the foreign investors might take in case of violations of international law. In that case, the CNAA compensation mechanism would still be the exclusive remedy available in the present instance, since the First Tribunal has found with *res judicata* effect that the expropriation of the Claimants' investment must be treated as a lawful one.

161.    Without prejudice to the impact of the BIT and the First Award's *res judicata* effect, the CNAA compensation mechanism is therefore the exclusive remedy available for the expropriation in the present case, dispensing the Respondent from paying any compensation additional to the capped amount due under the CNAA.

162.    Having made this finding, the Tribunal observes that a willing buyer would not, in any event, base its offer on the final and binding finding of a tribunal as to the exclusive or non-exclusive nature of the CNAA, which would not be available to him at the time of making the offer. Rather, a willing buyer would base its offer on a risk assessment as to the probability that the CNAA would ultimately be found to be an exclusive or non-exclusive mechanism. In that respect, the Tribunal considers that a willing buyer would have considered the risk of the CNAA being qualified as an exclusive mechanism, as very high.[141]

163.    The Tribunal considers that in the circumstances a willing buyer would, in formulating its offer, not have factored in the possibility of obtaining an additional amount of compensation from the State. To the opposite, a willing buyer would have made its offer on the assumption that no additional amount would be obtained.

*

## VI.    COMPENSATION PURSUANT TO THE BIT AND THE FIRST AWARD

164.    The Tribunal must now determine whether and if so, how the CNAA Compensation Mechanism, which the Tribunal has found was originally conceived to be exclusive in nature, has been affected by the subsequent conclusion of the BIT and by the First Award's non-annulled portions. In other words, the Tribunal must determine what place the BIT, as the instrument on which basis this arbitration proceeding is brought, accords to the CNAA.

---

[141] For the sake of completeness, the Tribunal notes that a willing buyer would, of course, not base its offer either on the First Tribunal's finding that the expropriation of the Claimants' investment was lawful. But a willing buyer would base its offer, *inter alia*, on the possibility that Venezuela would proceed with a lawful expropriation and that the CNAA would be interpreted as providing the exclusive compensation in that hypothesis. By contrast, a willing buyer would not accept to pay a higher price based on the reasoning that additional compensation might be obtained if Venezuela violated international law. No reasonable willing seller would present the hypothesis of a violation of international law as an opportunity for the buyer rather than as an additional risk.

For that purpose, the Tribunal must first address the issue of applicable law and more specifically the relationship between the CNAA and Venezuelan domestic law, on the one hand, and the BIT, on the other hand, which was at the heart of the First Award's partial annulment.

A.    THE APPLICABLE SOURCES OF LAW

165.    As concerns the sources of law applicable to the present instance, the Tribunal must discuss the relevance of the principle affirmed by Article 27 of the Vienna Convention on the Law of Treaties (VCLT), before moving to the sources of applicable law in Article 9 of the BIT.

(1)    The different normative regimes and Article 27 VCLT

166.    In the passages of the First Award that were subsequently annulled, the First Tribunal reasoned that the Respondent could not rely on the CNAA to avoid the application of Article 6 of the BIT concerning compensation in case of expropriation. The First Tribunal considered that the ICC and ICSID arbitrations involved different parties under different normative regimes[142] and that pursuant to Article 27 VCLT, "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty".[143] In the present proceeding, the Claimants have brought the same or similar arguments.[144]

167.    The First Tribunal's reasoning that the ICC and ICSID arbitrations involve different parties under different normative regimes is undisputable. However, this does not mean that the CNAA Compensation Mechanism and the ICC Award rendered in application thereof are necessarily and entirely irrelevant to the present ICSID claim. The distinction between contract claims and treaty claims to which the Claimants refer[145] is not determinative of this issue. As a treaty claim, the Claimants' claim before this Tribunal must be decided in accordance with the BIT's standards. This implies that the CNAA Compensation Mechanism is not automatically determinative of the matter of the compensation to be determined in the present proceeding. To this extent, the Claimants are clearly correct. But

---

[142] First Award, annulled §§216-218.

[143] First Award, annulled §225.

[144] Claimants' Memorial, §§160, 168 ff.; Claimants' Reply, §58.

[145] *I.a.*, Claimants' Memorial, §168 ff.

this does not exclude altogether the possibility that the former may impact on the latter. That the Claimants have obtained compensation pursuant to the CNAA Compensation Mechanism could, for instance and as the Respondent argues, impact on the compensation due under the BIT, an issue which the Tribunal will address below.[146]

168.    Neither is the principle affirmed by Article 27 VCLT determinative of the present instance. The First Tribunal's reliance on Article 27 VCLT is core to the *Ad hoc* Committee's reasons for annulment. The *Ad hoc* Committee reasoned that the principle codified in Article 27 VCLT was irrelevant to the case before it, in substance because there was no 'conflict' between domestic and international law and Venezuela did not, in the Committee's view, rely on its domestic law to evade its international obligations.[147] In the present proceeding, the Respondent argues more specifically that the way in which the CNAA determines the Claimants' rights under the BIT is different from the principle expressed in Article 27 VCLT. The BIT protects an "investment", that is, a bundle of rights determined by domestic law. The CNAA, says Respondent, determines the nature and scope of the Claimants' investment.[148]

169.    In this respect, the Tribunal finds in favour of the Respondent's position, which is consistent with the very structure of the BIT from two perspectives:

-    First, the BIT determines its substantive scope of application by reference to the notion of 'investment' defined in Article 1.1, and both Parties agree that the investment in the present instance must be determined by reference to the contractual rights accorded to the Claimants.[149] In particular, the BIT regime on expropriation set out in Article 6 applies to the Claimants 'investment' which is identified by reference to contractual rights governed by domestic law.

---

[146] *Infra*, §174ff.
[147] Annulment Decision, §§161-162.
[148] Respondent's Counter-Memorial, §§137, 142 ff.; Respondent's Rejoinder, §§50-56.
[149] Claimants' Memorial, §§14, 181; Claimants' Reply, §§ 2, 43-44; Respondent's Rejoinder, §§38, 45.

-   Second, Article 9 of the BIT, discussed hereafter, lists sources of international law, host State law and 'special agreements' such as the CNAA[150] as part of the law applicable by arbitral tribunals hearing disputes in application of the BIT.

### (2)    Applicable sources of law

170.    As concerns the applicable law, the Tribunal agrees with the *Ad hoc* Committee that Article 9 of the BIT "gives no indication as to a hierarchy or order of priority between [the listed] … sources of law, except to the extent that the conjunctive 'and' implies that several, or indeed all, of these sources of law may come into play in the circumstances of a particular dispute".[151]

171.    Unlike what the Claimants assert,[152] the Tribunal does not have the *discretion* to choose between the various sources enumerated in Article 9, if by that is meant the discretion to choose not to apply an, otherwise applicable, listed source of law. If identifying the applicable law were a matter of discretion, a failure to apply the applicable law could not give rise to a "manifest excess of power" as a ground for annulment pursuant to Article 52 of the ICSID Convention. The Tribunal has little doubt indeed that the Claimants would disagree, and rightly so, if the Tribunal purported to exercise such a discretion to decide their claim on the exclusive basis of Venezuelan domestic law.

172.    In the present instance, the Congressional Conditions and the CNAA, which both Parties qualify as a "special agreement" within the meaning of Article 9 of the BIT[153] are part of the applicable law together with the BIT. The Respondent's position that the CNAA and Venezuelan domestic law determine the bundle of rights constituting the Claimants' investment is in line with a combined application of the various sources enumerated in Article 9 of the BIT.

---

[150] As recognized by the Claimants at the hearing: Hearing Transcripts, Day 1, pp. 95-97.

[151] Annulment Decision, §154.

[152] Claimants' Memorial, §112.

[153] Counsel for the Claimants in Hearing Transcripts, Day 1, pp. 95-97; Respondent's Counter-Memorial, §10.

173.    *Obiter*, the Tribunal observes that it would disagree with the *Ad hoc* Committee's reasoning if that reasoning implied that the enumeration of sources in Article 9 of the BIT prevents arbitral tribunals from applying customary international law.[154] For example, it would be unreasonable to consider that the enumeration in Article 9 should be interpreted as preventing arbitral tribunals from applying, in particular, the law of State responsibility. In any event, that is not what the Tribunal understands the *Ad hoc* Committee to say. The Tribunal observes that the Annulment Decision's relevant passages refer to a failure to state reasons regarding the applicable law,[155] or find that the First Tribunal manifestly exceeded its powers for the more specific reason that it applied customary international law "in place" of the provisions of the BIT.[156] This indicates that the *Ad hoc* Committee did not intend to rule out the application of customary international law altogether.

## B.    THE RESPONDENT'S PRINCIPAL DEFENSE ("THRESHOLD ISSUE")

174.    In its Counter-Memorial and Rejoinder, the Respondent briefly argues at the outset that no compensation at all is due in the present proceeding.[157] The Respondent argues that the Claimants have qualified the ICSID proceeding as the "prior proceeding aimed at mitigation" within the meaning of CNAA Clause 15, and that "[n]ow that [the damages due pursuant to the ICC arbitration] were paid in full to Mobil, there is simply no damage that Mobil may 'mitigate' through the Arbitration under the terms of the Twentieth Condition and the CNAA".[158]

175.    The Respondent's reasoning echoes CNAA Clause 15.1 which is aimed at "restor[ing] the economic benefit" for the investor and therefore, at repairing the damage the foreign investor may originally have suffered by reason of a Discriminatory Measure taken by the Venezuelan State. As the Tribunal has set out above, this shows that upon an appropriate

---

[154] Annulment Decision, §§159, 187.

[155] The Annulment Decision at §159 thus notes that the First Tribunal "*gives no indication of where it derives the authority* to make what looks like a modification – or indeed an expansion – of the source rules laid down in the Article, *nor does the Tribunal state* what criterion it has in mind …" (emphasis added). The Annulment Decision's reasons at §187 and the decision at §§188.b-c identify a contradiction in the First Tribunal's reasoning.

[156] Annulment Decision, §188.a.

[157] Respondent's Counter-Memorial, §§ 12-18; Respondent's Rejoinder, §§ 11-26.

[158] Respondent's Counter-Memorial, §17.

functioning of the CNAA Compensation Mechanism, there would be no damage left for which reparation could be claimed from the State.[159] That was, as the Tribunal has emphasised,[160] before the entry into force of the BIT and before the First Award.

176. However, as the Claimants correctly observe, "Venezuela's so-called 'threshold issue' goes to the very heart of the substantive dispute between the parties in this arbitration: whether the limited payment made by PDVSA-CN to MCN under the CNAA had the effect of inoculating Venezuela against a claim for compensation under international law".[161] In other words, the Respondent's threshold argument does not address the question whether the compensation paid pursuant to the ICC Award satisfies the conditions of the BIT (notably in Article 6.c), and if not, what the consequences are. Neither does the Respondent's threshold argument address the impact of the non-annulled parts of the First Award.

177. The Respondent's principal defense *qua* "threshold" defense is accordingly rejected. As set out below, this does not mean that the CNAA provisions have become irrelevant to the present proceeding.

## C.    THE CNAA, THE BIT AND THE FIRST AWARD

178. The Tribunal will now consider whether and, if so, how the CNAA Compensation Mechanism relates to the BIT and to the non-annulled parts of the First Award. At first, the relationship can be conceived in different manners, but in the present instance, the BIT provisions combined with the First Award and the Parties' positions before the Resubmission Tribunal leave room for only one solution.

179. As a starting point, it is the very nature of bilateral investment treaties that affirms rights on which foreign investors can rely, generally before arbitral tribunals. Bilateral investment treaties are capable of giving rise to a new relationship between a host State and a foreign investor, which may or may not complement or replace the previously existing relationship.

---

[159] *Supra*, §§ 101 ff.
[160] *Supra*, §§ 78, 164.
[161] Claimants' Reply, §26.a.

The question here is whether the BIT has created a new legal relationship between the Respondent and the Claimants that complements or replaces the relationship created under the CNAA.

180.    A totally effective way to prevent the CNAA mechanism from being subsequently overturned by an investment treaty would have consisted in expressly barring access to investment arbitration pursuant to any investment treaty, present or future, with respect to the project. However, as the Claimants point out, "it is notable that Venezuela never objected to the jurisdiction of the Guillaume Tribunal on the basis that Mobil had somehow waived its rights to recourse against Venezuela for an Expropriation".[162] In any event, it bears repeating that jurisdiction over the present claim has been established with *res judicata* effect by the First Tribunal.[163]

181.    For the same reasons, it is of no avail to argue, as the Respondent does, that "the 'international rights' the Mobil Parties are actually referring to are those they have unilaterally created through a dishonest restructuring" and that the question is whether that restructuring "could have the effect of fully revamping the initial bargain".[164] The Tribunal could not entertain this argument without infringing on the First Award's *res judicata* effect.

182.    Alternatively, full legal certainty as to the perduring exclusive nature of the CNAA Compensation Mechanism could have been achieved, as the Claimants point out, by a waiver of "all other remedies – present and future – under all sources of law".[165] The crux would lie in a waiver encompassing *future* rights and remedies.[166]

---

[162] Claimants' Reply, §105.a.

[163] Decision on Jurisdiction, 10 June 2010.

[164] Respondent's Rejoinder, §134.

[165] Claimants' Reply, §86.b.

[166] For completeness' sake, the Tribunal observes that the existence of such a waiver could not have been established on the basis of adverse inferences as advocated by the Respondent (Respondent's Rejoinder, §§ 9 and 84 ff.; Hearing Transcripts, i.a. Day 1, pp. 141, 145 and Day 2, pp. 58, 60, 61). Even assuming there were a basis to draw adverse inferences from the Claimants' behaviour regarding document production, which the Tribunal does not consider to be the case, this would leave the Tribunal's finding on the interaction between the CNAA and the BIT unaffected. Inoculating an agreement from a subsequent agreement applicable between the same parties requires very strong and

183.  Absent such specific provisions, the contract starts *interacting* with the subsequent investment treaty. This interaction can take place in various ways, depending on various provisions of the BIT and the contract, and depending on whether the case involves an alleged breach of the BIT or a lawful expropriation.

184.  In the present instance, this question is not only determined by the BIT and the CNAA, but also by the *res judicata* effect of the non-annulled parts of the First Award as also reflected in the positions of the Parties in the present proceeding.

185.  The Tribunal starts with noting that the expropriation has been found to be lawful.[167] The Claimants are, accordingly, not entitled to full reparation but to compensation in accordance with the standards set out in the BIT. The first sentence of Article 6.c of the BIT enunciates the requirement that "the measures are taken against just compensation". If the BIT merely provided for "just compensation" without any further specification, the CNAA compensation might qualify as "just" compensation under the BIT because it could be said that it was freely agreed upon by the parties to the CNAA as "restoring the economic benefit" for the investor. Accordingly, no further compensation might be due. A similar reasoning could be followed to calculate compensation by reference to the investment's "market value", if one were to interpret this notion as referring simply to the "fair" market value,[168] and further if one were to consider that the CNAA price cap of USD 27 reflected what the parties regarded as the "fair" market value.[169] The point is that the BIT criteria could in theory be concretized by *direct* reference to the CNAA Compensation Mechanism.

---

explicit wording – which can always be set aside by equally strong and explicit wording in the subsequent agreement. No negotiation document could have produced that effect in the present instance.

[167] First Award, §§305-306.

[168] The expression is used in CNAA Clause 13 to which the Claimants refer in their Reply, §63.

[169] The Respondent has sought to present the legal issue before the Tribunal in this way: Respondent's Counter-Memorial, §141.

186. In the present instance, however, the First Tribunal found,[170] and the Parties have reiterated before this Tribunal,[171] that the market value of the investment must be determined specifically on the basis of the "willing buyer" test, i.e., by reference to what a willing buyer would have paid for the investment absent expropriation,[172] and what a willing seller would have accepted. Even more specifically, reference is made, both in the First Award and by the Parties before this Tribunal, to the need to determine that value by means of a discounted cash flow (DCF) method.[173]

187. In those circumstances, compensation under the BIT cannot be determined by a simple reference to the amount due under the CNAA Compensation Mechanism in case of expropriation. The question is a more complex one: whether a willing buyer and a willing seller would have had regard to the CNAA Compensation Mechanism in formulating their offer and acceptance, and if so, how?

**D.    THE BUNDLE OF RIGHTS CONSTITUTING THE INVESTMENT AND THE ENSUING CALCULATION METHOD**

188. In order to determine whether and, if so, how a willing buyer[174] would have regard to the CNAA Compensation Mechanism in formulating its bid, regard must be had to the bundle of rights constituting the investment to which the offer relates (1). Identifying the bundle of rights will assist in determining the method a willing buyer would use to calculate its bid (2).

---

[170] First Award, §307.

[171] Claimants Memorial, §§13-15, 130, 140; Respondent's Counter-Memorial, §§68, 100, 129 ff., 185 ff.; Respondent's Rejoinder, §166 ff. In its Counter-Memorial, §158, the Respondent further "insists that it did not ask the First Tribunal and does not ask the Arbitral Tribunal to 'alter the applicable standard of compensation.'"

[172] This is the very function of setting the critical date pursuant to Article 6 of the BIT, analysed below. The Respondent likewise states in its Counter-Memorial, §151, that the purpose of compensation "is to reinstate the party having been deprived of these rights in the situation in which it would have been *but for that deprivation*" (emphasis added).

[173] First Award, §308; Claimants' Memorial, §§14, 157; Respondent's Counter-Memorial, §243 ff.

[174] For greater ease, the Tribunal will refer hereinafter to "a willing buyer" without systematically referring also to "a willing seller", but it will revert to the position of a willing seller when concretizing its analysis.

**(1)    The bundle of rights constituting the investment**

189.    The Respondent has argued with force,[175] and the Parties substantially agree that a willing buyer would have regard to the bundle of rights constituting the investment in order to determine its bid.[176] The Respondent further argues that it is "necess[ary] to operate a specific allocation" between the sources listed in Article 9 of the BIT, and that the Claimants' investment must be identified by reference to the CNAA and Venezuelan domestic law.[177] The Claimants likewise identify the bundle of rights by reference to the CNAA.[178] It is essential to determine what this bundle comprises.

190.    In that respect, the Claimants are right in observing that the CNAA does not provide a *general* limit on Mobil's income from the project. It provides in substance that, *if* (and only if) Venezuela takes expropriatory measures, compensation shall be due and limited as provided in CNAA Clause 15. Absent such measures, the Claimants enjoy "an unencumbered right to the proceeds of the Cerro Negro Project for the thirty-five-year term of the CNAA".[179] The investors' right to unlimited income absent expropriatory measures is as much part of the "bundle of rights" as the capped compensation in case of expropriatory measures, to which the Respondent rightly refers.[180]

191.    The bundle thus comprises two rights of equal relevance to a willing buyer's reasoning. On the one hand, as long as Venezuela takes no expropriatory measures, the income from the project is uncapped (first right of the bundle). On the other hand, if Venezuela does take expropriatory measures, the investor will obtain no more than the capped amount from the CNAA (second right of the bundle).

---

[175] Notably Respondent's Counter-Memorial, §§136 ff.

[176] Claimants' Memorial, §§14, 181; Claimants' Reply, §§2, 43-45, 62; Respondent's Rejoinder, §§21, 38, 45-46, 164.

[177] Respondent's Counter-Memorial, §§143 ff.

[178] Claimants' Reply, §§42-43.

[179] Claimants' Reply, §§42-43; Also Claimants Memorial, §§185 ff.

[180] Respondent's Rejoinder, §§21, 38, 45-46, 164.

192.    Accordingly, to a willing buyer, the CNAA Compensation Mechanism does not come as a certain and immediate limitation on revenue. It comes as a *risk* that a limitation may apply at some time in the future, and replace the uncapped revenue earned until then.

### (2)    The ensuing calculation method

193.    It follows from the above that each Party is partly correct:

-    The Respondent errs in asserting that compensation is, as a matter of principle, limited to the capped compensation due under the CNAA.[181] This neglects the fact that the CNAA does not provide for a *general* limit on Mobil's income from the project, but for a limit in case of expropriation; and that expropriation is (in principle) a risk but not a certainty.

     However, the Respondent correctly observes that the CNAA "set the outer boundaries of the value *–in case of expropriation–* of Mobil's bundle of rights in the Cerro Negro Project."[182] For the purpose of valuing the investment a willing buyer and seller would want to assess the risk of an expropriation actually occurring, specifically, its likelihood and potential timing.

     This is not because a willing seller would, in the Respondent's terms, "prefer[] … to 'speculate' as to its chance of circumventing the applicable legal framework in a vain attempt to obtain more than what initially agreed",[183] but because, as discussed, the bundle of rights comprising the investment includes an agreement that income would be uncapped unless and until the Respondent took a Discriminatory Measure triggering the CNAA Compensation Mechanism.

-    The Claimants for their part err in asserting that they are entitled to the entire uncapped amount of compensation, as determined by the First Tribunal.[184] This either entirely

---

[181] Respondent's Rejoinder, §§101 ff.
[182] Respondent's Rejoinder, §164. Emphasis added.
[183] Respondent's Rejoinder, §177.
[184] Claimants' Memorial, §194.a, and *passim*; Claimants' Reply, §126.a, and *passim*.

discards the CNAA Compensation Mechanism[185] or effectively assumes that the risk of expropriation of the project throughout its entire duration, until 2035, is nil. As discussed further below, the Tribunal considers that no willing buyer would proceed on that assumption.

This is in fact inherent in the Claimants' correct observation that a willing seller, "absent duress, would never sell for the value of the PDVSA Partial Indemnity where, even in the worst-case scenario, it would receive that limited compensation from PDVSA in any event after enjoying unlimited cash flows for each day that the Cerro Negro Project was not expropriated."[186] In line with this reasoning, it seems evident that a willing seller and willing buyer would further consider *for how many days* the Project is likely to enjoy such unlimited cash flows.

194.    The willing buyer's hypothetical bid must therefore reflect its evaluation of the risk of occurrence of (lawful) expropriation of the investment between 2007 and 2035. As noted, the occurrence of this risk would deprive the buyer of a right to further uncapped income while still allowing it to earn the capped amount provided for in the CNAA. If a willing buyer estimated that Venezuela would expropriate its investment the very next day after the purchase, it would only pay (if anything at all – see below) an amount that accounts for the value of the CNAA capped amount. If a willing buyer estimated that its investment would likely not be expropriated until 2012, it would be willing to value the investment by reference to 5 years of uncapped revenue, *plus* the CNAA capped amount for the remaining years of the project, etc.

195.    For the sake of completeness, it is observed that there might be circumstances in which an investor holding a bundle of rights as presently considered could, as the second limb of its compensation, hope to obtain higher damages than the CNAA capped amount. This could arguably be the case, for example, in the hypothesis of a seizure of physical assets[187] or of

---

[185] E.g., Claimants' Memorial, §160.

[186] Claimants' Reply, §109b. Also Claimants' Memorial, §186.

[187] See *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481 (UNCITRAL), Award, 3 February 2006, IIC 91 (2006), RL-13, §184, to which the Respondent refers in its Counter-Memorial, §150: "[F]or there to have been an expropriation of an investment or return (in a situation involving legal rights or claims *as distinct from*

an illegal expropriation. However, leaving aside that they are inapposite in the present instance,[188] these are hypotheses a willing buyer would consider as part of a generic country risk rather than as a specific contract risk. A reasonable willing seller would be unlikely to present the hypothesis of a violation of international law as an opportunity for the buyer rather than as an additional risk, and a willing buyer would be unlikely accept to pay a higher price based on the reasoning that a contractual compensation cap could be set aside in case of an outright seizure or an illegal expropriation. Contrary to what the Claimants assert,[189] there is therefore insufficient basis to consider that a willing seller and buyer would have factored in the possibility of obtaining additional damages through international arbitration in the present case.

## E.    APPLICATION OF THE CALCULATION METHOD IN THE LIGHT OF THE FIRST AWARD

196.    The Tribunal will now apply the calculation method set out hereabove to the case at hand, taking particular account of the non-annulled parts of the First Award. The Tribunal will thus consider whether the specific risk engendered by the CNAA of an expropriation triggering a right to a capped compensation[190] is covered by (included in) the discount applied by the First Tribunal (1). Having concluded that it is not, the Tribunal will consider whether the evaluation of the CNAA risk by the experts before the First Tribunal or by the Respondent in the present proceeding reflects the calculation method set out above (2). Having concluded that they do not, the Tribunal will further analyse how the CNAA risk should be assessed at the critical date of 26/27 June 2007 set by the First Tribunal (3).

---

*the seizure of physical assets*) the rights affected must exist under the law which creates them, in this case, the law of Ecuador" (emphasis added).

[188] The migration process consisted in depriving the Claimants of their legal rights under the CNAA (See also below, §217) and the First Tribunal has found with *res judicata* effect that the expropriation was legal (§§305-306).

[189] Hearing Transcripts, Day 1, p. 64: "If international remedies are available to the willing buyer, or the willing seller in case of expropriation, that entitle them to the net present value of the project's future net cashflows, the willing seller is under no compulsion to offload the interest at a fraction of that value, even if they did anticipate an expropriation".

[190] The reference to a "risk engendered by the CNAA" must not be understood as obliviating the fact that the CNAA Compensation Mechanism was a guarantee for the foreign investors, because it guaranteed compensation in case of expropriation. It refers to the fact that the guarantee was a limited one, for a capped amount of compensation. The terms "contract risk" or "CNAA risk" are used to allow, insofar as necessary, for distinguishing between the just mentioned specific risk of an expropriation for the CNAA capped amount, and the general country risk referred to in the First Award in relation to the DCF calculation.

**(1)    Is the CNAA risk covered by the discount applied by the First Tribunal?**

197.    The non-annulled parts of the First Award include findings on the discount rate to be applied to calculate the discounted cash flow. According to the First Award, this discount rate includes a "country risk" which in turn includes a "confiscation risk".[191] The question is whether the specific risk arising from the CNAA, as described in the previous section, is already included in the "country risk" and the "confiscation risk" at the basis of the discount rate applied by the First Tribunal. Or is an additional discount required?

198.    When the Tribunal raised this issue at the hearing, the Claimants referred to the "Expert Report on the Discount Rate to be Applied to Projected Cash Flows" prepared by Messrs. Vladimir Brailovsky and Louis T. Wells at the Respondent's request and submitted to the First Tribunal (the "**Brailovsky-Wells Expert Report**").[192] This expert report indeed contains a list of "country risks" which includes an item called "windfall profits tax".[193] On close analysis, however, the Tribunal considers that this does not cover the specific "CNAA risk".

199.    *First*, the First Tribunal considered (in the annulled parts of its award) that the CNAA Compensation Mechanism was incapable of impacting on the amount of compensation due under the BIT, because of the principle that domestic law may not be relied upon to justify non-compliance with international law. It necessarily follows from this reasoning that the First Tribunal did not take account of the specific risk engendered by the CNAA compensation clause when determining compensation.[194]

200.    *Second*, the First Tribunal considered that "the confiscation risk remains *part of the country risk* and must be taken into account in the determination of the discount rate".[195] This

---

[191] First Award, §360 ff. and more specifically §§364-368.

[192] Vladimir Brailovsky and Louis T. Wells, *Expert Report on the Discount Rate to be Applied to Projected Cash Flows*, 15 June 2011, Exhibit R-15 ("**Brailovsky-Wells Expert Report**").

[193] Brailovsky-Wells Expert Report, Table 17, p. 92.

[194] This remains unaltered by the fact that the just mentioned paragraphs were annulled: these paragraphs were annulled precisely because the *Ad hoc* Committee reasoned that the First Tribunal had failed to consider the impact of the CNAA.

[195] First Award, §365. Emphasis added.

confirms that the discount rate applied by the First Tribunal reflected a general country risk rather than a specific contract risk.

201.    *Third*, in line with this, the Brailovsky-Wells Expert Report considers a generic risk of windfall taxes, as opposed to any specific risk flowing from the terms of the CNAA. The Brailovsky-Wells Expert Report indeed refers to "windfall profits tax", without any further specification, as an item in a generic "Catalogue of Country Risks"[196] and not as a contract risk associated specifically with the CNAA. The Brailovsky-Wells Expert Report explains the relevance of this "catalogue" depicted in its Tables 16 and 17 as follows:

> *"The main headings of country risk – political, social and economic – which are listed in Table 16 are expanded with some detail in Table 17. This table assembles factors and criteria used by a collection of organizations, in addition to Institutional Investor, that conduct methodical surveys of investors' views of country risk. All these factors are relevant when an investor makes a decision on how to value a potential investment in a developing country but, clearly, some economic risks are especially important. Among these are the risk of default, risks deriving from changing attitudes of the governments to foreign ownership, the risk of expropriation and the uncertainties of tax policy."*[197]

It is clear from the italicised phrase that the table is concerned with country risks, or with country risks in developing countries, in general. Although "the risk of expropriation" is identified as one such risk, the assessment is not specifically concerned with Venezuela, and even less so with the CNAA. This finds further confirmation in the subsequent paragraphs of the Brailovsky-Wells Expert Report, which are equally general, in which it is stated that "the relationship between oil prices and fiscal provisions holds in the U.S., as well as elsewhere".[198]

202.    *Fourth*, the Brailovsky-Wells Expert Report expressly envisages an alternative amount of compensation *with* the CNAA compensation cap:

> *"Second, we were asked to apply that discount rate to determine the present value, as of June 26, 2007, of the following:*

---

[196] Brailovsky-Wells Expert Report, Table 17, p. 92.

[197] Brailovsky-Wells Expert Report, §153. Emphasis added.

[198] Brailovsky-Wells Expert Report, §156.

> (i)   *The interest of ExxonMobil's subsidiary, Mobil Cerro Negro, Ltd. ('Mobil Cerro Negro'), in the Cerro Negro Project,* applying the price cap determined in accordance with the compensation provisions of the Cerro Negro Association Agreement*; and*
>
> (ii)  *The interest of Mobil Cerro Negro in the Cerro Negro Project, disregarding the price cap under the compensation provisions of the Cerro Negro Association Agreement."*[199]

And further:

> *"Table 2 summarizes the compensation calculation for the Cerro Negro Project applying the 19.8% discount rate as of June 26, 2007.* Applying the price cap under the Cerro Negro Association Agreement, *the present value of the projected cash flows, before considering Mobil Cerro Negro's portion of the Project debt, amounts to US$353.5 million. Disregarding the price cap, the amount is US$843.8 million, again before considering the outstanding Project debt."*[200]

203.   Irrespective of whether this calculation is compatible with the calculation method set out hereabove,[201] these passages illustrate that the 19.8% discount rate proposed in the Brailovsky-Wells Expert Report (which the First Tribunal reduced to 18%) did not take account of the operation of the CNAA Compensation Mechanism.

204.   It follows that, when applying the calculation method set out above, a further discount must be applied to the amount of compensation awarded by the First Tribunal. Unlike what the Claimants assert,[202] this does not amount to reducing their compensation twice or to double-counting the risks faced by the project.

**(2)    The evaluation of the CNAA risk by the experts before the First Tribunal and by the Respondent in the present proceeding**

205.   The Tribunal has before it two DCF valuations taking account of the CNAA compensation provisions. The first one is to be found in the just mentioned Brailovsky-Wells Expert Report[203] and in the Expert Report of Econ One Research (the "**Econ One Expert**

---

[199] Brailovsky-Wells Expert Report, §5. Emphasis added.

[200] Brailovsky-Wells Expert Report, §24. Emphasis added.

[201] See the next section, in particular §210.

[202] Claimants' Memorial, §179.

[203] Brailovsky-Wells Expert Report.

**Report**"), also submitted to the First Tribunal at the Respondent's request.[204] The second one was presented in the Respondent's written submissions in the present instance.[205]

206.    The Brailovsky-Wells Expert Report indicates that its authors had been mandated to "determine the appropriate discount rate" and then[206]

> "*to apply that discount rate to determine the present value, as of June 26, 2007, of the following:*
> (i) *The interest of ... Mobil Cerro Negro ..., applying the price cap determined in accordance with the compensation provisions of the Cerro Negro Association Agreement; and*
> (ii) *The interest of Mobil Cerro Negro ..., disregarding the price cap ...*"

207.    The Brailovsky-Wells Expert Report then identifies the following net present value, discounted at 19.8%, "under the compensation provisions":[207]

*Table 2*

| Summary of Net Present Value Calculations of the Cerro Negro Project (41.67%) *Million US dollars as of June 26, 2007* | Under the compensation provisions | Disregarding the compensation provisions |
|---|---|---|
| Undiscounted | 2,531.6 | 5,314.5 |
| Discounted at 19.8% | 353.5 | 843.8 |
| Mobil Cerro Negro debt outstanding | 238.1 | 238.1 |

Assumptions:
Fiscal regime: 33 1/3% Royalty / Extraction Tax;  50% Income Tax; includes Export, Drug and Science and Technology Taxes.
Prices:  Econ One price projections as of mid-2007.
Volumes and costs: Econ One.
Compensation provisions: assume limitation starting at the fraction of US$27 (1996 prices) representing the price of SCO.  Royalty and Extraction Tax calculated on notional value of extra-heavy crude oil; Income Tax calculated on notional taxable income.
Mobil Cerro Negro debt outstanding: US$ 64.57 million in bank debt plus US$250.57 million in bond debt, representing 50% of payments made by PDVSA to retire project bank debt and to purchase more than 99% of outstanding bonds in December 2007, less US$77.0 million principal payments on bonds made by Mobil Cerro Negro through date of filing.
Source: **App. 2**, Calculation of Net Present Value of the Project.

---

[204] Expert Report of Econ One Research, Inc., 14 June 2011, Exhibit R-26 ("**Econ One Expert Report**").
[205] Respondent's Counter-Memorial, §§197 ff.
[206] Brailovsky-Wells Expert Report, §5.
[207] Brailovsky-Wells Expert Report, Table 2, p. 12.

208.    In line with the experts' mandate, the calculation in the left column of the Table is based on an application of the CNAA Compensation Mechanism "as of June 26, 2007", that is, the day preceding the *effective* date of expropriation.

209.    This is further confirmed by the Econ One Expert Report, which describes its mandate as follows:

> *"as of June 26, 2007, what would be the projected cash flow for each year of the 2007-2035 period from Mobil Cerro Negro's interest in the Cerro Negro Project under two price scenarios:*
>
> *A)  SCO prices that would be expected to occur with Brent crude oil ('Brent') selling at US\$27 per barrel in 1996 dollars;*
>
> *B)  SCO prices reflecting future market conditions expected as of mid-2007."*[208]

210.    As the Tribunal has set out above, this is not what a willing buyer would consider. Rather, a willing buyer would try to evaluate *whether, and if so when,* the CNAA Compensation Mechanism would be triggered, at which point (if ever) the uncapped revenue stream would end, to be replaced with the capped compensation through the end of the project.

211.    The calculation in the Respondent's written submissions before the Tribunal must be discarded for the same reason. The Respondent considers that a willing buyer would only pay for the protected cash flow, and argues that "[c]*onsequently, the 'market value' of the Mobil Parties' interest in the Cerro Negro Project would necessary be based on the Threshold Price agreed upon by Mobil*",[209] which the Respondent then estimates at USD 485.846 million. This amount is less than the capped amount awarded by the ICC Tribunal – which leads the Respondent to request the Tribunal to entirely reject the Claimants' claim.[210] Again, this approach is not compatible with how this Tribunal conceives the interaction between the CNAA Compensation Mechanism and the BIT. If a willing buyer contemplated the application of the CNAA Compensation Mechanism (the cap) as a risk rather than a certainty, it might be willing to pay more than the cap, but it

---

[208] Econ One Expert Report, §3.
[209] Respondent's Counter-Memorial, §195.
[210] Respondent's Counter-Memorial, §245.

would not expect to pay less. As the Claimants correctly observe, a willing seller would not sell for less.[211]

212.    In conclusion, the just mentioned calculations by the experts before the First Tribunal and by the Respondent in the present instance do not correspond to what the Tribunal has identified above as a willing buyer's evaluation of the risk and price.

### (3)    The critical date and its implications

213.    In calculating the compensation due, the Tribunal must also take account of the fact that, on the one hand, the First Tribunal has determined the critical date at which the "willing buyer" test is to be applied, while on the other hand, the First Tribunal did not do so with the CNAA Compensation Mechanism in mind.

214.    Article 6.c of the BIT provides that the market value of the expropriated investment must be determined

> "*immediately before the measures were taken or the impending measures became public knowledge, whichever is the earlier*".

215.    In applying this rule,[212] the First Tribunal has decided, with *res judicata* effect, that the value of the investment must be determined immediately after the negotiations between Venezuela and Mobil failed, that is on 26/27 June 2007.[213] The First Tribunal thus stated:

> "*In the present case, the market value must be determined immediately after the failure of the negotiations between the Parties and before the expropriation, i.e., on 27 June 2007, and it must correspond to the amount that a willing buyer would have been ready to pay to a willing seller at the time in order to acquire the expropriated interests*".[214]

And further:

---

[211] Claimants' Reply, §109b.

[212] First Award, §307.

[213] It is undisputed that the negotiations failed on 26 June 2007 and that the investment was expropriated on 27 June 2007. Accordingly, the First Tribunal's finding that the investment must be valued between these two events does not allow for identifying a specific valuation date. It is also uncertain whether the reference made in the above-quoted passage of the First Award to 27 June 2007 is a reference to the or the valuation date. In any event, what matters is not the date as such, but the knowledge available at that date to a willing buyer.

[214] First Award, §307.

> *"it is precisely at the time before an expropriation (or the public knowledge of an impending expropriation) that the risk of a potential expropriation would exist, and this hypothetical buyer would take it into account when determining the amount he would be willing to pay in that moment. The Tribunal considers that the confiscation risk remains part of the country risk and must be taken into account in the determination of the discount rate."*[215]

216.    As discussed above, the phrase "the confiscation risk remains part of the country risk" demonstrates that the First Tribunal thereby considered the generic country risk associated with the investment. It did not set the critical date with the specific "contract risk" – the expropriation triggering the CNAA Compensation Mechanism – in mind. It had no reason to do so since it considered, in the parts of the First Award that were subsequently annulled, that the CNAA compensation provisions were irrelevant under the BIT standard of compensation.

217.    Yet, the critical date set by the First Tribunal is of great potential impact on a willing buyer analysis that factors in the CNAA Compensation Mechanism and attendant risks discussed above. It follows from various passages in the First Award – other than those setting the critical date – that on 26/27 June 2007, a willing buyer would have been informed of the following:[216]

- "On 8 January 2007, President Chávez announced that all of the projects that had been operating outside of the framework of the 2001 Hydrocarbons Law, including the Cerro Negro Project, would be nationalized".[217]

- "On 1 February 2007, the National Assembly enacted a law entitled the 'Law that Authorizes the President of the Republic to Issue Decrees with Rank, Value and Force of Law in Delegated Subject Matters' ('Enabling Law'). The Enabling Law authorized President Chávez to take over the Cerro Negro and La Ceiba joint ventures and other similar associations by: '[D]ecree[ing] norms allowing the State to assume directly or

---

[215] First Award, §365. Emphasis added.

[216] First Award, §§106-110. Claimants' Memorial, §84 ff., gives a similar overview of these facts, starting 18 August 2006. The Respondent, on its part, did not address these facts in great detail in its written submissions in the present proceeding. The Tribunal has carefully considered the Claimants' overview and concluded that the complements contained therein are consistent with the Tribunal's reasoning.

[217] First Award, §106.

through corporations of its exclusive property, the control of the activities performed by the associations operating in the Orinoco Oil Belt, … through the contractual form of mixed enterprises or companies [that are] exclusive property of the State'",[218] which was referred to as "migration".[219]

- On 26 February 2007, the Venezuelan State enacted the Decree-Law No. 5200 (the "**Migration Decree**") which provided a roadmap and schedule for the migration of the associations. Article 3 thereof required the operators of the Cerro Negro project to transfer control of all activities and operations related to those projects to a Venezuelan State enterprise no later than 30 April 2007, which the Claimants did on 30 April 2007.[220]

- The Migration Decree further provided for a four-month period of negotiations (until 26 June 2007) on the establishment and functioning of the new mixed companies and for the State's directly assuming the activities of the project if the negotiations failed. Article 5 of the Decree provided to that effect that if no agreement was reached by the end of the four-month period, "the Republic … shall directly assume the activities of the associations", notably the Cerro Negro Association.[221]

- No agreement was reached on 26 June 2007. The negotiations had failed.[222]

Against this background, a willing buyer would in all likelihood consider that an expropriation triggering the CNAA Compensation Mechanism would, in the normal course of events, take place the very next day after 26/27 June 2007. This is what the black-letter law of the Migration Decree provided. And as the Claimants aptly observe,[223] it is difficult to conceive of any buyer making an acceptable offer in these circumstances.[224]

---

[218] First Award, §107.

[219] First Award, §108.

[220] First Award, §§108-109; Claimants' Memorial, § 92.

[221] First Award, §110.

[222] First Award, §111.

[223] Claimants' Reply, §114: "a willing buyer would never purchase an asset that was about to be expropriated".

[224] A willing buyer might have made an offer for less than the CNAA capped amount, but that would not have been acceptable to the seller which would have preferred receiving the entire CNAA capped amount.

218.    As a matter of principle, as previously discussed,[225] resubmission tribunals may seek to harmonise the non-annulled parts of a first award as well as possible with the annulment decision and the exercise of their own jurisdiction, but the non-annulled parts of a first award cannot be rewritten, glossed over or wished away.

219.    In the present instance, both the Claimants and the Respondent have distanced themselves from a mechanical application of the critical date of 26/27 June 2007, albeit from different perspectives.

220.    The Claimants argue that according to Article 6.c of the BIT compensation shall represent the market value of the investments "immediately before the measures were taken or the impending measures became public knowledge, whichever is the earlier", and that the First Tribunal cannot be presumed to have discarded this provision which aims at preventing host States from lowering the amount of compensation due by announcing the expropriation prior to its implementation, in accordance with established case law of investment tribunals.[226] There is some merit in this argument insofar as it aims at preventing the critical date set in the First Award from producing consequences that were not considered by the First Tribunal and that may be unwarranted upon annulment. But the Claimants' approach also has its difficulties. It is the very function of the setting of a critical date pursuant to Article 6.c to protect investors against a reduction of compensation by reason of prior actions taken by the expropriating authority. That is how "reconstructing the scenario", as the Claimants term it,[227] is done under the BIT. The principles and case law referred to by the Claimants cannot apply independently from Article 6.c. – most certainly not where the government's prior actions have been found to be legal, as is the case here.[228] The arbitral award in *Devas v. India* to which the Claimants refer confirms the intricate relationship between the principles relied upon by the Claimants and

---

[225] *Supra*, § 75.

[226] Claimants' Reply, §115.

[227] Claimants' Reply, §114.

[228] First Award, §§305-306; Respondent's Rejoinder, §172. Accordingly, the statement in the Claimants' Memorial at § 97, that their investment was expropriated "without compensation" is – from a strictly *legal* viewpoint – incorrect.

investment treaty provisions on the critical date for the calculation of compensation. The *Devas* tribunal reasoned:

> "This approach is found specifically in Article 6(1) of the Treaty in relation to valuing property that has been expropriated. It says, in part, '[s]uch compensation shall amount to the market value of the investment expropriated immediately before the expropriation or before the impending expropriation became public knowledge.' The Tribunal recognizes this provision embodies what is practically a universal principle to be applied in expropriation cases: the expropriating authority cannot take advantage of its own conduct where it may have negatively influenced or adversely affected the value of what was to be taken ahead of the valuation date".[229]

The First Tribunal has set the critical date in application of Article 6.c. It has done so by reference to an expropriation on 27 June 2007,[230] that is, an instantaneous act, rather than a creeping expropriation or composite act starting earlier in time. With this expropriation date set, the First Tribunal expressly identified the moment "immediately after the failure of the negotiations … and before the expropriation"[231] as the moment "immediately before the measures were taken or the impending measures became public knowledge, whichever is the earlier". Whether the First Tribunal could have identified the enactment of the Migration Decree or any of the earlier acts of the Respondent as the "*impending measure*" is inapposite. The First Tribunal did not do so. This Tribunal cannot change the critical date, nor can it set an additional critical date for the hypothesis presently considered of an expropriation triggering the CNAA Compensation Mechanism. And reconstructing the scenario in another way would be tantamount to negating the critical date set by the First Tribunal.

221.    The Respondent, for its part, distances itself from a mechanical application of the critical date set by the First Tribunal on the basis of an argument in fact rather than in law. In its

---

[229] *CC/Devas (Mauritius) Ltd., Devas Employees Mauritius Private Limited, and Telcom Devas Mauritius Limited v. Republic of India*, PCA Case No. 2013-09, Award on Quantum, 13 October 2020, Exhibit CL-10, §199 (emphasis added). In the other case referred to by the Claimants, *American International Group, Inc. and American Life Insurance Company v. Islamic Republic of Iran and Central Insurance of Iran (Bimeh Markazi Iran)*, IUSCT Case No. 2, Award No. 93-2-3, 19 December 1983, Exhibit CL-7, pp. 16-17, there was no treaty provision on the setting of the critical date.

[230] First Award, §307 and footnote 370 noting that the Parties have consistently used that date in their calculations.

[231] First Award, §307, quoted above, §215.

Counter-Memorial, the Respondent argued that a willing buyer would have known on 26/27 June 2007 that expropriation was imminent and "would have concluded that 'the circumstances in which [the investment] would operate in the future' would in fact change 'the day after purchase'".[232] In its Rejoinder, however, the Respondent observes that the Migration Decree would have allowed the Claimants to retain the majority of their interest in the Cerro Negro project,[233] and that the Claimants err in arguing that "a willing buyer would never purchase an asset that was about to be expropriated".[234] The Respondent explains that even on 26 June 2007, the expropriation was not "a fatality" and that a willing buyer could have decided to purchase the Claimants' interest to maintain partial ownership and benefit from high crude oil prices under the Migration regime:

> "the question is not what a willing buyer would have made in abstracto but how an hypothetical willing buyer would have valued in concreto Mobil's interest in the Cerro Negro Project on 26 June 2007. Yet, at that date, even though the expropriation was indeed imminent, it was not a fatality and a willing buyer could very well have decided to purchase the $41^{1/3}$% Mobil's interest in the Cerro Negro Project taking into account the Limitation on Compensation. It could have then finalized the migration process through negotiations with PDVSA with a view to maintaining thereafter up to a 40% ownership interest in the Cerro Negro Project and benefiting from high crude oil prices. It is indeed one thing that the Mobil Parties refused to engage into bona fide discussions over the migration of the Cerro Negro Association, and it is another to assume that a willing buyer would necessarily have adopted the same unreasonable stance as the Mobil Parties."[235]

222.    The Tribunal understands this as meaning that a willing buyer arriving at the very last moment and showing (in the Respondent's view) greater cooperative spirit than the Claimants, could have stopped the clock and re-initiated negotiations with the State. As the Claimants observe,[236] this is not easily reconciled with the Migration Decree, which provided for a process leading inexorably to expropriation on 27 June 2007 if the negotiations failed the day before. For a willing buyer to re-initiate negotiations, an amendment to the Migration Decree or a similar legislative or, perhaps, executive measure

---

[232] Respondent's Counter-Memorial, §190.

[233] Respondent's Rejoinder, §174.

[234] Respondent's Rejoinder, §175 referring to the Claimants' Reply, §114.

[235] Respondent's Rejoinder, §175.

[236] Hearing Transcripts, Day 1, pp. 67-68.

would presumably have been needed. In the light of the Respondent's statement, however, the Tribunal accepts that a willing buyer prepared to engage with the State would reasonably have obtained a re-initiation of the negotiations. As the First Tribunal equally observed,[237] the Venezuelan Government had successfully pursued the migration of similar investments.[238] This shows that this was the Government's preferred option, and also an option that could be of interest to a willing buyer of the Claimants' investment.

223.  The Tribunal will evaluate the compensation due on the basis of such a scenario, which falls squarely within the Tribunal's jurisdiction in the light of the First Award's *res judicata* effect. The Tribunal will then revert to the Claimants' proposed approach to assess the reasonableness of the Tribunal's finding.

### F.    EVALUATION OF THE COMPENSATION DUE

224.  The Tribunal now turns to the concrete evaluation of the compensation due. It will first set out the factors a willing buyer would consider in order to evaluate the risk of expropriation and the parameters of its financial offer (1). It will then calculate the amount of future uncapped cash flow on which a willing buyer would likely have counted to formulate its offer (2) and the capped amount due under the CNAA Compensation Mechanism (3).

### (1)    Evaluating the risk

225.  In setting out the factors a willing buyer would consider in order to evaluate the risk of expropriation and the parameters of its financial offer, the Tribunal will first consider the Respondent's position regarding the situation at the critical date of 26/27 June 2007, and then confront it with the alternative approach in line with the Claimants' position.

226.  As indicated above, the Respondent argues that even on 26 June 2007, a willing buyer could have re-initiated negotiations with the Venezuelan Government with the aim of negotiating a new form of cooperation in accordance with the Migration Decree.[239] The Respondent does not, however, draw the appropriate conclusions from the scenario thus

---

[237] First Award, § 297.

[238] Respondent's Counter-Memorial, §194; Alexander's Gas & Oil Connections Company News: Latin America, *Statoil, Total, Chevron and BP Sign Joint Venture Deals with PDVSA*, 26 June 2007, Exhibit R-25.

[239] See *supra*, §§221-222.

contemplated. In this scenario, a willing buyer would not have bought the investment for the capped compensation due under the CNAA mechanism on 26/27 June 2007. It would, in one way or the other, have made an offer for a running business or for a chance of gaining a running business, albeit subject to the sort of risks that have been identified. A hypothetical willing seller, on its part, would have had no incentive to sell for the CNAA capped compensation which it was to obtain anyway without going through the trouble of selling its investment to a third party. It would have negotiated based on the assumption that the prospective buyer was willing to pay more, in consideration of (the chance of gaining) a running business.

227.    Given that the Migration Decree provided for a four-month period of negotiations, it is reasonable to assume that a willing buyer that managed to re-initiate negotiations on 26 June 2007 would have obtained a new four-month period of negotiations. The First Tribunal has calculated the compensation due to the Claimants based on the assumption that the Claimants benefited from the normal revenues under the project during the negotiations and until 26 June 2007.[240] This Tribunal likewise finds that it is reasonable to assume that a willing buyer would have requested the normal – uncapped – revenues under the project during the new four-month negotiation project. A willing buyer would thus have made an offer based on the expectation of at least four months of uncapped revenues.

228.    The question is whether the offer would have been based on the expectation of uncapped revenues extending over a period greater than four months. The Tribunal considers that it would not, because the buyer would have been making an offer to acquire only the right to negotiate in this regard – in the First Tribunal's words, "to weigh their interests and make decisions during a reasonable period of time".[241] No doubt, a willing buyer would wish to acquire such a right to negotiate precisely because it considered that it might have a chance of successfully completing such negotiations. However, this does not mean a willing buyer would necessarily make an additional payment reflecting that chance. Even if that chance

---

[240] This is in line with the First Tribunal's setting the expropriation date on 27 June 2007 (First Award, §307, footnote 370) and the critical date immediately before that. It also appears from the table in Annex I to the First Award, which includes DCF for 2007, the amount of which appears to correspond to half of the yearly amount.
[241] First Award, §297.

would undoubtedly have had some value for the buyer, no matter how difficult to calculate, a willing buyer could just as reasonably consider that it was already taking an important risk in allocating significant time and money to an investment which might well come to an end four months later.

229.    A willing seller, finding itself in the situation of the Claimants on 26 June 2007, could reasonably be expected to accept that offer, since it was obtaining four extra months of uncapped revenue that would otherwise be lost to them given that *their* negotiations with the State had failed. The State (or a hypothetical State finding itself in the situation presently considered) could also reasonably be expected to accept this way forward for two reasons which are inherent in the scenario presently considered. First, the State was keen to realize the migration process with a foreign partner, [242] which warranted an incentive. Second, the sale had to be concluded and the negotiations with the State re-initiated almost overnight, within a very short window of opportunity. In these circumstances, although it is reasonable to conclude that it would have been possible to replicate the existing mechanism, it does not appear likely that it would have been possible to negotiate any changes thereto.[243]

230.    This is not contradicted by the Claimants' assertion that "[i]f international remedies are available to the willing buyer, or the willing seller in case of expropriation, that entitle them to the net present value of the project's future net cashflows, the willing seller is under no compulsion to offload the interest at a fraction of that value, even if they did anticipate an expropriation".[244] Even assuming that a willing buyer would envisage international remedies with full trust and favour litigation over an immediate deal, it would still consider international remedies to enforce the two abovementioned limbs of the bundle of rights

---

[242] See *supra*, §222.

[243] For the sake of clarity, the Tribunal does not interpret the Respondent's statement quoted at §221 above as stating that Venezuela would have accepted to re-initiate the negotiations on this basis. The Tribunal does, however, take note of the Respondent's statement that the negotiations could be re-initiated, and the Tribunal concludes from this statement and from other elements mentioned above, §222, that Venezuela was indeed keen to finalize the migration process with a foreign partner. On these bases, the Tribunal has determined what offer a hypothetical willing buyer could reasonably have been expected to make, and how the willing seller and the State party could reasonably have been expected to react.

[244] Hearing Transcripts, Day 1, p. 64.

which constitute its investment, nothing more.[245] This is even more so in the present case since, as will appear below, the CNAA capped compensation is much more than just "a fraction" of the compensation due under the BIT.

231.    The Tribunal has also considered the hypothesis that a willing buyer might calculate its offer on the basis of the remaining interest in the project after migration – which can be estimated at approximately 3/5 of the original interest, following the examples of Total and Statoil[246] – until the end of the project in 2035. This hypothesis is however inapposite for two reasons. First, such an offer would be based on a willing buyer's assumption that it had 100% chance of reaching such a satisfactory outcome through negotiations with the Government. No reasonable willing buyer would proceed on that basis. Second and more importantly, such a hypothesis is beyond the Tribunal's jurisdiction in these resubmission proceedings. As stated several times, the Tribunal's jurisdiction is limited to determining whether and if so how the CNAA Compensation Mechanism would affect a willing buyer's offer. It does not allow for adopting entirely new hypotheses.

232.    By contrast, a willing buyer's offer would include, as a second limb, the amount of capped compensation as from the end of the four-month period of negotiations. This is not because a willing buyer would expect the CNAA Compensation Mechanism to be necessarily triggered at that date, but because there would be no guarantee of higher revenues at the expiry of the four-months period. And again, on 26/27 June 2007 a willing seller could reasonably be expected to accept such an offer, because it would assume that otherwise, the CNAA Compensation Mechanism would be triggered the very next day.

233.    On these bases, the Tribunal finds that a willing buyer would have made an offer valuing the Claimants' investment on the basis of uncapped revenues for four extra months as from

---

[245] See also above, §195

[246] Alexander's Gas & Oil Connections Company News: Latin America, *Statoil, Total, Chevron and BP Sign Joint Venture Deals with PDVSA,* 26 June 2007, Exhibit R-25: "*Venezuela's state oil firm PdVSA had been requiring at least 60 % ownership in the following four Orinoco joint ventures (JVs) as part of Venezuela's nationalization strategy: Ameriven, Cerro Negro, Sincor and Petrozuata ... Under the terms of the agreement, Total's interest in Sincor will drop from 47 % to 30 % and Statoil's from 15 % to 10 %. PdVSA will hold the remaining 60 % of the venture.*"

26 June 2007, and the capped compensation guaranteed under the CNAA for the remaining time of the initial project until 2035.

234. Having made this finding, the Tribunal will now confront it with the Claimants' approach based on the argument that the evaluation of compensation must discard facts attributable to the expropriating authority that negatively affect the market value of the investment. As set out above, the Tribunal considers that the First Award's non-annulled parts prevent it from following this approach, as it consists in directly or indirectly displacing the critical date set by the First Tribunal in application of Article 6.c of the BIT. It is nevertheless of use as a basis to assess the reasonableness of the Tribunal's finding.

235. The "reconstruction" advocated by the Claimants would entail discarding the fact that the Claimants' negotiations had failed and that (except for the Respondent's hypothesis) the expropriation would follow the very next day or shortly thereafter. As discussed below, it would also entail discarding other events that preceded the failure of the negotiations. But the "reconstruction" would not go as far as assuming that Venezuela would never proceed with an expropriation.

236. In appreciating the risk of an expropriation that triggers the payment of a capped compensation (the "**CNAA risk**"), a willing buyer would first of all consider the following:

- The "CNAA risk" is more than just a general (generic) risk of windfall profit taxes. The measure is contemplated in Clause 15 of the CNAA. It is not announced as a foregone conclusion, but it is contemplated.

- In the CNAA, the risk is associated with the oil price reaching a certain level (USD 27). That hypothesis had materialized before June 26/27, 2007, which arguably increased the risk of expropriation as of that date.

- The Claimants observe that they had been allowed to operate unhindered for many years after oil prices reached that level, without being made subject to an application of the CNAA compensation provision.[247] This is so, but it cuts both ways: a willing

---

[247] Claimants' Reply, §66.

buyer might also have considered that, given that governmental measures were contemplated to be taken if oil prices reached that level, it was unlikely that the *status quo* would be maintained for much longer. In any event, the circumstance that Venezuela had not yet taken any measure does not make it reasonable to assume (as the Claimants' argument does) that no measure would be taken for the remaining 28 years until the end of the Project.

237.    In addition, a willing buyer would reasonably be expected to consider the initiatives and measures already taken by Venezuela in the months and years preceding 26/27 June 2007, notably since the election of President Chávez. The Claimants observe that Venezuela "train[ed] its sights" on foreign investment in the oil industry soon after President Chávez's election,[248] and took various measures between 2004 and 2006 that "depressed the value of the Cerro Negro  Project".[249] While the Government of President Chávez initially declared that it would respect existing contracts, subsequent events  made it clear that the Government would *at least* take steps to reap all the benefits that could be reaped under the existing contracts. The risk of an expropriation for a capped amount as provided in the CNAA was very significant. This is illustrated by the following passages from the First Award:

> "86. *The Claimants assert that the alleged wrongful measures at issue in the present case were all taken after Mr. Hugo Chávez Frías was elected President of Venezuela in December 1998.* [footnote: Memorial On the Merits, §122. Mr. Chávez became President of Venezuela in February 1999].
> …
>
> 88. *As indicated above, a reduced royalty rate was applicable to the Cerro Negro Investment and the La Ceiba Investment.* On 13 November 2001, President Chávez (exercising delegated legislative powers) issued the Organic Law of Hydrocarbons*, replacing the 1975 Nationalization Law and the 1943 Hydrocarbons Law. Under the new law, production activities were reserved to the State, and* private Parties would be authorized to participate in those activities only through mixed enterprises in which the State owned more than 50% of the shares. Any production from a mixed enterprise would be subject to a royalty of 30% *and would have to be sold to PDVSA or another State-owned company.*

---

[248] Claimants' Memorial, title E and § 72 ff.
[249] Claimants' Memorial, §75.

*89. According to the Claimants, both before and after the adoption of the 2001 Organic Law of Hydrocarbons,* President Chávez's administration reaffirmed its assurances that pre-existing contracts (such as the Cerro Negro and La Ceiba Association Agreements) would be respected. ...

*90.* However, on 19 October 2004, PDVSA served notice on Mr. Mark Ward, President of ExxonMobil de Venezuela S.A. ('ExxonMobil de Venezuela') that, by order of President Chávez, the MEM was 'leaving without effect' the 1% royalty ...

...

*94. During the course of 2005 and 2006, the price of crude oil continued to soar, reaching new record highs each year. By May 2006, the price of crude oil had risen to US$69.78 per barrel.*

*95.* On 16 May 2006, *the National Assembly enacted a partial amendment to the 2001 Organic Law of Hydrocarbons, which created* an additional royalty in the form of an 'extraction tax' *(Impuesto de Extracción). The new law, which took effect on 29 May 2006, imposed an extraction tax of 33 1/3% on all liquid hydrocarbons* ...

...

*98.* On 29 August 2006, *the National Assembly amended the Income Tax Law to repeal the provision that subjected income from the extra-heavy oil projects in the Orinoco Oil Belt to the general corporate rate, instead of the higher rate applicable to the oil industry. This amendment had the effect of* increasing from 34% to 50% the rate applicable to income from those projects, *including the Cerro Negro Project. The measure took effect on 1 January 2007.*

*99. Accordingly, after 1 January 2007, Mobil Cerro Negro was subject to an income tax rate of 50%.*"[250]

238. It follows from the above that the Government of President Chávez:

- was putting an end to the "*Apertura Petrolera*" which had been at the basis of the Claimants' return to Venezuela,[251]

- was taking measures to deprive Mobil and others of certain of the benefits granted to them by the previous government,

---

[250] First Award, emphasis added.

[251] First Award, §39; Claimants' Memorial, §18 ff.

- was taking measures very considerably increasing state revenue from the oil industry and concomitantly reducing the revenues of the foreign investors, and

- was gradually stepping up measures since 2001 and very significantly in the course of 2006.

239.  Even before January 2007, these circumstances evidenced a very high risk that the Government of President Chávez would take additional measures – such as an expropriation triggering the CNAA compensation provision.

240.  It follows that if one were to appreciate the concrete "CNAA risk" without having regard to the measures taken as from 26 February 2007 (the enactment of the Migration Decree), or even as from 8 January 2007 (President Chávez's initial announcement of forthcoming nationalisations),[252] in preparation of the expropriation on 27 June 2007, it remains that a willing buyer would regard the risk of a lawful expropriation triggering the application of the CNAA as very high in the short term, that is:

- it was far more likely than not to materialise, and

- it was far more likely to materialise soon, and not towards the end of the Project, in 2030 or so.

241.  The Tribunal therefore considers that even a hypothetical willing buyer endowed with the knowledge of events no later than 7 January 2007, would have made an offer based on the expectation that the CNAA compensation provision would be triggered before the end of 2007. Against that background, the offer made by a hypothetical willing buyer on 7 January 2007 would have comprised the value of uncapped revenues for less than the entire year 2007: either 9/12 or 10/12 of the uncapped revenues for the entire year 2007. And a hypothetical willing seller considering that offer on 7 January 2007 would reasonably be expected to accept that offer because it would be cognisant that the trigger might as well

---

[252] See *supra*, §217.

be pulled at an earlier date – as it eventually was.[253] The figure most favourable to the Claimants (10/12 as from 7 January 2007) corresponds to the four extra months of uncapped revenue as from 27 June 2007 that a willing buyer intent on re-initiating the negotiations on 27 June 2007 could have been expected to pay.

242.   It follows that if one were to displace the critical date of the expropriation to 7 January 2007 (which the Tribunal cannot do), the ensuing compensation would be equal to that based on the scenario of a willing buyer intent on re-initiating the negotiations on 27 June 2007, which the Tribunal has discussed and applied above. This confirms the reasonableness of the Tribunal's finding based on that scenario.

   **(2)    Concrete application: the amount of *uncapped* cash flow (first element of an offer)**

243.   It follows from the above that a willing buyer making an offer on 26 June 2007 would offer (as the first element of the total price for Claimants' investment) an amount equivalent to the uncapped cash flow corresponding to the income over four months as from that date.

244.   This amount can be calculated on the basis of the numbers in Annex I to the First Award. In this respect, the Tribunal is mindful of the Respondent's observation that the Annulment Decision's *dispositif*, after having identified the annulled parts of the First Award,[254] also identified for the avoidance of doubt parts of the award that were not affected by the annulment. This included "the first sentence of paragraph 368",[255] which causes the Respondent to argue that the second sentence of that paragraph has *a contrario* been annulled.[256] The second sentence sets the discounted cash flow at USD 1,411.7 million by reference to Annex 1, column 19. The Tribunal has already discussed the interpretative issues raised by the Annulment Decisions' *dispositif* and found that the scope of the

---

[253] And again, contrary to what the Claimants assert (Hearing Transcripts, Day 1, p. 64), a willing seller would not consider any additional amount that might possibly be obtained through arbitration. In the 'reconstructed' scenario presently considered, a willing buyer and seller typically focus on the transfer of a going concern, and a willing seller could not reasonably be expected to request a higher price by reference to what it could, arguendo, obtain from an investment tribunal in case of expropriation.

[254] Annulment Decision, §196.3.

[255] Annulment Decision, §196.4.

[256] Respondent's Counter-Memorial, §123.

annulment is determined by paragraph 196.3 and not by paragraph 196.4 of the Annulment Decision.[257] The second sentence of paragraph 368 is not included in the *Ad hoc* Committee's list of annulled paragraphs.[258] The Claimants are therefore right in stating that this passage has "been left intact" by the Annulment Decision.[259] There was no reason to annul the sentence since it reflected the calculation arrived at by the First Tribunal *before* considering the possible impact of the CNAA. In any event, even if the second sentence of paragraph 368 of the First Award had been annulled, *quod non*, this would not prevent the Tribunal from using the Annex to the First Award for calculations different from that contained in paragraph 368, second sentence, as the Tribunal will now do.

245.    According to the first row of the last column of Annex I of the First Award, the DCF value for (the last six months of) 2007 is of USD 128.1 million. As a consequence, the DCF value corresponding to unlimited cash flows for 4 months as from June 26, 2007 is approximately of (128.1 x 4/6) = USD 85.4 million.

246.    This value is approximate because the DCF decreases over time, as Annex I to the First Award illustrates. Accordingly, the DCF amount for the first 4 months following the expropriation date should be higher than that for the last 2 months of 2007. As a consequence, the DCF for the 4 first months following the expropriation date is higher than 4/6 of the DCF until the end of 2007. The Tribunal however reminds that the offer of a willing buyer cannot, in the circumstances of the present case, be wholly mathematical. It involves delicate appreciations of risks and opportunities, and the Tribunal considers that the 4/6 rule applied hereabove reflects the estimate a willing buyer and seller would use in the circumstances.

247.    The Tribunal is also mindful that the Respondent has observed that some of the figures contained in Annex I to the First Award are rounded or based on an incorrect number of

---

[257] See *supra*, §§62 ff.

[258] Annulment Decision, §196.3: "paragraph 404(d) of the Award is annulled, together with certain paragraphs in Sections V, VI, and VIII of the Award bearing directly on the assessment of compensation and the basis therefor, that is to say paragraphs 216-218, paragraphs 223-225, and paragraphs 373-374".

[259] Claimants' Memorial, §§107-108 and further §137.

days (366) per year.[260] However, as set out above,[261] the Tribunal does not consider that the calculations in Table 1 have been annulled. In any event, the Tribunal considers that a willing buyer and a willing seller would indeed negotiate on the basis of rounded figures and accommodate themselves with calculation errors having a limited impact on the main arguments and corresponding figures at stake in the negotiations. This is all the more evident in the scenario presently considered[262] of a willing buyer entering the scene "overnight" between 26 and 27 June 2007 to buy the Claimants' investment and immediately reboot the Migration Process.

### (3)    Concrete application: the *capped* amount (second element of an offer)

248.    It further follows from the above that a willing buyer would include a second amount in its offer, corresponding to the capped amount of compensation it would obtain as of the assumed date of expropriation. That amount is not the same as that accorded by the ICC Tribunal, which was for an expropriation on 27 June 2007. It would be a lower amount, for a hypothetical expropriation at a later date. The ICC Award[263] can however be used as a starting point.

249.    The Claimants state in their Memorial that they were awarded USD 747 million by the ICC Tribunal.[264] However, this is the amount awarded after set-off for a counterclaim from Lagoven, which is irrelevant to the calculation of a willing buyer's offer. The relevant amounts are USD 12,681,000 for (the last six months of) 2007 and USD 894,900,000 for 2008-2035, as shown in the ICC Award's *dispositif*:

> *"3. Respondent No.2 (PDVSA-CN) is liable for the economic consequences of Discriminatory Measures according to Clause XV of the Association Agreement dated 28 October 1997.*

---

[260] Respondent's Counter-Memorial, §§205-206, 208.

[261] *Supra*, §244.

[262] *Supra*, §§221--222.

[263] *Mobil Cerro Negro, Ltd. v. Petróleos de Venezuela, S.A. and PDVSA Cerro Negro, S.A.*, ICC Case No. 15416/JRF/CA, Final Award, 23 December 2011, Exhibit CL-4.

[264] Claimants' Memorial, §104.

> *4. Respondent No.1 (PDVSA) is liable for the economic consequences of the same Discriminatory Measures due to the GUARANTY dated 28 October 1997 in favor of the above Association Agreement.*
>
> *5. As a result of their liability mentioned above, both Respondents are jointly and severally liable to pay to Claimant an amount of US\$ 12,681,000 for 2007 and US\$ 894,900,000 for the period 2008 – 2035, for a total of US\$ 907,581,000, subject to the two set-offs mentioned hereafter."*

250.    Accordingly, a willing buyer making an offer on 26/27 June 2007 would pay (as the second element of the total price) for a capped compensation calculated as follows:

-    For the two last months of 2007: (12,681,000 x 2/6) = USD 4,227,000

-    For 2008-2035: USD 894,900,000

-    In total: USD 899,127,000

Again, the extra amount is an approximate one because the monthly capped amounts evolve over time, as does the DCF, but the Tribunal considers this approximate amount to be appropriate for the reasons stated above with respect to the first element of the offer.[265]

### (4)    The total amount

251.    On the basis of the elements in the two previous sections, the Tribunal finds that the total amount (representing uncapped cash flows and the capped compensation combined) a willing buyer would reasonably offer, and a willing seller would reasonably accept on 26/27 June 2007, is composed of USD 85,400,000 corresponding to the uncapped revenues for 4 additional months, and USD 899,127,000 corresponding to the capped revenues for the remaining term of the project until 2035, that is in total: USD 984,527,000.

252.    In other words, in all the circumstances of the case, the fair market price calculated on the basis of a willing buyer / willing seller analysis would be (984,527,000 - 907,581,000) = USD 76,946,000 higher than the capped amount awarded by the ICC Tribunal, or approximately 8.5 percent more than the capped amount before the setoffs decided by the ICC Tribunal.

---

[265] *Supra*, §§246--247.

G.    **FORMULATION OF THE RESUBMISSION TRIBUNAL'S** *DISPOSITIF*

253.    A last question is how the Tribunal should translate its above findings in the *dispositif* of its Award, against the background of the ICC Award, the Guillaume Award's *res judicata* effect, and the Claimants' undertaking to reimburse Lagoven/PDVSA to avoid double recovery.

254.    In its section on double recovery, the First Award reads as follows:

> *"380 ... The Claimants have expressly stated that 'in the event of an award in this case in favor of the Claimants, the Claimants are willing to make the required reimbursement to PDVSA'. The Tribunal has no reason to doubt the Claimants' representation.*
>
> *381. Effectively, the total compensation payable to the Claimants is the amount specified in* [annulled] *paragraph 374 above* [US$ 1,411.7 million, annulled]*, less the amount already received by the Claimants under the ICC Award for the same damage. Double recovery will thus be avoided."*[266]

255.    The terms "total compensation payable to the Claimants" in paragraph 381 do not refer to the amount formally awarded in the *dispositif* of the ICSID award. If the Claimants reimburse the sum received from Lagoven/PDVSA, as paragraph 380 contemplates, the amount formally awarded in the *dispositif* of the ICSID award must be for the total loss sustained by the Claimants, and not for the total loss *less* the amount already received from Lagoven/PDVSA. It follows that the terms "total compensation payable to the Claimants" in paragraph 381 do not refer to the amount to be awarded in the ICSID award, but to the final sum the Claimants will ultimately obtain after reimbursements to Lagoven/PDVSA.

256.    This is confirmed by the First Award's *dispositif*. The annulled paragraph 404.d stated the amount of damages awarded by the First Tribunal before reimbursements (USD 1,411.7 million), and paragraph 404.e thereupon took note of the Claimants' representation that they "[were] willing to make the required reimbursements" "in the event of favourable award", adding that "[d]ouble recovery will thus be avoided". Paragraph 404.e has not been annulled.

---

[266] Emphasis added.

257.    In these circumstances, the Tribunal will award the whole amount of compensation due based on the fair market price analysis, that is <u>USD 984,527,000</u>, subject to the Claimants' reimbursing to Lagoven/PDVSA the compensation awarded to them in the ICC Arbitration. The Tribunal notes that the amount to be reimbursed to Lagoven/PDVSA is the amount awarded in the ICC Arbitration without the set-offs for the counter-claims of Lagoven/PDVSA.

*

## VII.    COSTS AND EXPENSES

258.    In their respective submissions on costs and expenses of 10 March 2023, both the Claimants and the Respondent have requested the application in their favour of the principle that "costs follow the event" to the effect that the Tribunal should award them the entirety of their costs and expenses and hold the other Party liable to pay the entirety of the costs and expenses incurred by the Centre and the Tribunal. The Parties have grounded this request on the expected outcome of the arbitration, and also on specific arguments regarding the alleged behaviour of the other Party and specific phases or incidental proceedings in the course of the arbitration.

259.    The Claimants thus argue, in substance, that as a principle, "costs follow the event", and in addition that "a cost award in favor of Claimants is further warranted in light of Venezuela's conduct in these proceedings, namely that (i) Venezuela ultimately abandoned its argument that the Annulment Decision decided the merits of this case and bound the Tribunal, (ii) Venezuela refused to pay its share of advances while needlessly increasing the costs of the proceeding, (iii) Venezuela made repeated, frivolous arbitrator challenges, and (iv) Venezuela abusively accused Claimants of withholding evidence. On these bases, the Claimants claim USD 2,501,917.14, GBP 91,022.96 and EUR 1,865.25 "with pre- and post-award interest at the current U.S. prime rate of 7.75% compounded annually running from the date of the Award".[267]

---

[267] Claimants' Submission on Costs, 10 March 2023, §31 and *passim*.

260.    The Respondent refers to the allocation of costs and expenses on the basis of the principle that "costs follow the event" and argues that tribunals may in addition take into account special circumstances, which may include "procedural misconduct, including non-compliance with the tribunal's directions, the existence of a frivolous, unfounded or improper claim, or an abuse of the investment arbitration process or the international investment protection regime".[268] It argues that the "Claimants' abusive claims and litigation tactics must be remedied with an award on costs condemning them to pay, jointly and severally, all the costs of these proceedings, including the Republic's legal fees and expenses", given that (i) "Mobil is responsible for the continuation of this protracted and abusive Arbitration", (ii) "Mobil's mere reiteration in this Arbitration of strawman arguments already annulled by the Committee is abusive"  and (iii) "Mobil's reiterated efforts to conceal relevant evidence and its blatant disregard of the Arbitral Tribunal's order to produce all documents discussing the negotiation of the Limitation on Compensation cannot be tolerated".[269]

## A.    APPLICABLE LAW

261.    Article 61(2) of the ICSID Convention provides:

> *"In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."*

262.    It is accepted by the Parties that arbitral tribunals enjoy discretion in this respect,[270] and that there is a trend towards applying the principle that "the costs follow the event" according to which all the costs shall be borne by the unsuccessful party,[271] while also

---

[268] Respondent's Submission on Costs, 10 March 2023, §17.

[269] Respondent's Submission on Costs, 10 March 2023, Section II and *passim*.

[270] Claimants' Submission on Costs, 10 March 2023, §§5-6, referring to ICSID case law; Respondent's Submission on Costs, 10 March 2023, §§2, 13-14.

[271] Claimants' Submission on Costs, 10 March 2023, §§3-6, referring to the case law and to Rule 52 of the 2022 ICSID Arbitration Rules (which are not applicable *per se* in the present instance); Respondent's Submission on Costs, 10 March 2023, §§14-16.

taking account of specific circumstances[272]. Such specific circumstances may include the conduct of the parties, the complexity of the case and the reasonableness of the costs.

263.    On these bases, the Tribunal decides as follows.


**B.    THE OUTCOME OF THE PROCEEDING**

264.    A first and important factor to be considered in awarding costs and expenses is the outcome of the proceeding which, as agreed by both Parties, may warrant the application of the principle that "costs follow the event", i.e., the unsuccessful party shall pay all the costs and expenses. The Tribunal considers that in the present instance, this principle can apply from two different angles.

265.    On the one hand, both the Claimants and the Respondent prevail in part on the merits of the present case. More specifically:

-    The Respondent prevails regarding the interpretation of the CNAA *before* the BIT, but the Claimants prevail in their argument that the BIT did impact on the exclusive or non-exclusive nature of the CNAA compensation mechanism.

-    As to how exactly the BIT provisions (together with the First Award) interact with the CNAA compensation mechanism, the Tribunal has found that both Parties are partly correct.

    This militates in favour of allocating the costs and expenses on the basis of the principle that "costs lie where they fall", with the consequence that each Party should bear its own costs and expenses and that the costs and expenses of the Centre and the Tribunal should be borne in equal parts by both Parties.

266.    On the other hand, the Claimants qualify as the successful party insofar as they are being awarded an amount of compensation. From this perspective, the principle "costs follow the event" warrants awarding the Claimants at least a portion of their costs and expenses.

---

[272] Claimants' Submission on Costs, 10 March 2023, §3 ss. and *passim*; Respondent's Submission on Costs, 10 March 2023, §17 and *passim*.

267.    In this light, the Tribunal will award the Claimants a lump sum corresponding to approximately one third of their costs and expenses, subject to what is set out below.

## C.    THE RESPONDENT'S FAILURE TO MAKE ADVANCE PAYMENTS

268.    The Claimants observe that the Respondent failed to make advance payments. They also observe that the Respondent has made advance payments in other proceedings while the present proceeding was pending.[273] The Claimants do not argue in detail how the Respondent's failure to make advance payments should impact on the allocation of costs, but the Tribunal understands from the general structure and scope of their argument that the Respondent's failure to make advance payments should, in the Claimants' view, be taken into account as one of the elements justifying that the Tribunal should award all the costs and expenses to the Claimants.

269.    The Tribunal does not consider that the Respondent's failure to make advance payments should, either in isolation or in combination with the other elements referred to by the Claimants, cause the Tribunal to award all the costs and expenses to the Claimants.

## D.    OTHER CIRCUMSTANCES RELATED TO THE BEHAVIOUR OF THE PARTIES

### (1)    The arguments of the Parties on the merits

270.    With respect to the arguments brought by the Parties on the merits, the Claimants argue that the Respondent maintained until the end, but ultimately renounced its argument, that the Tribunal was bound by the Annulment Decision's reasons. The Tribunal observes that this has not been shown to have generated discernable additional costs. While arguing or at least suggesting in its written submissions that the Tribunal was bound by the Annulment Decision's reasons, the Respondent presented these reasons in detail in its submissions. This had substantially the same effect as re-arguing the *Ad hoc* Committee's reasoning before the Tribunal, which is what the Respondent could and presumably would have done if it had been established beforehand that the Committee's reasons were not *res judicata*.

---

[273] The Claimants refer to *ConocoPhillips Petrozuata B.V. et al v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Rectification, 29 August 2019, Exhibit CL-20, § 63 (observing "that the Claimants and the Respondent have each paid their respective share (US$ 150,000 each) of the advances requested by the ICSID Secretariat" in the rectification proceeding). Claimants' Submission on Costs, 10 March 2023, §19, footnote 20.

The Tribunal therefore considers that the Respondent's conduct in this respect is not relevant for the allocation of costs and expenses.

271.   The Respondent on its part argues that the Claimants replicated before the Tribunal their main arguments which had been rejected by the *Ad hoc* Committee, notably "(i) the treaty claims/contract claims arguments; (ii) the *res inter alios acta* argument; (iii) the national law argument and (iv) the 'non-exclusive remedy' argument based on a flawed textual interpretation of selected terms of Article XV of the CNAA".[274] In this respect, the Tribunal observes, first, that the Annulment Decision's reasons on the just-mentioned points were not *res judicata.* Secondly, at the hearing, the Respondent distanced itself from one of the Committee's reasons, namely that customary international law was not part of the law applicable under the BIT. The Respondent was invited to clarify whether this prevented the Tribunal from applying the law of State responsibility. The Respondent answered by specifying that it regarded the Annulment Decision's reasons as authoritative or persuasive, but not legally binding.[275] The Tribunal interprets this response as implying that not all of the Annulment Decision's reasons should necessarily be taken as equally authoritative or persuasive. It follows that the Claimants cannot be blamed for 'replicating' some arguments that proved unsuccessful before the *Ad hoc* Committee. Thirdly and finally, the Claimants partially prevail with respect to the interaction between the BIT and the CNAA, which is at the heart of the just mentioned 'replicated' arguments. The Tribunal therefore finds that the alleged replication by the Claimants of arguments that had been rejected by the *Ad hoc* Committee is no reason to award costs to the Respondent.

272.   In more general terms, the Tribunal observes that the written and oral submissions of the Claimants as well as of the Respondent were of the highest quality and have been of great assistance to the Tribunal. Accordingly, the arguments brought by either Party on the merits of the dispute cannot found the Tribunal's decision on the allocation of costs.

---

[274] Respondent's Submission on Costs, 10 March 2023, §28.
[275] Hearing transcripts, Day 2, p. 37, ll. 12 ff., and p. 85, ll. 10 ff.

**(2)      The costs of the hearing**

273.   The Claimants argue that the Respondent caused unnecessary costs by insisting that the hearing take place in Paris rather than in London or in Washington. They observe that the Centre could have assisted the Respondent's representatives in obtaining any necessary visas. They further observe that the Respondent only added a representative of the State to its team after the Claimants had observed that one of the main alleged reasons why the Respondent had objected to Washington or London (namely, the participation of State representatives), proved unfounded in the light of the list of participants provided by the Respondent.[276]

274.   The Tribunal observes that the choice of the venue was difficult in the circumstances, as the Respondent objected to Washington DC and London because its representatives would not feel comfortable in these jurisdictions given the state of intergovernmental relations at the time, whereas the Claimants disfavoured Paris because the World Bank's hearing rooms were temporarily unavailable and alternative locations in Paris during the period scheduled for the hearing were less appropriate for arbitral hearings and more expensive.[277] The Tribunal then suggested that the hearing could take place remotely, which the Respondent accepted, while the Claimants objected. Absent an agreement between the Parties, the Tribunal informed the Parties by email of 3 June 2022 of its decision "to hold the hearing in person, as the Claimants prefer, at the Westin Paris Vendôme, as the Respondent prefers" – with the choice for the hotel being, in the circumstances, the automatic consequence of the choice for Paris as the place of the hearing. In these circumstances, the Tribunal finds that the Respondent's position as to the choice of the venue is not relevant for the allocation of costs and expenses.

**(3)      The length of the proceedings and the constitution of the Tribunal**

275.   The Respondent argues that the Claimants are responsible for the duration of the arbitral process and the Respondent's ensuing "procedural ordeal". In this context, the Respondent also argues that the Claimants wrongfully objected to the proposed appointment method

---

[276] Claimants' Submission on Costs, 10 March 2023, §§20-23.

[277] The Westin Paris Vendôme, mentioned in the correspondence referred to below, turned out to be the only available venue meeting all the parameters.

and "sought to rely on the illegitimate intervention of a third party" – the intervention of representatives of Mr. Guaidó purporting to represent Venezuela in this arbitration – "to request the appointment of the President through the default mechanism", that is, by the Chairman of the Administrative Council.[278]

276.    The overall duration of the arbitral process since the request leading to the First Award is irrelevant to the Tribunal's decision on costs and expenses, since the costs and expenses for the previous phases have already been decided upon by the First Tribunal and the *Ad hoc* Committee, respectively, and the Respondent does not (assuming it could) request the Tribunal to revisit these issues.

277.    As to the constitution of this Tribunal, the Claimants' position as to the appointment of the President did not constitute an abuse of process. The Claimants exercised their procedural rights in the same, considered manner as the Respondent did.

278.    Accordingly, there is no reason to allocate costs and expenses on these bases.

### (4)    The challenge proceedings

279.    The Claimants further argue that the Respondent made "repeated, frivolous arbitrator challenges" which were "ultimately unsuccessful" and caused further expense and delay.[279]

280.    The Tribunal considers that challenging an arbitrator is a right of each Party in the fundamental interest of a fair trial and the integrity of the proceeding. In the Tribunal's view, this militates against awarding related costs and expenses to the successful party in challenge proceedings.

281.    Further, while the Respondent has indeed made successive challenges in the present arbitration, these were brought on the basis of specific factual allegations and legal arguments, and were the object of well-argued submissions of the Parties before being

---

[278] Respondent's Submission on Costs, 10 March 2023, §§21-27.
[279] Claimants' Submission on Costs, 10 March 2023, §24 ff.

decided by the two Unchallenged Arbitrators, who did not qualify the proposals for disqualification as frivolous or abusive.

282.    Accordingly, there is no reason to allocate costs and expenses by reference to the challenge proceedings.

### (5)    The document production proceedings

283.    The Respondent argues that the Claimants resisted document production and failed to produce all relevant documents.[280]

284.    The Respondent's request for document production was aimed at obtaining contemporaneous documents on the interpretation of the CNAA during its negotiation and at the time of signing – more specifically, on whether the compensation mechanism contained in the CNAA was exclusive or not of any additional damages or further remedy available to the Mobil parties against the State. In its above analysis of the merits, the Tribunal has found in favour of the Respondent with respect to the interpretation of the CNAA at the time of signing. While the Tribunal has further found partially in favour of the Claimants with respect to the interaction between the CNAA and the BIT, this is a matter of a meeting of the Parties' will *subsequent* to the signing of the CNAA, through the Claimants' accepting the Respondent's offer contained in the BIT, in combination with the absence of a waiver in the CNAA extending to all other *future* recourses. No document relating to the negotiation of the CNAA could have altered the Tribunal's findings in this respect. Finally, the Respondent's request for production of documents that the Claimants qualified as privileged or otherwise protected has been rejected as unfounded by the Tribunal.

285.    Accordingly, there is no reason to allocate costs and expenses by reference to the document production proceedings.

### E.    CONCLUSION ON COSTS AND INTEREST

---

[280] Respondent's Submission on Costs, 10 March 2023, §§33 ff.

286. Based on the above, the Tribunal's decision on costs and expenses shall be based on two factors:

-   First, each Party shall bear half of the costs of the arbitration.  These costs comprise the fees and expenses of the Tribunal as well as the administrative fees and direct expenses of the Centre, and amount to USD 941,623.27.  Given that the costs of the arbitration were paid from the advance payments made solely by the Claimants, the Claimants are awarded half of the arbitration costs, i.e., USD 470,811.635.

    o   The costs of the arbitration are broken down as follows:

    | Arbitrators' fees and expenses | |
    |---|---|
    | President Angelet | 290,387.66 |
    | Co-arbitrator Drymer | 210,678.28 |
    | Co-arbitrator Giardina | 173,125.00 |
    | | |
    | ICSID's administrative fees | 210,000.00 |
    | Direct expenses (estimated) | 57,432.33 |
    | **Total** | **941,623.27** |

-   Second, the Claimants are awarded a lump sum corresponding to approximately one third of their aggregate legal fees and expenses, calculated and estimated as follows:

    o   The Claimants' aggregate legal fees and expenses as per their Updated Statement of Costs of 24 May 2023 are of USD 1,526,917.14, GBP 91,022.96 and EUR 1,865.25. Around 13 June 2023, these amounts corresponded to approximately USD 1,643,110.25.

    o   One third of that amount is USD 547,703.41.

287. The total amount of costs and expenses awarded to the Claimants is therefore of USD 1,018,515.045.

288.   In their Submission on costs of 10 March 2023, the Claimants request that costs and expenses be awarded to them "with pre- and post-award interest at the current U.S. prime rate of 7.75% compounded annually running from the date of the Award".[281] The Respondent states at paragraph 44b of its Submission on Costs that costs should "bear interest at the rate the Arbitral Tribunal may consider appropriate, as from the date of the Award on costs and until complete payment".

289.   The non-annulled *dispositif* of the First Award states an interest rate for the amounts of compensation on the merits, including the one which was subsequently annulled.[282] This interest rate is *res judicata* and remains applicable to the amount of compensation that is accorded by the present Award on the merits. However, it does not apply to the costs and expenses which are addressed in subsequent paragraphs of the *dispositif* stating that "(i) each Party shall bear its own costs and counsel fees" and "(j) the Parties shall equally share the fees and expenses of the Tribunal and the costs of the ICSID Secretariat". As the First Tribunal applied the principle that costs lie where they fall, there was no need to decide on interests applicable to costs and expenses.

290.   Given the current market conditions as referred to by the Claimants, and given the Respondent's reference to an interest rate the Tribunal may consider appropriate, the Tribunal decides that the abovementioned amount of costs shall bear interest at the rate of 7.75% compounded annually up to the date when payment of this sum has been made in full. Interest on the abovementioned amount shall run as from the date of the Award rendered by this Tribunal.

---

[281] Claimants' Submission on Costs, 10 March 2023, §31.
[282] First Award, §404.h.

## VIII.  AWARD

291.  For the reasons set forth above, and without prejudice to the non-annulled parts of the First Award's *dispositif*, the Tribunal decides as follows:

(1)  The Respondent shall pay to the Claimants the sum of USD 984,527,000 (nine hundred eighty-four million, five hundred twenty-seven thousand United States dollars) in compensation for the expropriation of their investments in the Cerro Negro Project.

(2)  The Respondent shall pay to the Claimants the sum of USD 1,018,515.045 representing (i) part of the legal fees and expenses incurred by the Claimants with respect to this Resubmission Proceeding; and (ii) half of the arbitration costs.  This amount shall bear interest at the rate of 7.75% compounded annually, as from the date of this Award and up to the date when payment of this sum has been made in full.

(3)  All other claims are dismissed.

_____                    _____
Mr. Stephen L. Drymer                         Prof. Andrea Giardina
Arbitrator                                    Arbitrator

Date:                                         Date:

_____
Prof. Nicolas Angelet
President of the Tribunal

Date: 6 July 2023

Mr. Stephen L. Drymer
Arbitrator

Prof. Andrea Giardina
Arbitrator

Date: 6 July 2023

Date:

Prof. Nicolas Angelet
President of the Tribunal

Date:

117

Mr. Stephen L. Drymer
Arbitrator

Prof. Andrea Giardina
Arbitrator

Date:

Date: 6 July 2023

Prof. Nicolas Angelet
President of the Tribunal

Date:

118