# EXHIBIT 4

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

WASHINGTON, D.C.

IN THE PROCEEDING BETWEEN

**VENEZUELA HOLDINGS, B.V.**
**MOBIL CERRO NEGRO HOLDING, LTD.**
**MOBIL VENEZOLANA DE PETRÓLEOS HOLDINGS, INC.**
**MOBIL CERRO NEGRO, LTD. AND**
**MOBIL VENEZOLANA DE PETRÓLEOS, INC.**
(RESPONDENTS)

AND

**BOLIVARIAN REPUBLIC OF VENEZUELA**
(APPLICANT)

**(ICSID CASE NO. ARB/07/27)**

_____

**DECISION ON ANNULMENT**

_____

**Members of the _ad hoc_ Committee:**
Sir Franklin Berman, President of the Committee
Tan Sri Cecil Abraham, Member of the Committee
Professor Dr. Rolf Knieper, Member of the Committee

**Secretary of the Committee:**
Ms. Alicia Martín Blanco

_Date of dispatch to the Parties:  March 9, 2017_

### REPRESENTATION OF THE PARTIES

Representing the Respondents:

Representing the Applicant:

**Mr. Thomas L. Cubbage III**
**Mr. Miguel López Forastier**
**Ms. Mary T. Hernández**
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, D.C. 20004-2401
USA

**Mr. Gaëtan Verhoosel**
**Mr. Scott Vesel**
**Mr. Simon Maynard**
Three Crowns LLP
New Fetter Place
8-10 New Fetter Lane
London EC4A 1AZ
UK

**Mrs. Alice Brown**
**Mr. Eugene J. Silva II**
Production Company Law Department
Exxon Mobil Corporation
1301 Fannin Street
CORP-FB-1459
Houston, TX 77002
USA

**Dr. Reinaldo Enrique Muñoz Pedroza**
Procurador General de la República
Av. Los Ilustres, cruce con calle Francisco Lazo
Martí
Edif. Procuraduría General de la República,
piso 8
Urb. Santa Mónica
Caracas 1040
Venezuela

**Mr. George Kahale, III**
**Mr. Benard V. Preziosi, Jr.**
**Ms. Miriam K. Harwood**
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178
USA

**Ms. Gabriela Álvarez-Ávila**
Curtis, Mallet-Prevost, Colt & Mosle, S.C.
Rubén Darío 281, Pisos 8 & 9
Col. Bosque de Chapultepec
11580 Mexico, D.F.
Mexico

**Table of Contents**

I.  Procedural History ............................................................................................. 1

    **1. Application, Registration, Provisional Stay of Enforcement and Constitution of the Committee** ....................................................................................................... 1

    **2. First Session and Procedural Order No. 1** ............................................................ 2

    **3. Stay of Enforcement** ........................................................................................... 3

    **4. Written Procedure** ............................................................................................. 6

    **5. Hearing on Annulment** ...................................................................................... 6

    **6. Post-Hearing Phase** ........................................................................................... 8

II.  Request for Relief ............................................................................................... 9

    **1. Applicant** .......................................................................................................... 9

    **2. Respondents** ...................................................................................................... 9

III.  Arguments of the Parties .................................................................................. 9

    **1. Applicant** .......................................................................................................... 9

        *A.  Grounds for annulment* .................................................................................. 9

        *B.  Standard for annulment* ............................................................................... 10

          (i) Manifest excess of powers: ....................................................................... 10

          (ii) Failure to state reasons: .......................................................................... 11

          (iii)Serious departure from a fundamental rule of procedure: ................................. 12

        *C.  Facts alleged supporting the grounds for annulment* ................................................. 13

          (i) Failure to Apply the Proper Law and the Special Agreement concerning the Cerro Negro Project ................................................................................................ 13

          (ii) Refusal to allow essential document production ................................................ 18

          (iii)Exercise of Jurisdiction under the Dutch Treaty based on a Corporate Restructuring Effected to Gain access to ICSID ....................................................... 20

    **2. Respondents** .................................................................................................... 23

        *A.  Concerning the grounds for annulment* .............................................................. 23

        *B.  Concerning the standard for annulment* .............................................................. 23

          (i) Manifest excess of powers: ....................................................................... 24

          (ii) Failure to state reasons: .......................................................................... 25

          (iii)Serious departure from a fundamental rule of procedure: ................................. 26

        *C.  Concerning the alleged facts supporting the grounds for annulment* ............................ 26

(i) Failure to Apply the Proper Law and the Special Agreement concerning the Cerro Negro Project .................................................................................................. 27

(ii) Refusal to allow essential document production .................................................... 30

(iii)Exercise of Jurisdiction under the Dutch Treaty based on a Corporate Restructuring Effected to Gain access to ICSID ......................................................... 32

IV.   the Committee'S Analysis ................................................................................. 35

(i) Jurisdiction ................................................................................................................ 36

(ii) Excess of power (Article 52(1)(b) ......................................................................... 39

(iii)Failure to give reasons (Article 52(1)(e)............................................................... 39

(iv)Document production.............................................................................................. 42

(v) 'The Price Cap' ....................................................................................................... 46

V.    Decision .......................................................................................................... 71

VI.   Costs ............................................................................................................... 73

VII.  Dispositif......................................................................................................... 74

# I.  PROCEDURAL HISTORY

### 1.  APPLICATION, REGISTRATION, PROVISIONAL STAY OF ENFORCEMENT AND CONSTITUTION OF THE COMMITTEE

1.  On 2 February 2015, the Bolivarian Republic of Venezuela ("Venezuela" or "the Applicant") filed with the Secretary-General of the International Centre for Settlement of Investment Disputes ("ICSID" or "the Centre") an Application under Article 52 of the ICSID Convention and Rule 50 of the ICSID Arbitration Rules ("the Application"), seeking the annulment of the Award rendered on 9 October 2014 ("the Award") of the Tribunal in the arbitration proceedings between Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd. and Mobil Venezolana de Petróleos, Inc. ("the Mobil Parties" or "Respondents") and Venezuela.  The Application sought annulment of the Award on three of the five grounds set forth in Article 52(1) of the Convention.

2.  The Application also included a request for a stay of enforcement of the Award under Article 52(5) of the ICSID Convention.

3.  On 9 February 2015, the Secretary-General informed the Parties that the Application had been registered on that date and that the Chairman of the Administrative Council of ICSID would proceed to appoint an *ad hoc* Committee pursuant to Article 52(3) of the ICSID Convention. The Parties were also notified that, pursuant to ICSID Arbitration Rule 54(2), enforcement of the Award had been provisionally stayed.

4.  By letter of 8 May 2015 the Secretary-General notified the Parties that a Committee had been constituted, composed of Sir Franklin Berman (British) as President, Tan Sri Cecil Abraham (Malaysian) and Prof. Dr. Rolf Knieper (German) as Members, and that, in accordance with Rule 52(2) of the Arbitration Rules, the annulment proceeding was deemed to have begun on that date.  The Parties were also informed that Ms. Alicia Martín Blanco, Legal Counsel, ICSID, would serve as Secretary of the Committee.

## 2.  FIRST SESSION AND PROCEDURAL ORDER NO. 1

5.  On 22 May 2015, the Secretary circulated a draft agenda for the first session and invited the Parties to consult and revert to the Committee with their joint or separate proposals on the draft agenda items as well as on any item they might wish to add.

6.  After consultation with the Parties, the Committee notified the Parties on 10 June 2015, pursuant to Arbitration Rule 13(1) that the first session would be held on 7 July 2015.

7.  On 11 June 2015, the Parties jointly submitted a draft Procedural Order No. 1 with their agreement on all the items included in the draft agenda and confirmed that they had no items that they wished to add.  It was also agreed that the first session would be held by telephone conference.

8.  On 15 June 2015, the Mobil Parties enclosed a copy of the Decision on Revision that had been issued by the Tribunal on 12 June 2016.  In its Decision, the Tribunal dismissed the Application for Revision as inadmissible, declared the stay of enforcement automatically terminated and decided that all costs related to the proceeding would be born by the Applicant.

9.  The first session was duly held by telephone conference on 7 July 2015. The list of participants was as follows:

> <u>Members of the Committee:</u>
> Sir Franklin Berman, President of the Committee
> Tan Sri Cecil Abraham, Member of the Committee
> Professor Dr. Rolf Knieper, Member of the Committee
>
> <u>ICSID Secretariat:</u>
> Ms. Alicia Martín Blanco, Secretary of the Committee
>
> <u>Attending on behalf of the Applicant:</u>
> Mr. George Kahale, Curtis, Mallet-Prevost, Colt & Mosle
> Mr. Ben Preziosi, Curtis, Mallet-Prevost, Colt & Mosle
> Ms. Gabriela Alvarez Avila, Curtis, Mallet-Prevost, Colt & Mosle
> Ms. Arianna Sanchez, Curtis, Mallet-Prevost, Colt & Mosle

Mr. Fuad Zarbiyev, Curtis, Mallet-Prevost, Colt & Mosle

Attending on behalf of the Respondents:

Mr. Gaëtan Verhoosel, Three Crowns

Mr. Scott Vesel, Three Crowns

Mr. Thomas L. Cubbage III, Covington & Burling

Mr. Miguel López Forastier, Covington & Burling

Mr. René Mouledoux, ExxonMobil

Mr. Eugene Silva II, ExxonMobil

10. On 13 July 2015, the Committee issued Procedural Order No. 1 containing the Committee's decisions on procedure, including a schedule for written submissions.

### 3.   STAY OF ENFORCEMENT

11. On 9 June 2015, the Mobil Parties submitted a communication contending that "the provisional stay of enforcement granted by the Secretary General on 9 February 2015 [had] automatically terminated as of 8 June 2015" and seeking confirmation from the Committee.   On the same day the Applicant wrote to the Committee opposing the Respondents' interpretation of Rule 54(2).   The Applicant contended that the stay remained in place and should continue in place until the conclusion of the proceeding.   If the Respondents wished the Committee to rule on the continuation of the stay, the Applicant proposed that the Committee establish a briefing schedule for that purpose.   The Parties exchanged further communications on whether the request was properly framed as a request for a new stay (assuming the stay had been automatically terminated) or as a request for the continuation of the stay (assuming the stay continued in place).

12. On 10 June 2015, the Committee established a schedule of submissions on the issue of a stay and indicated that the Parties would be given the opportunity to argue this issue orally before the Committee during the first session.

13. On 10 June 2015, the Mobil Parties filed their submission on the stay issue.

14. On 24 June 2015, Venezuela filed its submission on the stay issue.

15. Having heard the Parties' oral arguments at the first session on 7 July 2015, the Committee issued its decision concerning the stay in Procedural Order No. 2 dated 28 July 2015. In the Order, the Committee noted that "[t]he Parties were in disagreement over the essential nature of the stay application. In the view of Venezuela, it was applying for a prolongation of the provisional stay brought into effect by the Secretary-General in application of Article 52.5 of the ICSID Convention and Arbitration Rule 54(2). In the view of the Mobil Parties, that provisional stay had lapsed, and the application could therefore only be for the imposition of a fresh stay *de novo*. Given the actual enforcement situation, however, both Parties had indicated that, in the circumstances, the question was not one which the Committee was required to decide. The Committee was moreover satisfied that the criteria to be applied, in deciding whether to grant or to deny a stay, would be the same under either of the two alternative scenarios." Paragraph 10 of the Order reads as follows:

   a) The enforcement of the Award of the Tribunal dated 9 October 2014 (ICSID Case No. ARB/07/27) is stayed pending the Committee's decision on Venezuela's application of 2 February 2015 for its annulment.

   b) The continued effect of Paragraph a. above is conditional on the receipt, within 30 days of the date of this Order, of an official undertaking in writing, by a Minister or other senior officer empowered to commit the Government of Venezuela, that, if the Committee decides not to annul the Award, or to annul it only in part, Venezuela will promptly comply with any or all parts of the Award that have not been annulled. The written undertaking will be addressed to the Committee and copied to each of the Mobil Parties.

   c) If no undertaking satisfying the terms of Paragraph b. above has been received at the end of the time limit specified in that paragraph, the stay will automatically be lifted 15 days later, but only if there has by then been received an official undertaking or undertakings in writing, by a senior officer or officers empowered to commit each of the Mobil Parties, that no attempt will be made to enforce any part of the Award in a manner that does not take full account of the requirement set forth in the above-cited paragraphs of the Award to avoid double recovery. In the absence of an undertaking or undertakings to that effect, the stay will continue in effect until such time as the requisite undertaking or undertakings have been

received. The written undertaking or undertakings will be addressed to the Committee and copied to each of the other Parties to the present annulment proceedings.

d)   It is open to any Party to apply at any time for a modification or termination of the above in accordance with the provisions of Arbitration Rule 54.

e)   Any Party may apply to the Committee, if the need arises, to certify whether the conditions laid down in Paragraphs b. or c. above have been duly complied with.

16. On 18 August 2015, the Centre received a letter addressed to the Committee by the Viceprocurador de la República of Venezuela, which was however challenged by the Mobil Parties by letter of 20 August 2015 as failing to comply with the requirements of paragraph 10(b) of Order No. 2;  the Mobil Parties requested that the stay be lifted in accordance with paragraph 10(c) of the Order unless Venezuela provided a compliant undertaking by 26 August 2015 or a bank guarantee covering the full amount of the La Ceiba portion of the Award by 10 September 2015.

17. On 24 August 2015, the Committee suspended the time limits under paragraph 10 of Order No. 2 and invited Venezuela to confirm in writing, at Ministerial level, not later than 31 August 2015, that the letter did constitute "a formal and binding undertaking on the part of the Government of Venezuela, in the words of sub-paragraph 10(b), 'that, if the Committee decides not to annul the Award, or to annul it only in part, Venezuela [would] promptly comply with any or all parts of the Award that have not been annulled'."  The Committee further noted that the Mobil Parties would be at liberty thereafter, if they considered it necessary, to avail themselves of the procedure specified in sub-paragraph 10(e) of the Order.

18. On 28 August 2015, a letter dated 27 August 2015 was received from the Minister of Petroleum and Mines of Venezuela containing a confirmation as requested by the Committee.   On 1 September 2015, the Mobil Parties requested the Committee to confirm under paragraph 10(e) of Order No. 2 that Venezuela  had not complied with paragraph 10(b) of the Order and to order that the stay be lifted immediately upon provision by the Mobil Parties of the undertaking referred to in paragraph 10(c) of the Order.   On 2 September 2015, the Committee invited the Applicant's response; the time limits under paragraph 10 of Procedural

Order No. 2 would in the meanwhile remain suspended.  On 4 September 2015, the Applicant wrote asserting that the Minister's letter did comply with the Committee's request.

19. On 17 September 2015, the Committee issued a decision in the following terms:

> [...] Having examined all of the submissions and supporting documents, the Committee is in no doubt that the two communications made on behalf of Venezuela correspond to the precise requirements laid down in Procedural Order No. 2, notably as regards the scope of the undertaking and its operation in time. [...] The Committee is accordingly satisfied that the Government of Venezuela has formally engaged itself, in the event that the Committee decides not to annul the Award, or to annul it only in part, promptly to comply with any or all parts of the Award that have not been annulled. That being so, and as laid down in sub-paragraph 10 a. of Procedural Order No. 2, the enforcement of the Award of the Tribunal dated 9 October 2014 (ICSID Case No. ARB/07/27) is stayed pending the Committee's decision on Venezuela's application of 2 February 2015 for its annulment. [...] In consequence of the above, sub-paragraphs 10 b., c., and e. of Procedural Order No. 2 cease to have effect.

### 4.  WRITTEN PROCEDURE

20. On 22 July, 16 September, 4 November, and 23 December 2015, the Parties duly filed their respective written Memorials in support of and in opposition to the Application for Annulment.

### 5.  HEARING ON ANNULMENT

21. On 12 August 2015, the Committee determined, on the basis of agreement between the Parties, that the hearing would be held on 25 and 26 January 2016.

22. On 2 December 2015, the Committee invited the Parties to confer and try to reach agreement on the procedural arrangements for the hearing and submit any such agreements or points or disagreement by 15 January 2016.

23. On 12 January 2016, the Parties submitted their agreements and points of disagreement concerning procedural hearing matters.  The Committee issued its decision concerning

procedural arrangements on 14 January 2016 and confirmed that a pre-hearing organizational meeting would not be necessary.

24. On 21 January 2016, the Committee sent a communication to the Parties concerning a severe snow storm forecast for the hearing venue during the period immediately prior to the hearing. The Committee noted that the storm was expected to disrupt transport and power, and put forward possible alternative arrangements for that eventuality. After numerous exchanges between the Parties and the Committee and two conference calls with its President, the hearing days were finally vacated.

25. After consultation with the Parties, the Committee confirmed 8 and 9 March 2016 as the new hearing dates, and further confirmed that the timing arrangements would be those established for the original hearing but transposed to the new dates.

26. The hearing was duly held at the seat of ICSID in Washington, D.C. on 8 and 9 March 2016. The list of participants was as follows:

Members of the Committee:
Sir Franklin Berman, President of the Committee
Tan Sri Cecil Abraham, Member of the Committee
Professor Dr. Rolf Knieper, Member of the Committee

ICSID Secretariat:
Ms. Alicia Martín Blanco, Secretary of the Committee

Attending on behalf of the Applicant:
Mr. George Kahale, III, Curtis, Mallet-Prevost, Colt & Mosle
Mr. Benard V. Preziosi, Curtis, Mallet-Prevost, Colt & Mosle
Mr. Fuad Zarbiyev, Curtis, Mallet-Prevost, Colt & Mosle
Mr. Borzu Sabahi, Curtis, Mallet-Prevost, Colt & Mosle
Ms. Arianna Sánchez, Curtis, Mallet-Prevost, Colt & Mosle
Mr. Simon Batifort, Curtis, Mallet-Prevost, Colt & Mosle
Ms. Lisandra Novo International, Curtis, Mallet-Prevost, Colt & Mosle
Ms. Kimberly Blair International, Curtis, Mallet-Prevost, Colt & Mosle

Ms. Gloria Díaz-Buján, Curtis, Mallet-Prevost, Colt & Mosle

Mr. Christopher Grech, Curtis, Mallet-Prevost, Colt & Mosle

Mr. Farshad Ali Zahedinia, Curtis, Mallet-Prevost, Colt & Mosle

Attending on behalf of the Respondents:

Mr. Gäetan Verhoosel, Three Crowns

Mr. Scott Vesel, Three Crowns

Mr. Simon Maynard, Three Crowns

Mr. Thomas Cubbage, Covington & Burling

Mr. Miguel López Forastier, Covington & Burling

Ms. Mary Hernández, Covington & Burling

Mr. David Rodríguez, Covington & Burling

Ms. Catherine Gibson, Covington & Burling

Mr. Eugene Silva, ExxonMobil

Mr. Bill Buck, ExxonMobil

Ms. JoAnn Lee, ExxonMobil

Ms. Alice Brown, ExxonMobil

## 6. POST-HEARING PHASE

27. On 25 March 2016, the Parties submitted their agreed corrections to the hearing transcript.

28. On 15 April 2016, as requested by the Committee, the Parties submitted their respective statements of costs.

29. The Tribunal declared the proceeding closed on 6 January 2017 in accordance with Rules 53 and 38(1) of the ICSID Arbitration Rules.

## II.    REQUEST FOR RELIEF

### 1.    APPLICANT

30. The Applicant makes the following request for relief:[1]

> (i) [T]he portion of the Award dealing with the Cerro Negro Project should be annulled due to the tribunal's manifest excess of powers and failure to state reasons in holding that it had jurisdiction under the Dutch Treaty; (ii) in the event that the portion of the Award dealing with the Cerro Negro Project is not so annulled, then the part of the Award dealing with the amount of compensation for the Cerro Negro Project and the determination of such compensation in paragraph 404(d) of the Award should be annulled on the grounds of (a) manifest excess of powers and failure to state reasons in failing to apply the special agreement regarding compensation and (b) manifest excess of powers, failure to state reasons and serious departure from a fundamental rule of procedure in failing to order document production relating to the special agreement regarding compensation; and (iii) the portion of the Award dealing with the La Ceiba Project should be annulled due to the tribunal's manifest excess of powers and failure to state reasons in holding that it had jurisdiction under the Dutch Treaty.

### 2.    RESPONDENTS

31. The Respondents makes the following request for relief:[2]

> The Mobil Parties respectfully request that the Committee dismiss the Application and award them all costs incurred in connection with these proceedings.

## III. ARGUMENTS OF THE PARTIES

### 1.    APPLICANT

#### A.    Grounds for annulment

32. The Applicant seeks annulment of the Award under Article 52(1) of the ICSID Convention. Specifically, the Applicant relies on the following three grounds for annulment:[3]

---

[1] Reply, para. 323.

[2] Rejoinder, para. 112.

[3] Memorial, para. 102.

- Manifest excess of powers (Article 52(1)(b) ICSID Convention);

- Failure to state reasons (Article 52(1)(e) ICSID Convention); and

- Serious departure from a fundamental rule of procedure (Article 52(1)(d) ICSID Convention).

### B.   Standard for annulment

33. The Applicant acknowledges that annulment constitutes an exception to the finality of awards and that annulment does not constitute appeal.  According to the Applicant, what matters is that this exception to finality does exist under the ICSID Convention and that the Applicant is not seeking an appeal but has filed a "bona fide application for annulment that fits squarely within Article 52 of the ICSID Convention".[4]

34. The Applicant rejects the limiting proposition put forward by the Mobil Parties that annulment is discretionary even when the grounds for annulment are met.  According to the Applicant, this proposition is not supported by the text or the drafting history of the ICSID Convention;[5] "[i]n sum, if the Committee finds that a ground for annulment exists, it must annul the Award."[6]

35. Concerning the specific three grounds for annulment it relies upon, Venezuela asserts the following:

   *(i)  Manifest excess of powers:*

   –  <u>Failure to apply the proper law</u>: it is well established that a tribunal manifestly exceeds its powers when it fails to apply the law agreed upon by the parties, even if the tribunal is nominally applying the correct law.[7]  The Applicant does not dispute that a mere error of law or a failure to apply individual provisions of the applicable law do not constitute a manifest excess of power, but rejects the allegation that it is seeking annulment on that basis; annulment is sought rather

---

[4] Reply, paras. 156, 157.

[5] Reply, para. 160.

[6] Reply, para. 170.

[7] Memorial, paras. 106-110.

on the grounds that the Tribunal either completely failed to apply the proper law or referred to it but then effectively disregarded it. The Applicant contends that the Mobil Parties do not dispute that failure to apply the proper law altogether or gross misapplication of the law that amounts to failure to apply it amount to a manifest excess of power.[8]

– <u>Lack of jurisdiction</u>: the Applicant rejects the notion that it is "merely attempting to challenge the tribunal's 'factual findings' on jurisdiction;" the lack of jurisdiction follows from the application of the standard established by the Tribunal, such that its conclusions on jurisdiction cannot be reconciled with its factual findings.[9] Lack of jurisdiction amounts to an excess of powers that is manifest *per se*.[10]

– <u>Admissibility</u>: the Applicant rejects the argument that the Tribunal's decision on jurisdiction amounts in reality to a decision on admissibility. Even if it were, a characterization as admissibility does not prevent annulment for manifest excess of powers (or failure to state reasons).[11]

*(ii) Failure to state reasons:*

– The Applicant contends that the obligation to state reasons "flows from" Article 48(3) of the ICSID Convention, which requires that the award "deal with every question submitted to the Tribunal, and [...] state the reasons upon which it is based."[12] Specifically, this ground for annulment has two main components: (first) that it is not possible to follow the Tribunal's reasoning to its conclusion, and (second) that the Tribunal failed to deal with questions raised by the

---

[8] Reply, paras. 172-175.

[9] Reply, paras. 182-183.

[10] Reply, paras. 177-181, 185.

[11] Reply, para. 186.

[12] Memorial, paras. 112-115.

applicant, the answer to which might have affected its conclusion.[13]   The Applicant submits that neither of these components is disputed by the Mobil Parties.[14]

*(iii) Serious departure from a fundamental rule of procedure:*

– The Applicant contends that this ground involves a two-part test: (first) the departure must be *serious*, which refers to its actual or potential impact on the award; and (second) the procedural rule affected must be *fundamental*, which refers to the minimal standards of procedure including the right to be heard.[15]

– The Applicant understands that the Mobil Parties do not dispute the test itself but rather whether it has been met in the present case.  According to the Applicant:

   a.  The 'seriousness' test is met because the Tribunal's decision on document production prevented the Applicant from fully presenting its case.[16]

   b.  The 'fundamental' test is equally met because the taking of evidence forms part of the right to be heard.[17]   The discretion enjoyed by tribunals in managing document production does not "alter the principle that flat denial of a request for production of highly relevant and material documents is tantamount to a denial of due process."[18]   In other words, tribunals do not have discretion to deviate from a fundamental rule of procedure.[19]

---

[13] Reply, paras. 188-189.

[14] Reply, paras. 190-191.

[15] Reply, para. 193.

[16] Reply, para. 194.

[17] Reply, para. 195.

[18] Reply, para. 197.

[19] Reply, para. 198.

### C. *Facts alleged supporting the grounds for annulment*

36. The three grounds for annulment relied on by the Applicant are based on the following three contentions, of which (i) and (ii) are relevant to the Cerro Negro Project, and (iii) is relevant to both the Cerro Negro and the La Ceiba Projects:[20]

> "(i) the tribunal did not apply the applicable law and the special agreement relating to the investment of the Mobil Parties in the Cerro Negro Project, thereby disregarding the basic terms and conditions on which that investment was authorized; (ii) the tribunal refused to allow essential document production with respect to the fundamental issue in (i) above, applying the wrong standard and denying the Applicant due process; and (iii) the tribunal exercised jurisdiction under the Dutch Treaty based on a corporate restructuring effected by the Mobil Parties in anticipation of litigation for the sole purpose of gaining access to ICSID."[21]

*(i)    Failure to Apply the Proper Law and the Special Agreement concerning the Cerro Negro Project*

37. The Applicant alleges that the Tribunal manifestly exceeded its powers and failed to state reasons when it failed to apply the proper law and the special agreement concerning the Cerro Negro Project.[22]

38. It emphasizes that its Application for Annulment does not seek to challenge any findings of fact by the Tribunal:  "On the contrary, the Applicant fully agrees with the tribunal's principal findings relating to the compensation structure of the Cerro Negro Project."[23]  According to the Applicant, it is "the Mobil Parties [who] are forced to either distort or ignore every single piece of evidence in the record to sustain their position on the facts concerning the compensation structure of the Cerro Negro Project."[24]

---

[20] Memorial, para. 102.

[21] Memorial, para. 102.

[22] Memorial, paras. 105, 123.

[23] Reply, paras. 201, 204.

[24] Reply, para. 203.

39. Venezuela contends that the portion of the Tribunal's decision relating to the compensation for the Cerro Negro Project must be annulled precisely because the Tribunal's conclusions do not follow from the Tribunal's factual findings.[25]  The Tribunal's conclusions are at odds with its own findings of fact as a result of its failure to apply the proper law under Article 9(5) of the Dutch Treaty, which amounts to a manifest excess of power.  The Tribunal also failed to state the reasons that would carry its findings of fact to its conclusions on the Cerro Negro Project compensation structure.

        a)    <u>Manifest excess of powers</u>
                <u>Failure to apply Article 9(5) of the Dutch Treaty</u>

40. According to the Applicant, Article 9(5) of the Dutch Treaty required that the Award be based "not only on the provisions of the Dutch Treaty and international law, but also on Venezuelan law and 'the provisions of special agreements relating to the investments'."[26]  The Tribunal acknowledged this provision but manifestly exceeded its powers when it disregarded the compensation structure for the Cerro Negro Project applicable under Venezuelan law and the special agreement on compensation for the Cerro Negro Project, namely the Cerro Negro Association Agreement, as authorized by the Cerro Negro Congressional Authorization.[27]

41. The Applicant asserts that a tribunal manifestly exceeds its powers when it fails to apply the law agreed upon by the parties,[28] even if the tribunal is nominally applying the correct law.[29]  In the present case, the Applicant submits that the Tribunal referred to Article 9(5) of the BIT but then ignored both the applicable law (Venezuelan law) and the special agreement under that provision (the Cerro Negro Association Agreement, as authorized by the Cerro Negro Congressional Authorization).[30]

---

[25] Reply, para. 206.

[26] Memorial, para. 105.

[27] Memorial, paras. 106-110, 121-122.  Reply, para. 207.

[28] Memorial, para. 106.

[29] Memorial, para. 107.

[30] Memorial, paras. 106-110, 124.

42. Venezuela rejects the Mobil Parties' argument that in order to establish a manifest excess of powers "the Republic would need to establish that either (a) the Tribunal applied a law different than the ones enumerated in Article 9(5) or (b) under the exception recognized by some committees, the Tribunal erred so egregiously in its determination as to which of these sources of law applied to which issues as to amount to a failure to apply these sources of law at all."[31] According to Venezuela, Article 9(5) does not establish options, and so the Tribunal was not free to disregard a special agreement on compensation.[32]   This is also not contrary to international law; when a State admits an investment under certain conditions, the State does not violate international law by applying those conditions.[33]

43. *Regarding failure to apply Venezuelan law*, the Applicant ultimately relies on the argument that "[a] party cannot claim compensation for the expropriation of rights it never had."[34] Because the scope of an investor's rights is always determined by national law, the Tribunal should have applied Venezuelan law in order to determine the scope of the Mobil Parties' rights.

44. In this sense, the relevant enquiry[35] is not "whether a particular asset 'qualifies as an investment under the Treaty' but rather what that asset consists of."[36]  What the asset consists of (or the scope of the rights attached to it) is determined by national law, not international law. International law can only provide protection for rights recognized by domestic law, but not create new property rights or expand existing property rights.[37]

45. The Tribunal determined the extent of the compensation due for the expropriation of the Respondents' rights under international law, in reliance on the fundamental but irrelevant principle that a State may not invoke its internal law as an excuse to escape international

---

[31] Reply, para. 207, quoting from Counter-Memorial, para. 180.

[32] Reply, para. 208.

[33] Reply, para. 210.

[34] Reply, para. 219.

[35] Reply, para. 225.

[36] Reply, para. 219.

[37] Reply, paras. 211, 219.

obligations. In so doing, the Tribunal failed to address the Applicant's argument that an investor's property rights are defined by local law or its corollary that an investment treaty merely protects these rights but does not create or expand them.[38] By applying international law instead of domestic law to determine the scope of the expropriated rights the Tribunal manifestly exceeded its powers.

46. *Regarding failure to apply the special agreement*, the Applicant relies on the combination of the Cerro Negro Congressional Authorization and the Cerro Negro Association Agreement.[39] Together, these instruments established the terms and conditions of the Cerro Negro Project, including its compensation structure, which included the price cap on compensation for governmental action affecting the project. This compensation structure constituted a special agreement in the sense of Article 9(5) regardless of whether the State was a party to the Association Agreement because the parties to the Association Agreement could not depart from the terms of the Congressional Authorization, as mandated by Article 5 of the Nationalization Law.[40] The conditions laid down by the Congressional Authorization would apply even if the Treaty did not specifically include special agreements in Article 9(5). This is (i) because the Congressional Authorization constituted a condition for the investment established from the outset by the State and (ii) because, as a matter of principle, property rights are created and defined by national law.

b)    Failure to state reasons

47. The Applicant submits that the purported reasons given by the Tribunal to ignore the Cerro Negro Project compensation structure are "not reasons at all". They were facts that bore no relevance to the issue before the Tribunal and did not address the core point made by Venezuela that "a party cannot receive compensation for rights it never had or beyond the rights it did have."[41]

---

[38] Memorial, paras. 128-132.

[39] Venezuela rejects the Mobil Parties' argument that there was no special agreement capable of being applied as a source of law. Reply, para. 226.

[40] Reply, paras. 227-230.

[41] Reply, paras. 236-241. Memorial, paras. 123-130.

48. The Applicant claims that the Tribunal also failed to state reasons in the sense of Article 52(1)(e) of the ICSID Convention in that it failed to address the Applicant's argument that an investor's property rights are defined by domestic law, which would have affected the outcome of the Award. A failure to deal with material issues is tantamount to a failure to state reasons.[42]

49. According to the Applicant, the Tribunal also failed to address the Applicant's arguments (i) that the compensation structure established for the Cerro Negro Project pursuant to the Cerro Negro Congressional Authorization was an integral part of the fair market value analysis;[43] (ii) that the relevance of the compensation provisions was not a matter of a "third-party beneficiary" analysis, which was not part of Venezuela's argument;[44] as well as (iii) Dr. Mommer's uncontested testimony which would have supported the Tribunal's own findings of fact concerning the compensation structure under the Association Agreement and the Congressional Authorization.[45]

      c)    <u>Conclusion</u>

50. In the light of the above, the Applicant frames the argument concerning annulment under Article 52(1)(b) and/or (e) of the ICSID Convention based on the Tribunal's failure to apply the proper law and the special agreement as follows:

> The issue of whether the portion of the Award relating to compensation for the Cerro Negro Project should be annulled for manifest excess of powers or failure to state reasons, or both, hinges upon whether there was any basis for the tribunal to disregard the terms and conditions established for the Cerro Negro Project pursuant to the Cerro Negro Congressional Authorization.[46]

---

[42] Reply, para. 243. Memorial, paras. 131-132. The Applicant rejects the Respondents' argument that this is a new issue that was not presented before the Tribunal. Reply, paras. 245-249.

[43] Reply, paras. 250-264. Memorial, paras.133-137.

[44] Reply, paras. 265-273. Memorial, paras. 138-142.

[45] Reply, paras. 274-276. Memorial, paras. 143-147.

[46] Reply, para. 277.

51. The Applicant answers this issue in the negative, on the ground that the reasons provided by the Tribunal are not sufficient to establish a link between the bases or factual findings relied on by the Tribunal and the conclusions reached by it, and must therefore result in the annulment of the portion of the Award that deals with compensation for the Cerro Negro Project.[47]

*(ii)*    *Refusal to allow essential document production*

52. The Applicant contends that the same portion of the Award should be annulled as a consequence of the Tribunal's refusal to allow document production concerning the applicability of the compensation structure of the Project pursuant to the Congressional Authorization.[48] According to the Applicant, the Tribunal's refusal to allow this request for document production constitutes a manifest excess of powers,[49] a failure to state reasons[50] and a serious departure from a fundamental rule of procedure[51] pursuant to Article 52(1)(b), (e) and (d) of the ICSID Convention.

53. The Applicant contends that the request for document production (i) was sufficiently narrow,[52] related to the Mobil Parties' "theory of the compensation structure of the Cerro Negro Project being an 'incentive'" and (ii) was relevant to the Applicant's argument "that under the Congressional Authorization for the Cerro Negro Project, Respondent expressly reserved all of its sovereign rights to take action affecting the Project, that this was a fundamental condition to obtaining the authorization of the Project that was required by law, that Mobil Cerro Negro agreed that compensation would be subject to the terms, conditions and, most importantly, limitations on compensation through a price cap to be set forth in the Cerro Negro Association

---

[47] Reply, paras. 242, 279-280.

[48] Memorial, para. 149.

[49] Memorial, paras. 152-158.

[50] Memorial, para. 159. Reply, paras. 291-298.

[51] Memorial, para. 160-167. Reply, paras. 299-303.

[52] Reply, paras. 302.

Agreement, and that Mobil Cerro Negro understood from the outset that any compensation for adverse governmental action would be subject to those terms, conditions and limitations."[53]

54. The Applicant acknowledges "that the record is clear and that the tribunal found the material facts to be exactly as the Applicant has presented them, but that does not mean that the Mobil Parties were entitled to hide highly relevant documents that would have confirmed the Applicant's position..."[54] According to the Applicant, these documents would have shown the Mobil Parties' understanding of the special agreement on compensation for governmental action against the Project and would have had a significant and material impact on the Tribunal's determination of the relevance of the price cap.[55]

      a)    <u>Manifest excess of powers</u>

55. The Tribunal's refusal to order document production was effected in one sentence, where the Tribunal "consider[ed] that [Venezuela] ha[d] not demonstrated that the documents requested [were] necessary as required under Article 43(a) of the ICSID Convention and Rule 34(2)(a) of the ICSID Arbitration Rules."[56] According to Venezuela, the Tribunal manifestly exceeded its powers when it failed to apply the applicable law in so far as it failed to apply any proper standard for document production[57] even if, as the Mobil Parties argue, ICSID provides no specific rules of document production[58] and even if the Tribunal mentioned Article 43(a) of the ICSID Convention and ICSID Arbitration Rule 34(2(a).[59] Failing to apply "well-known principles" is equivalent to failing to apply the provisions mentioned or constitutes a "gross

---

[53] Reply, paras. 282-283, quoting from Venezuela's Observations on Mobil Parties' Reply to Venezuela's Application for an Order Requiring the Production of Documents.

[54] Reply, para. 287.

[55] Memorial, paras. 150-151.

[56] Memorial, para. 150.

[57] Memorial, paras. 152-158.

[58] Reply, para. 288.

[59] Reply, para. 289.

misapplication or misinterpretation of the governing principles, amounting to a failure to apply the applicable law."[60]

b)      Failure to state reasons

56. According to the Applicant, the Tribunal also failed to state reasons for its denial of the document production request.  In fact, the Tribunal "provided no supporting reasons at all, simply reciting the ultimate conclusion that the standard for document production had not been met."[61]  The Applicant contends that it is not possible to decipher how the Tribunal arrived at its conclusion.[62]

c)      Serious departure from a fundamental rule of procedure

57. Finally, the Applicant argues that the refusal constituted a serious departure from a fundamental rule of procedure.  The Applicant contends that tribunals do not have unfettered discretion to manage document production to the extent of including unjustified denials of document production.  This would constitute a denial of the right to be heard, which itself constitutes a fundamental rule of procedure.[63]

(iii)    *Exercise of Jurisdiction under the Dutch Treaty based on a Corporate Restructuring Effected to Gain access to ICSID*

58. The Applicant contends that the Tribunal's failure to dismiss the case for lack of jurisdiction constitutes a manifest excess of powers in the sense of Article 52(1)(b) of the ICSID Convention and a failure to state reasons in the sense of Article 52(1)(e).[64]

59. The Applicant submits that the Tribunal manifestly exceeded its powers when it found that it had jurisdiction despite the abuse of rights constituted by the corporate restructuring

---

[60] Memorial, para. 153.

[61] Reply, para. 292.

[62] Reply, para. 294.

[63] Reply, para. 300.

[64] Reply, para. 304.

undertaken by the Mobil Parties with the sole purpose of gaining access to ICSID jurisdiction and in anticipation of litigation.[65]

60. In addition, the Tribunal failed to state reasons to explain how it reached the conclusion that it had jurisdiction having found "that the sole purpose of the corporate restructuring was to gain access to ICSID, that there were existing and foreseeable disputes between the Mobil Parties and Venezuela prior to the Dutch restructuring and that the Mobil Parties had already notified the Applicant of tax disputes and of a potential expropriation dispute before the restructuring."[66]

    a)    Manifest excess of powers

61. The Applicant contends that a tribunal's exercise of jurisdiction when jurisdiction does not exist constitutes in itself a manifest excess of powers,[67] and lists a "set of factors to be taken into account in determining whether there has been an abuse through a 'corporation of convenience' for purposes of obtaining ICSID jurisdiction". The Tribunal referred to the cases where these factors are considered but "failed to apply the principles they represent."[68]

62. The Applicant relies in particular on the principle that "transfers into a treaty jurisdiction for the sole purpose of gaining access to ICSID jurisdiction in anticipation of litigation constitute treaty abuse."[69] According to the Applicant, all the factors identified were present in this case. Therefore, there could have been no doubt that the corporate restructuring constituted an abuse of rights.[70] The exercise of jurisdiction in those circumstances constituted a manifest excess of powers.[71]

---

[65] Memorial, para. 168.

[66] Memorial, para. 168.

[67] Memorial, para. 169.

[68] Memorial, paras. 171, 181.

[69] Memorial, para. 182.

[70] Memorial, para. 186.

[71] Memorial, para. 188.

b)    Failure to state reasons

63. According to the Applicant, the Award should be annulled for failure to state reasons, this being a ground that applies when the reasons given are insufficient or contradictory.[72]

64. The Applicant contends that the Tribunal's conclusion that there was no abuse of rights in the Mobil Parties' corporate restructuring does not follow from the Tribunal's factual and legal findings that (i) a restructuring effected with the sole purpose of securing access to ICSID jurisdiction would constitute an abuse of right; and that (ii) the corporate restructuring of the Mobil Parties was done with the sole purpose of gaining access to ICSID jurisdiction and at a time when there were existing and foreseeable disputes.[73]

65. The Applicant further contends that the Tribunal's different conclusions on jurisdiction concerning the expropriation claim and the income tax measure claim are contradictory; : "...the tribunal's exercise of jurisdiction over the expropriation claim on the ground that the expropriation did not occur until after the Mobil Parties had restructured their interests directly contradicts the tribunal's determination that it did not have jurisdiction over the claim based on the income tax measure, which did not take effect until January 2007, after the restructuring of both the Cerro Negro and the La Ceiba Projects.".[74]

66. Finally, the Applicant submits that, even though the Tribunal recognized the foreseeability principle as stated in the *Pac Rim* Decision, it (i) failed to analyze it and therefore to address the argument that jurisdiction cannot be exercised where the restructuring that brings about the protection of a treaty occurs when the claim is foreseeable, which applied to the expropriation claim in this case; and (ii) upheld jurisdiction over the expropriation claim on the basis of when the nationalization measures were actually taken, instead of considering when the dispute concerning those measures was foreseeable.[75]

---

[72] Reply, paras. 318-319.

[73] Memorial, para. 190.

[74] Memorial, para. 191.

[75] Memorial, para. 192.  Reply, paras. 320-322, referring to *Pac Rim Cayman LLC v. The Republic of El Salvador* (ICSID Case No. ARB/09/12), Decision on the Respondent's Jurisdictional Objections, dated 1 June 2012.

### 2. RESPONDENTS

#### A. Concerning the grounds for annulment

67. The Mobil Parties consider the application for annulment part of a tactic to evade or at least delay payment of the compensation awarded to them in the Arbitration.[76]

68. The Mobil Parties contend that none of the complaints raised against the Award has any merit; "[w]hat is relevant to – and dispositive of – the Republic's Application is that none of its complaints could possibly give rise to a valid basis for annulment under any of the grounds listed in Article 52."[77]

#### B. Concerning the standard for annulment

69. The Mobil Parties state that annulment is "constrained by three fundamental propositions",[78] which results in the grounds for annulment being subject to "particularly high standards"[79]:

- annulment constitutes an extraordinary and limited exception to the finality of awards.[80]
- annulment does not constitute appeal and therefore does not allow for revision of errors of fact or law.[81]
- annulment is discretionary.[82]

70. Concerning the three specific grounds for annulment relied on by Venezuela, the Mobil Parties argue as follows:

---

[76] Counter-Memorial, paras. 2, 5.

[77] Counter-Memorial, para. 8.

[78] Counter-Memorial, para. 46.

[79] Counter-Memorial, para. 47.

[80] Counter-Memorial, paras. 46, 52-55.

[81] Counter-Memorial, paras. 46, 56-64.

[82] Counter-Memorial, paras. 46, 65-69.

*(i)  Manifest excess of powers:*

–  The Mobil Parties contend that manifest excess of powers contains a "dual requirement" that the Tribunal acted in excess of powers and that the excess qualifies as manifest.[83]  In particular, the word "manifest" was intended to place a serious restriction and emphasizes the extraordinary nature of the annulment remedy.  They refer to decisions of previous *ad hoc* committees which found that: (i) manifest means "'evident', 'obvious', and 'plain on its face' such that it can be discerned without any elaborate analysis of the Award"[84]; and that (ii) the excess must give rise to serious consequences.[85]

–  <u>Failure to apply the proper law</u>: the Mobil Parties distinguish between failure to apply the law and an error in the application of the law, and contend that only the former could constitute a basis for annulment – albeit not every failure to apply the law will meet the threshold for annulment.[86]  In the same sense, failure to apply individual provisions of the law[87] and failure to refer to the governing law would not amount to failure to apply the law.[88] The Mobil Parties also note that a few *ad hoc* committees have differentiated between a mere error of law and an atrocious error of law, and acknowledged the possibility that an "atrocious" error could constitute basis for annulment.[89]  In addition, they argue that even if failure to apply the law was established, the Applicant would also have to show that the failure was manifest, and contend that, so long as a tribunal endeavoured to apply the proper law (as they suggest the Committee will be satisfied is the case here),

---

[83] Counter-Memorial, para. 71.

[84] Counter-Memorial, para.73.

[85] Counter-Memorial, para. 74.

[86] Counter-Memorial, paras. 80-85. Rejoinder, paras. 46-49.

[87] Counter-Memorial, para. 88-89.

[88] Counter-Memorial, para. 90.

[89] Counter-Memorial, paras. 86-87. Rejoinder, para. 50.

that would discharge its duty and would thus fail to cross the "manifest" threshold.[90]

- <u>Lack of jurisdiction</u>:  The Mobil Parties argue that a manifest excess of powers concerning jurisdiction should be treated no differently from any other ground for annulment, in that it must meet the dual requirement that jurisdiction was exercised where there was none and that the non-existence of jurisdiction was manifest.[91]  They reject the argument that the manifest requirement should not apply in relation to jurisdiction (or that exercising jurisdiction where none exists in itself raises to the level of manifest excess of powers).[92]

- <u>Admissibility</u>:  The Mobil Parties submit that an allegation of abuse of right is a claim of admissibility and not an objection to jurisdiction.  Since admissibility is discretionary in nature, it "cannot provide a basis for annulment for an alleged manifest excess of powers."[93]

*(ii) Failure to state reasons:*

- The Mobil Parties contend that the standard for annulment for failure to state reasons requires the following: (i) that the failure result in "a particular point essentially lacking any expressed rationale"; and (ii) that the point itself be necessary for the tribunal's decision.[94]  According to the Respondents, so long as the reasoning can be followed, is "plausible" and not "clearly frivolous", there is no basis for annulment under this ground.[95]  The Mobil Parties further state that this ground does not cover failure to address a question (which is governed by

---

[90] Counter-Memorial, para. 92.

[91] Counter-Memorial, para. 97.

[92] Counter-Memorial, paras. 98-103.

[93] Counter-Memorial, para. 96.

[94] Counter-Memorial, para. 111.

[95] Counter-Memorial, para. 112.

Article 49(2) of the ICSID Convention)[96] unless the particular failure "amounts to a failure in the intelligibility of the reasoning in the award."[97] Similarly, the Tribunal's reasoning need not be exhaustive or explicit.[98] The Mobil Parties acknowledge that contradictory reasons may fall under this ground for annulment, but argue that the contradiction would have to render the reasoning incomprehensible and not constitute a mere inconsistency.[99]

*(iii) Serious departure from a fundamental rule of procedure:*

– The Mobil Parties contend that this ground involves a "three-stage test": (i) that the procedural rule be fundamental or limited to the principles of natural justice; (ii) that there be a departure as opposed to an exercise of the Tribunal's discretion; and (iii) that the departure be sufficiently serious to merit annulment, *i.e.*, that it cause the Tribunal to reach "a result substantially different from what it would have awarded had such a rule been observed."[100]

### C.  *Concerning the alleged facts supporting the grounds for annulment*

71. The Mobil Parties describe the Applicant's "theory" as follows: "that in order to participate in the Cerro Negro Project, Mobil CN was forced to agree to a contract with PDVSA-CN, the terms of which (through an unspecified legal mechanism) precluded the pursuit of treaty-based remedies against the Republic to obtain full compensation in case of expropriation."[101]

72. According to the Mobil Parties, this theory is not supported by either the facts or the language of the Cerro Negro Association Agreement.[102] In particular, the Mobil Parties argue that Section 15 of the CNAA contains a "limited indemnity" granted by a subsidiary of PDVSA for certain governmental actions, not a limitation on Venezuela's compensation obligation

---

[96] Counter-Memorial, paras. 115-116.

[97] Counter-Memorial, para. 116.

[98] Counter-Memorial, paras. 117-118, 121.

[99] Counter-Memorial, paras. 119-120. Rejoinder, para. 82.

[100] Counter-Memorial, para. 106.

[101] Rejoinder, para. 16.

[102] Rejoinder, para. 17.

under the Dutch Treaty,[103] not least because the limitation of liability constituted a limitation on the investors and PDVSA under a contract, whereas the payment of just compensation for expropriation constituted an obligation of Venezuela under a treaty.[104]  The contractual indemnity provided protection to the Mobil Parties as an incentive to invest in the Cerro Negro Project, and was additional to the treaty protection.[105]

73. The Mobil Parties similarly contend that the Applicant's position finds no support in its own Congressional enactments or the Eighteenth and Twentieth Conditions of the Framework of Conditions.[106]  The Venezuelan Congress did not enact provisions "capable of being read as disclaiming the Republic's international law obligations or as providing a basis to construe the Mobil Parties' decision to invest as a waiver of the Mobil Parties' international law rights to obtain just compensation in the event of an expropriation."[107]

(i)        *Failure to Apply the Proper Law and the Special Agreement concerning the Cerro Negro Project*

      a)        <u>Manifest excess of powers</u>

74. The Mobil Parties state that the complaint of manifest excess of powers must be rejected because the Tribunal correctly identified and applied the proper law, because there was no special agreement in the sense of Article 9(5) of the Dutch Treaty between the Parties and because Venezuela could not rely on its domestic legislation to amend or avoid its obligations under the Treaty.[108]

75. *Regarding identification and application of the proper law*, the Mobil Parties contend that the Tribunal observed the possible sources of law listed by the Parties in Article 9(5) of the Treaty, which did not in itself allocate matters to one law or another, leaving it therefore for the

---

[103] Rejoinder, para. 26.

[104] Rejoinder, para. 42.

[105] Rejoinder, para. 36.

[106] Rejoinder, paras. 27-43.

[107] Rejoinder, para. 41.

[108] Rejoinder, para. 45.

Tribunal to determine which issues would be governed by which law.[109]  The Tribunal's approach "is consistent with well-established principles of international law and the practice of other investment tribunals."[110]

76.  The Mobil Parties submit that the Tribunal's determination that international law governed the amount of compensation due for the expropriation of their interests is "unassailable" and supported by "ample and unanimous authority,[111] whereas Venezuela's position that this issue should have been determined under domestic law instruments is "untenable" under the principle that a State cannot rely on its domestic law to thwart its international obligations enshrined in Article 27 of the Vienna Convention.[112]

77.  *Regarding the existence or otherwise of a special agreement within the meaning of Article 9(5) of the Treaty*, the Mobil Parties reject the argument that the CNAA can be used as the basis for such special agreement since the Republic was not a party to the contract and "[i]t is axiomatic that a contract can only be a source of law as between the parties to the contract."[113]  The Tribunal also reached this conclusion and its findings are not subject to review on annulment.[114]

78.  Since the CNAA does not constitute a special agreement and the Framework of Conditions and Congressional Authorization constitute pieces of legislation, not agreements, the combination of these instruments does not result in a special agreement under Article 9(5) of the Treaty.[115]

79.  *Regarding the argument that domestic law governs the scope of property rights and therefore that the extent of compensation is dependent on the scope of these rights under national law*

---

[109] Rejoinder, para. 51.

[110] Rejoinder, para. 52.

[111] Rejoinder, para. 54.

[112] Rejoinder, paras. 56-57.

[113] Rejoinder, para. 58.

[114] Rejoinder, para. 60.

[115] Rejoinder, paras. 61-62.

*(and its corollary that the Tribunal should have applied domestic law to determine the amount of compensation)*, the Mobil Parties state that it is inadmissible on annulment as (i) it constitutes a new argument that was not presented before the Tribunal;[116] and (ii) the Applicant is unable to identify any such right.[117]   In any event, the Mobil Parties contend that the principles relied on are not applicable to the present case.[118]

80.  The Mobil Parties contend that it is a well-established argument that annulment cannot be based on new evidence or new arguments, which makes this new argument inadmissible.  A reference made by Venezuela in the context of its FET argument to "rights and expectations" being defined by Venezuelan law and special agreements is not equivalent to its current argument on the scope of "property rights" and its impact on the amount of compensation.[119]

81. The Mobil Parties state that there was no dispute relating to the scope of property rights, and therefore the Applicant is unable to identify which property right exactly is under discussion. The dispute identified by Venezuela before the Tribunal concerned whether its liability under the Treaty was limited by the CNAA or the Eighteenth and Twentieth Conditions, which did not require a determination on the scope of a property right.[120]

82. Finally, the Mobil Parties argue that the authorities relied on by the Applicant do not support its position concerning the limitation of an investor's treaty rights through a contract with the State.  In particular, the Mobil Parties refer to the *Siag* case and distinguish it from the present situation in that the underlying contract in *Siag* was between the parties to the dispute and it contained a provision requiring payment of a share of the sale value of the transferred investment to the State for which there is no equivalent in the CNAA.[121]

---

[116] Rejoinder, paras. 66-69.

[117] Rejoinder, paras. 66, 70-72.

[118] Rejoinder, paras. 66, 73-79.

[119] Rejoinder, paras. 67-69.

[120] Rejoinder, paras. 70-72.

[121] Rejoinder, paras. 73-79.

      b)    <u>Failure to state reasons</u>

83. The Mobil Parties assert that the Tribunal provided "clear, cogent, and correct reasons for rejecting the Republic's attempts to invoke the indemnity provisions to limit the Republic's liability" in particular, that Venezuela was not a party to the CNAA and that the Republic's domestic legislation cannot alter its international law obligations. In addition, the Mobil Parties contend that there is no contradiction between the "description of undisputed facts" provided by the Tribunal in the Award and the Tribunal's legal conclusions.

84. The Mobil Parties refer to the Applicant's "new argument" and contend that Venezuela may not challenge the Award on the basis of a failure to address an argument that was never presented to the Tribunal. In any case, the Mobil Parties find that the reasons provided for not applying either the Eighteenth and Twentieth Conditions or the CNAA were correct.[122]

85. Regarding the argument that the Tribunal should have considered the indemnity provisions in the analysis of the fair market value, the Mobil Parties state that the Republic cannot fault the Tribunal for inconsistency in finding that the Republic may not rely on the indemnity provisions and then not considering the indemnity provisions in the analysis of the fair market value.[123]

86. The Mobil Parties also reject Venezuela's arguments concerning the third-party beneficiary analysis and Dr. Mommer's testimony.[124]

*(ii)*    *Refusal to allow essential document production*

      a)    <u>Manifest excess of powers</u>

87. The Mobil Parties say that the Tribunal applied the standard contained in Article 43 of the ICSID Convention to decide the document production request. Accordingly, Venezuela's argument that the Tribunal manifestly exceeded its powers by failing to apply the proper law is untenable. Article 43 is the only applicable standard for document production under the

---

[122] Rejoinder, para. 84.

[123] Rejoinder, paras. 85-86.

[124] Rejoinder, paras. 87-88.

ICSID Convention, and therefore the Applicant's references to "all recognized standards" or to "any proper standard" are unavailing.[125]

88. According to the Mobil Parties, the Applicant is ultimately arguing that the Tribunal reached the wrong decision "when exercising its discretion in applying the standard", which is not reviewable on annulment.[126]

      b)    <u>Failure to state reasons</u>

89. The Mobil Parties contend that the Tribunal provided adequate reasons for its decision to deny document production, and add that (i) "brevity of the Tribunal's order alone is not a meaningful criterion for determining a failure to state reasons, particularly here where the parties' pleadings clearly provided context and documentation for the Tribunal's order"; and that (ii) the Tribunal's reasoning "may be implicit in other considerations and conclusions in the award".[127]

90. Likewise, the Mobil Parties assert that Venezuela has not (i) produced support for its contention that procedural orders must state reasons; or (ii) explained "how its contention of an inadequate explanation of the denial is consistent with its own inaction" after the decision was issued by the Tribunal. Specifically, the Mobil Parties remark that the Republic never complained of lack of reasoning or demanded that the Tribunal elaborate. As a consequence, the Applicant has forfeited its ability to bring this complaint on annulment.[128]

      c)    <u>Serious departure from a fundamental rule of procedure</u>

91. The Mobil Parties argue that the Applicant has failed to establish any of the three necessary elements under this ground for annulment.[129]

---

[125] Rejoinder, paras. 96-97.

[126] Rejoinder, para. 98.

[127] Counter-Memorial, paras. 323-326. Rejoinder, para. 100.

[128] Counter-Memorial, para. 322. Rejoinder, para. 99.

[129] Rejoinder, para. 89.

92. First, the Applicant has failed to establish that there was a fundamental rule that entitled it to the production of these documents. In particular, the Mobil Parties contend that the Tribunal applied the relevant standard under Article 43 of the ICSID Convention, which is inherently discretionary and therefore cannot constitute a fundamental rule which would have required the Tribunal to rule in a particular way.[130]

93. Second, even if there was a fundamental rule, the Applicant has failed to establish that there was a departure from it, since the denial of documents was justified. In particular, the documents failed to meet the standard of materiality under the IBA Rules on the Taking of Evidence in International Arbitration. This is supported by the Applicant's own contention that it had presented sufficient evidence in support of the factual premises of its legal contentions.[131]

94. Third, even if there was a departure, Venezuela has failed to establish that the departure was serious in the sense of Article 52(1)(d) of the ICSID Convention, and in particular to demonstrate that "the application was 'materially prejudiced' and the Award might have been different had the alleged departure not occurred."[132]

(iii)     *Exercise of Jurisdiction under the Dutch Treaty based on a Corporate Restructuring Effected to Gain access to ICSID*

   a)  Manifest excess of powers

95. The Mobil Parties contend that the Applicant's argument on "abuse of right" lacks merit, firstly because 'abuse of right' is a question of admissibility, falling within the discretion of the Tribunal, and is not therefore subject to review on annulment; secondly because it seeks to relitigate factual or legal issues, which is not possible on annulment; and thirdly because in any event the Committee should uphold the determinations made by the Tribunal.[133]

---

[130] Rejoinder, paras. 89-91.

[131] Rejoinder, paras. 89, 92-94.

[132] Rejoinder, paras. 89, 95.

[133] Counter-Memorial, paras. 348-350.

96. First, concerning the question of admissibility, the Mobil Parties assert that Venezuela does not dispute that "all mandatory requirements for ICSID jurisdiction were satisfied in this case", nor the distinction between jurisdiction and admissibility, nor that issues of admissibility are not subject to review on annulment. The Mobil Parties deny that the abuse of right objection can properly be framed as a jurisdictional argument, and contend that both the Parties and the Tribunal distinguished between issues of jurisdiction and admissibility, and included abuse of right among the latter.  Even if the Tribunal had classified this issue as one of jurisdiction, "nomenclature alone cannot alter the substance of the Tribunal's decision and render it reviewable at the annulment phase."[134]

97. Second, the Mobil Parties state that the fact that Venezuela is raising the same arguments on annulment as it raised at the jurisdictional phase means that it is seeking to have the issue relitigated in the hopes of obtaining a different result.  This is not permissible on annulment since *ad hoc* committees do not have the authority to substitute their own findings for those of the tribunal.[135]

98. Third, even if the Committee were to review the abuse of right objection at the annulment stage, the Mobil Parties contend that it would find that it does not warrant annulment.  In particular, the Mobil Parties say that the Tribunal acted within its discretion when analyzing the abuse of right objection and concluding that the restructuring of the Mobil Parties was "a perfectly legitimate goal" because it occurred before the expropriating measures had been implemented and the dispute had arisen.  The Mobil Parties in addition reject Venezuela's contention that the Tribunal did not consider foreseeability when deciding whether it had jurisdiction over the expropriation claim; on the contrary, the Tribunal found that the absence of references to expropriating measures in contemporaneous correspondence and press announcements indicated that the measures had not been foreseeable at the time of the

---

[134] Rejoinder, paras. 102-106.

[135] Counter-Memorial, paras. 356-360.

restructuring.[136]  In any case, the decisions in *Pac Rim*, *Tidewater* and *Gremcitel* are consistent with the Tribunal's Decision on Jurisdiction.[137]

b)      Failure to state reasons

99. According to the Mobil Parties, Venezuela's argument that the Tribunal's reasoning is contradictory should be dismissed because it is premised on the mischaracterization of the Tribunal's findings of fact and law;[138] the Tribunal's reasoning is in fact "complete and coherent, and displays no trace of the sort of self-contradiction that could render the relevant parts of the Award incomprehensible, as would be required for annulment."[139]

100. According to the Mobil Parties, the Tribunal did not find that it is invariably an abuse of right to restructure with the sole purpose of gaining access to ICSID jurisdiction.  Instead, what the Tribunal found is that it could constitute an abuse of right to do so for pre-existing disputes, but was legitimate for future disputes.  The Mobil Parties also dispute that there was any finding by the Tribunal that the restructuring was effected to access ICSID jurisdiction for existing disputes.  To the contrary, their position, as supported by the Tribunal's findings, has always been that jurisdiction was sought for "action that the Respondent took or continued to take after the restructuring was completed".[140]  In order to reach its conclusion the Tribunal had analyzed several legal authorities that had addressed restructurings as an alleged abuse of right, and had applied the legal principles derived from these authorities to the facts of the case.[141]

101. The Mobil Parties also dispute the claim that there was a contradiction in the exercise of jurisdiction over the expropriation claim but not over the claim concerning income tax. According to the Mobil Parties, the Tribunal found that the income tax claim constituted a pre-existing claim that was known at the time of the restructuring, so that the Tribunal's denial of

---

[136] Rejoinder, paras. 107-108.

[137] Counter-Memorial, paras. 368-377.

[138] Counter-Memorial, para. 378.

[139] Rejoinder, para. 109.

[140] Counter-Memorial, para. 379.

[141] Counter-Memorial, paras. 380-383.

jurisdiction over this claim was consistent with its assuming jurisdiction over the expropriation claim, which the Tribunal considered a future claim unknown at the time of the restructuring.[142] In particular, the Tribunal found that although the income tax rate was formally enacted after the restructuring, "a real dispute concerning a decision already made" to increase the income tax existed before the restructuring.[143] By contrast, the nationalization measures had not been undertaken, were not known, and had not been raised as a dispute before the restructuring occurred.[144]

102. The Mobil Parties further deny that the Tribunal failed to address Venezuela's argument regarding foreseeability of the expropriation claim. According to the Mobil Parties, the Tribunal acknowledged and dismissed this argument, albeit analyzing it in different terms. The Tribunal was not required to frame its reasoning in the precise language of foreseeability, but the reasoning behind the Tribunal's approach "was not only clearly articulated but has been endorsed and followed by subsequent Tribunals." In particular, the Tribunal's finding that the dispute regarding the expropriation was a "future dispute" at the time of the restructuring impliedly concludes that the dispute was not foreseeable at the time.[145]

103. Finally, the Mobil Parties contend that Venezuela's reliance on *Pac Rim* is misplaced because that decision considered the foreseeability of an actual or specific future dispute as opposed to the foreseeability of a potential dispute or a possible controversy. According to the Mobil Parties, the Tribunal's observation that it concurred in the view taken by the *Pac Rim* Tribunal is consistent with its analysis on foreseeability. In particular, the Tribunal's approach is "'comparable' to that of the *Pac Rim* tribunal because both decisions analyzed when the specific disputes arose in respect of each measure."[146]

## IV. THE COMMITTEE'S ANALYSIS

---

[142] Counter-Memorial, para. 385.

[143] According to the Mobil Parties, this finding also disproves the Applicant's allegation that the Tribunal assumed that a dispute cannot arise until a measure is taken. Rejoinder, para. 110.

[144] Counter-Memorial, paras. 385-391.

[145] Counter-Memorial, paras. 392-397.

[146] Rejoinder, para. 111.

104. As already indicated, the Applicant, Venezuela, makes three requests for annulment of the Award: the Tribunal's erroneous assumption of jurisdiction (as a manifest excess of power under Article 52(1)(b) of the ICSID Convention);  the Tribunal's refusal, for no adequate reason, to order production of certain documents (as a serious departure from a fundamental rule of procedure under Article 52(1)(d)); and the Tribunal's decision not to apply the price cap provisions of the Cerro Negro Project to the assessment of Venezuela's admitted liability to pay compensation (as a combination of manifest excess of power for failure to apply the proper law and failure to state reasons, under Article 52(1)(b) and (e)).

105. Two of these three requests can be disposed of without great difficulty, and will be dealt with first. The third, however, raises questions of some difficulty and importance and will therefore form the main focus of this Decision.

 (i)      *Jurisdiction*

106. It should be recalled that Venezuela's arguments under this head are directed at the Tribunal's decision to assume jurisdiction both in respect of the Cerro Negro Project and of the La Ceiba Project.

107. The burden of Venezuela's complaint under this head is that the corporate re-structuring undertaken by the Mobil Parties in 2005 was for the sole purpose of gaining access to ICSID under the Netherlands/Venezuela BIT;  that it was done in anticipation of litigation;  and that there is ample precedent for regarding that combination of circumstances as an abuse of right "that should have led the tribunal to find that it lacked jurisdiction to hear this case."[147]

108. The essence of the Mobil Parties' answer is that an 'abuse of right' argument goes to admissibility, not jurisdiction, and is therefore outside the scope of the annulment process, inasmuch as it relates to an issue that is recognized to lie within a tribunal's discretionary assessment.  But the Mobil Parties assert also that the restructuring was entirely legitimate (and was found to be so by the Tribunal), and moreover that the Tribunal gave ample attention to

---

[147] Applicant's Memorial, paragraph 168.

Venezuela's contention that the litigation was foreseeable at the time, and gave that contention a reasoned rejection.

109. Venezuela retorts that the issue is not the legitimacy of the restructuring as such, but rather, given the circumstances under which it was undertaken, whether it was effective to bring the dispute between the Parties within the jurisdictional consent to arbitration under the BIT. To which the Mobil Parties reply that in the arbitral proceedings there was no dispute between the Parties that all of the formal conditions for jurisdiction were satisfied, so that the real issue raised by Venezuela is indeed one of admissibility, not jurisdiction.

110. The Committee accepts that there is some force in the argument advanced by Venezuela that matters of jurisdiction may call for a more rigorous approach than other grounds for annulment, simply because a tribunal ought not to be allowed to exercise a judicial power it does not have (or vice versa). The Committee also accepts that there is weight in the Mobil Parties' contention that questions of admissibility may require to be approached in a different way from questions of jurisdiction for the purposes of the annulment scheme laid down in Article 52 of the ICSID Convention. It is plain on the face of it that the reference in Article 52(1)(b) to a tribunal having "manifestly exceeded its powers" fits most naturally into the context of jurisdiction, in the sense that it covers the case where a tribunal exercises a judicial power which on a proper analysis had not been conferred on it (or vice versa declines to exercise a jurisdiction which it did possess). It follows that it is less easy to apply the criterion laid down in Article 52(1)(b) – and in particular when it comes to deciding whether the excess was 'manifest' – when what the tribunal is doing is to make a discretionary assessment of whether, assuming the existence of its judicial power in principle, it is proper in the particular circumstances for that power to be exercised.

111. The Committee does not, however, have to decide any of these questions. The issue that divides the Parties in these annulment proceedings, as it divided them in the underlying arbitration proceedings, is the extent to which the dispute or disputes that went to arbitration were in fact within the contemplation of the Mobil Parties, as foreign investors in Venezuela, at the time at which the corporate restructuring was undertaken; in other words whether there had been a manipulation of the ownership of an established investment with the express

purpose of bringing an already existing dispute within a favourable jurisdictional regime from which it did not benefit at the time the dispute emerged. This is the central question which the Tribunal addressed, and it did so *in extenso*, devoting a full twenty-one paragraphs to the question in its Decision on Jurisdiction;[148] the Tribunal had, immediately previous to that, devoted eighteen paragraphs to the law on 'abuse of right' including an analysis of the prior case-law before international courts and tribunals and in investment arbitration.[149] The outcome of this eleven-page treatment is that the Tribunal adopts, as the basis for its decision on the point, the need "to give 'effect to the object and purpose of the ICSID Convention' and to preserve 'its integrity'".[150] It finds that "the main, if not the sole purpose of the restructuring was to protect Mobil investments from adverse Venezuelan measures in getting access to ICSID arbitration through the Dutch-Venezuela BIT", but that this still remained capable of being either legitimate corporate planning or, alternatively, an abuse of right; which of those two it was, would depend on the circumstances. Having proceeded to consider the circumstances, i.e. those specific to the case, notably the timing of new investment into the Claimants' projects, measured against the timing of the assertion by the Claimants vis-à-vis Venezuela of the existence of investment disputes, the Tribunal draws a distinction between pre-existing and future disputes, which it then applies so as to include within its jurisdiction Cerro Negro and La Ceiba disputes "born" after specified dates, while excluding any dispute "born" before those dates.

112. The dispute over jurisdiction then carried itself forward into the merits phase of the arbitral proceedings, in the form of a disagreement between the Parties over which of the complex series of claims by the Claimants against the Respondent in respect of the Cerro Negro Project did or did not fall within the Tribunal's conclusions in its Decision on Jurisdiction. These were in turn analysed in detail by the Tribunal in paragraphs 191-210 of the Award. The analysis culminates in the enunciation of a distinction between "a potential dispute relating to a measure to be taken" and on the other hand "a real dispute concerning a decision already made." On the basis of which distinction the Tribunal confirms that it has no jurisdiction over the dispute

---

[148] Decision on Jurisdiction of 10 June 2010, paragraphs 186-206.

[149] Ibid., paragraphs 167-185.

[150] At paragraph 184.

relating to the increase in income tax, but proceeds to the merits on the dispute in relation to expropriation. [151]

113. For the purposes of the present Decision, the Committee will treat as a composite whole all of these jurisdictional findings, those which appear in the Decision on Jurisdiction and those which appear in the Award, and will apply the provisions of Article 52(1) of the ICSID Convention accordingly. [152]

*(ii)    Excess of power (Article 52(1)(b)*

114. However the argument may be put, it seems to the Committee beyond doubt that it has no legitimate power to control the Tribunal's specific findings on either of the two elements in its jurisdictional findings, i.e. either the legal theory which the Tribunal applied in order to distinguish between legitimate corporate planning and abuse of right, or the application of that theory to the particular circumstances of the case. That would amount to appeal, not annulment; on the first point, it would be an appeal on a point of law, on the second point, an appeal on the facts. As the *ad hoc* Committee in the *CMS v. Argentina* annulment proceedings pithily put the matter, "the Committee cannot simply substitute its own view of the law and its own appreciation of the facts for those of the Tribunal." [153]

115. The Committee is thus unable to find that there has been an excess of power by the Tribunal on this issue, let alone a manifest one.

*(iii)    Failure to give reasons (Article 52(1)(e)*

116. The only basis on which, within the accepted limits of the annulment procedure, the Committee could legitimately be asked to intervene would be if it were alleged that the process by which the Tribunal had arrived at one or another of these findings was vitiated by a defect so serious as to invalidate the findings themselves.

---

[151] Award, at paragraph 210.

[152] The Tribunal has itself stated, quite properly, that its Decision on Jurisdiction is to be regarded as an integral part of the Award; see Award, paragraph 15.

[153] *CMS v. Argentina*, Decision on Annulment of 5 September 2007, at paragraph 158.

117. This is indeed the basis on which Venezuela has brought its application invoking Article 52(1)(e) of the Convention, namely a failure to state reasons. Although, as set down in that Article, the vitiating factor is the failure by a tribunal to state reasons for its "award", it is common ground that that criterion has to be applied *mutatis mutandis* when, as in this case, the challenge is not directed at the eventual decision on the merits itself, but at a finding contained in a decision on preliminary objections, or (again as in this case) largely in a decision on preliminary objections but completed in the final award.

118. For the reasons already stated in paragraphs 111 and 112 above, however, the Committee cannot find any substance in the claim that the Tribunal failed to state sufficient reasons in support of the conclusions it had reached either on the point of law or on the question of fact. The Committee has not been able to identify a fault of any kind in the quality or sufficiency of the Tribunal's reasoning on either point to sustain the conclusions the Tribunal ultimately arrived at. To repeat the frequently cited test laid down by the *ad hoc* committee in *MINE v. Guinea*, "the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or law."[154] The Committee is in no doubt that the relevant portions of the Decision on Jurisdiction meet that basic test, as do the relevant paragraphs in the Award. All that can remain, therefore, is Venezuela's complaint that the Tribunal's composite decision on jurisdiction suffers from an internal contradiction when it arrives at opposite conclusions in respect of the expropriation claim (found to be within the jurisdiction) and the income tax claim (found to fall outside the jurisdiction).

119. For a complaint of that kind to be valid, two conditions would have to be satisfied: first, that there was indeed a contradiction which was apparent on the face of the Decision; but second, and in the circumstances more important still, that the contradiction, once demonstrated, was serious enough to vitiate the Tribunal's reasoning on jurisdiction as a whole. This latter condition stems from the fact that, when applied mutatis mutandis to a decision on jurisdiction,

---

[154] Decision on Annulment, 22 December 1989, at paragraph 5.09.

what Article 52(1)(e) opens to challenge is a failure to state reasons for the decision on jurisdiction as such, not alleged insufficiencies in parts of the reasoning along the way.

120. The Committee does not, however, believe that the reasoning of the Tribunal is open to objection under either of those heads.

121. To begin with, the notion of a contradiction in its reasoning would have to entail, in the specific circumstances, either that the Tribunal had applied different (and mutually incompatible) legal theories in accepting jurisdiction over one head of claim while rejecting another, or that the Tribunal, even while applying one and the same legal theory, had nevertheless reached opposite assessments of identical or substantially similar sets of facts. The first of these possibilities is however excluded by the plain fact that, in paragraphs 186-205 of its Decision on Jurisdiction, the Tribunal can be seen to be applying exactly the same legal theory just enunciated in the preceding paragraph, without exception, to all of the Cerro Negro and La Ceiba claims. Venezuela challenges whether the analysis and application which the Tribunal made in this connection of earlier awards by other tribunals is correct, but – even if it were the case that those awards were binding in law on the Tribunal – a challenge of that kind quite clearly takes on the quality of an appeal on a point of law, which is in turn not an admissible ground for annulment.

122. Conversely, with regard to the factual analysis, what Venezuela asserts is that the Tribunal's holding that the income tax measures which took effect only after the restructuring of both projects were outside its jurisdiction is irreconcilable with its holding that the expropriation, which likewise took place after the restructuring, was within its jurisdiction.[155] The essence of the argument raised by Venezuela on this point is that the Tribunal wrongly failed to apply to the expropriation claims the foreseeability test it had applied to the tax claims. The Committee does not however see that this argument is well-founded. It appears clearly from the relevant portion in the Decision on Jurisdiction (at paragraphs 202-204) that the Tribunal made the distinction turn on the difference between pre-existing disputes, notably those that had already been identified by the investors and notified as such to the Respondent, and future disputes,

---

[155] Paragraph 65 above.

the origin of which lay in measures taken by the Venezuelan authorities after the restructuring which brought the investment under the umbrella of the BIT. In particular, in paragraphs 202-203, the Tribunal notes: that by June 2005 there were already pending disputes relating to royalties and income tax in respect of which the investors had actually consented to ICSID arbitration under the Venezuelan Investment Law; that their parallel consent for any future disputes was expressly made 'out of an abundance of caution' and explicitly in connection with possible future expropriation or confiscation; and that the nationalization measures happened only from January 2007 onwards.

123. The key passage in paragraph 203 of the Decision contrasts 'already pending disputes' with disputes based on measures still to be taken later on. The Committee can find no contradiction, let alone a manifest contradiction, between this finding and the finding in paragraph 210 of the Award (dealing with the tax disputes), which makes the Tribunal's decision turn on whether the disagreement was a 'potential dispute,' or alternatively a 'real dispute concerning a decision already made.' The assessment of the facts, and specifically the assessment of whether the facts showed the difference to be in fact a 'potential dispute,' or alternatively a 'real dispute concerning a decision already made,' was a matter within the authority of the Tribunal, and the Committee cannot find that there was anything in the way this was done that might justify intervention within the framework of the annulment process.

124. This ground for annulment is accordingly rejected.

 (iv)    *Document production*

125. Venezuela's submission under the head of document production can be disposed of even more shortly.

126. The object of Venezuela's complaint is a decision by the Tribunal on 24 March 2011 in which it denied the Respondent's application for an order for the production of documents that had been lodged a month earlier.   The Tribunal's decision had been preceded by a double round of exchanges between the Parties (application – reply – observations on reply – comments on observations), but the Tribunal's lapidary decision is in two sentences, one sentence stating that the Respondent has not demonstrated that the documents requested are "necessary as required under Article 43(a) of the ICSID Convention and Rule 34(2)(a) of the ICSID

Arbitration Rules" and the next that the application is therefore denied.   Venezuela says that this represented a further sanctionable failure to state reasons, a manifest excess of powers, and in addition constituted a "serious departure from a fundamental rule of procedure" within the meaning of Article 52(1)(d) of the Convention.

127. The Committee shares to a certain extent Venezuela's sense of surprise at the cursory nature of the Tribunal's decision. It might perhaps have been desirable for the Tribunal, having once allowed the sequential exchanges between the Parties described above, to have said a little more about why it was declining to accede to the application. That is however an aspect on which it would be rash to pronounce without a full investigation of the content of the exchanges and the elements of the developing argument in the arbitral proceedings to which the Respondent's request for production related, and an investigation of that kind lies plainly beyond the functions of an *ad hoc* annulment committee. It could also be said that the Tribunal was a little imprecise in choosing to couch the decision in terms of a failure by the Respondent to demonstrate necessity;  in fact, the provisions both of the Convention and of the Arbitration Rules cited leave little room for doubt that what these provisions establish is not a right or duty inhering in one or other party but rather a power conferred on the tribunal itself. What both Convention and Rules say is that a tribunal "may," "if it deems necessary," call upon the parties to produce documents or other evidence. The use of the verb 'may' shows in itself that we are in the presence of a power to be exercised by the tribunal at its own discretion, and this is then redoubled by the express indication that the tribunal is to be the sole judge of necessity. That said, the Committee can find no warrant for saying that the exercise of that discretion is subject to control through the annulment procedure on the basis simply that the tribunal has not offered sufficiently ample reasons for how it has chosen to exercise its discretion.

128. Venezuela has in addition argued that the Tribunal's rejection of the document production request represents a 'manifest excess of powers for failure to apply applicable law,' which it justifies on the basis that the Tribunal must have failed to apply the standard of 'necessity' laid down in other arbitral decisions, but the Committee can find no substance in this argument at all, which is on the one hand inconsistent with the discretionary power vested in a tribunal, and (even if not) would be tantamount to a straightforward appeal against the Tribunal's decision.

129. It remains then to consider whether the Tribunal's refusal to order production of the requested documents can be impugned as a serious departure from a fundamental rule of procedure. The Committee notes at the outset that the bar is set high;  the rule of procedure must be a 'fundamental' one, and the departure from it must in addition be a 'serious' one. This is common ground between the Parties on both sides.[156] Venezuela rests the substance of its argument on the submission that the denial of the particular documents adversely affected its right to be heard and the associated requirement that a party be given a full opportunity to present its case, which it says are unanimously recognized as basic and fundamental elements of fair arbitral procedure.

130. The Committee agrees that the right of a party to be heard and the full opportunity to present its case, whether taken singly or in combination, fall squarely within the category of what Article 52(1)(d) of the ICSID Convention refers to as a 'fundamental rule of procedure'. The Committee will therefore examine whether there was 'a serious departure from' that right (or those rights) as a result of the Tribunal's denial of Venezuela's request to order production of the particular documents in question.

131. The Committee notes in this connection that the documents Venezuela sought were 'presentations that relate to the legal and financial aspects of the Cerro Negro Project referred to by [one of the witnesses in the parallel ICC arbitration]'; and on the other hand 'presentations and similar documents prepared by or for Mobil or its subsidiaries or affiliates … during the period prior to the execution of the Cerro Negro Association Agreement that relate to the contractual and financial aspects of the Cerro Negro Project …'[157] The Committee notes further that the Mobil Parties' response was that this represented a fishing expedition, that the requests covered a broad category of documents that were irrelevant and immaterial, and the documents were in any case unnecessary for the resolution of the case.[158] They particularly argued in further support that the request was based on a confusion of the treaty claims under

---

[156] There is no dispute between the Parties, either, that refusals to compel production of documents have been accepted as the ground for annulment in no more than a very small number of cases;  cf. ICSID Secretariat Background Paper on Annulment (updated version, May 2016), paragraph 101.

[157] See Memorial, paragraph 76.

[158] Cited *ibid.*, paragraph 77.  See also Counter-Memorial, paragraphs 295 ff.

litigation in the arbitration with the contract claims being heard in the parallel ICC arbitration.[159]

132. The point for decision by the *ad hoc* Committee in these proceedings is not, however, whether either side was right or wrong in these arguments, or indeed whether the Tribunal was right or wrong in accepting one set of arguments or the other, whether as a matter of law or as a matter of discretionary assessment. That, once again, would constitute appeal. The only aspect properly for consideration by the Committee is the possible effect of the Tribunal's refusal to order disclosure. Specifically, did that refusal infringe Venezuela's right to be heard, or did it at least deny Venezuela a full opportunity to present its case?

133. The Committee considers the first of these two contentions to be unsustainable. In the limited number of prior cases in which *ad hoc* committees have given serious consideration to the contention that a party has been denied the right to be heard, it has been on the basis that a tribunal reached its ultimate award on a ground that one or both parties had had no opportunity to address at all in its argument. The Committee can see no sign whatever in the text of the Award itself, nor in the submissions of either side in these proceedings, that the grounds for the Tribunal's findings on the merits in its Award had not been fully and amply argued by the Parties, both in writing and orally.

134. As to the second contention, namely that, by reason of the refusal to order disclosure of these documents, Venezuela had been denied a full opportunity to present its case, the Committee concludes that the answer lies in Venezuela's own written submissions. At paragraph 151 of its Memorial in the present annulment proceedings, Venezuela asserts that "To the extent that the tribunal considered that it did not have sufficient evidence of the special conditions under which the Cerro Negro Project was authorized – although, as reviewed earlier, the record is quite clear on that point – those documents would have had a significant and material impact on the tribunal's determination as to the relevance of the price cap …"[160] And further on, that "The record is replete with documents and testimony that prove the contrary and is devoid of

---

[159] *ibid.*

[160] Emphasis added.

any evidence to support the Mobil Parties' revisionist history, but if the tribunal had any doubt about that, which was not expressed in – and is even contradicted by – its recitation of the facts, clearly the presentations prepared by the Mobil Parties to explain the terms and conditions of the Cerro Negro Project to their own executive committee would have shed light on their understanding."[161]

135. In the light of those avowals by the Applicant itself, the Committee is clear that the contention that the Applicant was denied a full opportunity to present its case is without merit and the request for annulment on this ground cannot therefore be accepted.

136. The first and second of Venezuela's requests for annulment are accordingly rejected.

(v)    'The Price Cap'[162]

137. The Committee proceeds then to consider the third request for annulment, the one which has given the Committee the greatest difficulty and has assumed the greatest importance in the case, namely Venezuela's challenge to what it considers to be the Tribunal's flawed approach to the assessment of compensation for expropriation. It should be recalled that this ground relates exclusively to the Cerro Negro Project, not the La Ceiba Project, and that the request is therefore, by definition, for an annulment of the Award in part only. That is expressly foreseen in Article 52(3) of the ICSID Convention. The Committee associates itself with the views of other *ad hoc* committees that a request for the partial annulment of an award can relate, in appropriate cases, to limited portions of an Award only. There was no dispute before it between the Parties on this point.

138. The Committee notes, by way of preliminary, that it is not in dispute, and never has been, that the Cerro Negro Project was expropriated by Venezuela in 2007.  Nor has Venezuela ever denied that this expropriation carried with it an obligation to pay compensation. The essence of the dispute between the Parties is over the nature and magnitude of the compensation due.

---

[161] *Ibid.*, paragraph 157 (emphasis added).

[162] The Committee has adopted this descriptor from the Applicant's submissions as a useful form of shorthand; the quotation marks signal, however, that the phrase is not regarded by the Committee as an entirely accurate reflection of the nature of the issue that had been placed before it in these proceedings.

139. It will be recalled that Venezuela asserts as Applicant that those parts of the Award dealing with Venezuela's liability to pay compensation in respect of the expropriation of the Cerro Negro Project should be annulled because of the Tribunal's failure, in the Award, to give due effect to certain legal provisions applicable to the Project. The specific reference is, in the first instance, to 'the Cerro Negro Congressional Authorization' (i.e. the formal decision by which the Venezuelan legislature approved the Project, as required by Venezuelan law), and, in the second instance, to 'the Cerro Negro Association Agreement' (i.e. the contractual agreement under which the Mobil Parties and the Venezuelan State entity Lagoven entered into and undertook the Project). More specifically still, the Cerro Negro Association Agreement required the parties to that Agreement to carry out the Project "under the terms and subject to the conditions set forth in this Agreement, and in accordance with the requirements set forth in [the Venezuelan nationalization law of 1975] and the Conditions"; and the Conditions are defined in terms as those set forth in the decision of 2 October 1997 by which the Venezuelan Congress approved the Agreement and authorized Lagoven to enter into it ('the Cerro Negro Congressional Authorization').

140. One particular consequence of this general scheme was that the terms of the Association Agreement reflected specifically what are known as the Eighteenth and Twentieth Conditions of the Congressional Authorization. The Eighteenth Condition was to the effect that neither the Association Agreement nor activities and operations conducted under it was to impose any obligation on the Republic of Venezuela nor restrict its sovereign powers. This was duly reflected in the Agreement, in the form of an additional paragraph appended to the clause which provides for the settlement of disputes by arbitration (Clause 18).[163] This additional paragraph has figured largely in Venezuela's argument in these annulment proceedings, but the Committee has found it of only limited relevance to the essential issue, as will appear below. What the Twentieth Condition required, on the other hand, was that the Agreement should contain provisions for either the renegotiation of its terms or, failing that, for compensation, in the event of "adverse and significant economic consequences" arising out of what are described

---

[163] The provisions of the Association Agreement are referred to variously in the exhibits and memorials as 'Articles' and 'Clauses' and are numbered variously in Roman and Arabic numerals. The Committee will follow the usage in the Award of the terminology 'Clause' with Arabic numbering.

in neutral terms as 'discriminatory measures'; but this is made subject to the proviso that there should not be deemed to be an adverse and significant economic consequence of this kind at any time when the price of crude oil was higher than a specified threshold. This was in its turn reflected, in a somewhat elaborated form, in Clause 15 of the Agreement, under the title 'Consequences of Certain Governmental Actions'. The Tribunal, in paragraph 51(4) of its Award, refers to this as a "limitation of liability." That is also the way in which Venezuela, as Respondent in the Arbitration, pleaded its case. Its case was that the expropriation of Cerro Negro was lawful under the BIT; that the compensation for it was to be calculated in accordance with the BIT and assessed as of June 2007; and that the compensation due was to be limited by "the amount of compensation to be granted for adverse governmental action specifically negotiated and agreed at the outset of the Cerro Negro Project as an express condition of the Project's authorization by Congress."[164]

141. The Tribunal, for its part, upheld the Respondent's contention that the expropriation was lawful. It relied specifically on the facts that the expropriation took place as a result of laws enacted by the National Assembly and executive decisions, and that these latter allowed for negotiation, with nationalization following only if negotiation failed, a process which the Tribunal found to be "compatible with the due process obligation of Article 6 of the BIT."[165] Moreover, the failure to reach agreement on the quantum of compensation did not of itself, the Tribunal held, render the expropriation unlawful, so long as the offer of compensation made was not unreasonable.[166] The compensation due to the foreign investors was accordingly, the Tribunal held, to be "calculated in conformity with the requirements of Article 6(c) of the BIT."[167] This is, in the *ad hoc* Committee's view, a key finding, to which it will therefore revert in several places in this Decision.

---

[164] See paras. 144-145 of the Award.

[165] *Ibid.*, para. 297.

[166] *Ibid.*, para. 301: "… the mere fact that an investor has not received compensation does not in itself render an expropriation unlawful. An offer of compensation may have been made to the investor and, in such a case, the legality of the expropriation will depend on the terms of that offer."

[167] *Ibid.*, para. 306: "In light of the above, the claim that the expropriation was unlawful is rejected. Accordingly, the Tribunal does not need to consider the standard for compensation in case of unlawful expropriation or whether it

142. It should be noted that Article 6(c) calls for the payment of "just compensation."[168] Article 6(c) also provides that the compensation must represent "the market value of the investments affected."[169] The Parties were, so it seems from the Award, in agreement before the Tribunal that these parameters required the application of a discounted cash flow approach. Having considered the elements necessary for such an approach, i.e. production volume, future revenues, taxes, operational and investment costs, and having determined the appropriate discount rate to apply, the Tribunal then turned, in Section VIII.C.3 of its Award,[170] to consider the effect of what it termed the 'Price Cap' under the Twentieth Condition of the Congressional Authorization and Clause 15 of the Association Agreement (see above), in the light of the Respondent's contention that compensation had to be limited in accordance with the Price Cap. The Claimants contested this, contending for their part that the Price Cap was not applicable to the case in hand, as their claims were treaty claims under the BIT not contractual claims under the Association Agreement, and Venezuela, the Respondent in the Arbitration, was not in any case itself party to the Agreement. Venezuela's answer was that it was not seeking contractual enforcement of the Association Agreement, but rather seeking to have respected the terms and conditions under which the Cerro Negro Project had been authorized in the first place. Venezuela submitted further that any prospective purchaser of Mobil Cerro Negro's investment would have taken the Price Cap into account in placing a value on it.[171]

143. The Tribunal deals with the matter quite briefly in paragraphs 371-374 of the Award. Paragraphs 371 and 372 recite the content of the Price Cap and place it alongside the provisions in Clause 15 of the Agreement that confer on the foreign investors a separate right to contractual arbitration against Lagoven, the Venezuelan party to the Association Agreement,

---

would differ from the standard for compensation to be paid in case of lawful expropriation. The compensation must be calculated in conformity with the requirements of Article 6(c) of the BIT."

[168] 'justa compensación' in the authentic Spanish-language text. In its argument before the Committee Venezuela has used the form 'equitable compensation;' the Committee considers the two terms to be equivalent in their meaning, but prefers to use the terminology of the BIT itself.

[169] Either as at the moment immediately before the measures were taken or before they became known (whichever was the earlier).

[170] At paras. 369 ff.

[171] *Ibid.*, at para. 370.

coupled with an obligation to pursue whatever legal recourse may be available to mitigate any damages suffered by them as a result of the 'discriminatory measures' (see paragraph 140 above) and thereafter to bring into account in relation to Lagoven any net benefit received from legal action of that kind. Paragraph 373 of the Award then states –

> "The Tribunal notes that the Twentieth condition of the Congressional Authorization does not impose a specific price cap, but provides for a price cap to be established in the Association Agreement. In the present case, Clause 15(1) of the Association Agreement makes a clear distinction between the action that the Foreign Party may initiate against Lagoven CN on the one hand, and the action that it may initiate against the Government on the other. The price cap contained in Clause 15(2)(a) is applicable only to the compensation payable by Lagoven CN. Since the Respondent in this proceeding is the Bolivarian Republic of Venezuela, not Lagoven CN, the Tribunal concludes that it may not oppose this price cap to the Claimants."

The Tribunal finally draws from this the conclusion (paragraph 374) that the assessment it had arrived at of the compensation due remains unaffected by the Price Cap.

144. The findings in these two paragraphs, particularly paragraph 373, which represented in effect the acceptance of the Claimants' case and the rejection of that of the Respondent, have caused the Committee some considerable difficulty and will be considered in greater detail below.

145. It should however be noted at this stage that these findings led to a question as to the possibility of double recovery, in the light of the provision in Clause 15 referred to above under which the foreign investors were to bring into account in relation to Lagoven the benefits received out of pursuing their alternative remedy (sc. under the BIT) against the Government of Venezuela. The particular awkwardness lay in the fact that the parallel cause of action against Lagoven under the Association Agreement had already been pursued to its conclusion in an ICC arbitration, and had led to a very substantial award of compensation to one of the Mobil claimants in the present BIT arbitration, precisely in respect of the expropriation of the Cerro Negro Project; and the award had indeed already been paid.[172]

---

[172] See Award, para. 379.

146. The Mobil Parties have made much in these proceedings of this requirement to pursue independent remedies against adverse governmental measures, and of the fact that such remedies would seem, under Clause 15 of the Agreement, to have a priority of some kind.[173] However that may be, it is not clear what bearing it might have on the proceedings for annulment. It appears to the Committee that Venezuela's arguments as to the effect of the Price Cap would have had just as much, or just as little, relevance to the question of the quantum of compensation under the BIT had there been no prior award in the ICC proceedings, or for that matter no ICC proceedings at all. The only connection between the two came about because the Tribunal found itself in a situation in which, whatever sequence of time might have been foreseen by those drafting Section 15, the actual sequence in time was that the ICC arbitration had been completed before the present Arbitration had been finally argued, and because the Respondent (Venezuela) thereupon submitted that the ICC award put an end to the entire dispute. These circumstances inevitably raised a question in the Tribunal's mind as to whether there might be a possibility of double recovery.

147. The Tribunal deals with this matter (once again briefly) in Section VIII.C.5 of the Award, in which, having recalled the general principle of no *enrichissement sans cause* and recited the specific contractual provisions against it, the Tribunal notes an express statement made by the Claimants during the proceedings (which the Tribunal says it has no reason to doubt) that, in the event of an award in their favour in the ICSID proceedings, they were willing to make the required reimbursement to PDVSA (the parent body of Lagoven). The Tribunal concludes as follows, in paragraph 381: "Effectively, the total compensation payable to the Claimants is the amount specified in paragraph 374 above, less the amount already received by the Claimants under the ICC Award for the same damage. Double recovery will thus be avoided." Linked to this is point (e) in the dispositive part of the Award, in which the Tribunal "takes note … of the Claimants' representation that, in the event of favourable award, the Claimants are willing to make the required reimbursements to PDVSA.  Double recovery will thus be avoided."

148. The Committee did its utmost to understand exactly what the Tribunal might have been intending to convey through these passages. Even after having sought the assistance of the

---

[173] Counsel referred to it, in the oral hearing, as a 'condition precedent' (Transcript, Day 2, pp.343-344).

Parties in this endeavour, the Committee remains in a state of some uncertainty. Fortunately, however, in view of what follows, the matter turns out to be immaterial to the Committee's decision on the request for annulment, and the Committee sees no need to pursue it further, on the basis that the avoidance of double recovery is, in its essence, an adjustment that might arise *ex post facto* (as the paragraphs cited above seem to imply), whereas the question raised in these annulment proceedings is one going to the basis for the assessment of the compensation due in the first place. The Committee notes simply that the conclusion is however irresistible that the Tribunal saw in its mind some sort of necessary connection, however unspecific, between the contractual liability (already met) and the compensation still to be assessed in the BIT Arbitration.

149. This conclusion is reinforced by the fact that, in a separate section of its Award, [174] the Tribunal addresses directly what it calls "Effects of the ICC Arbitration," and that (as paragraph 215 of the Award indicates) this was a question which the Tribunal had itself raised with the Parties. In crude terms, the Claimants' position was 'no effect at all,' and the Respondent's 'full effect' (i.e. that nothing remained over for decision in the BIT arbitration). The remaining paragraphs in this section of the Award are devoted to the Tribunal's reasons for rejecting the Respondent's contention. The Tribunal points out in particular that there was no identity of parties: the State was not party to the ICC arbitration, nor was Lagoven, the respondent in the ICC proceedings, party to the BIT Arbitration. The Tribunal does, however, go on to note (in paragraph 218) that the Association Agreement limits the compensation due from PDVSA, a limitation reflected in the amount awarded by the ICC tribunal, and then adds "No such limitation applies, however, to the State's responsibility under the BIT;" and it gives as the reasons for this that the Government of Venezuela was "neither a party to the Association Agreement nor a third-party beneficiary," and that Venezuela had not "advanced any relevant argument that the limitations on … contractual liability under Clause 15 should be transmuted into limitations of the State's responsibility under international law." The Section concludes with a forward reference to the Section of the Award dealing with quantum, to which the Committee will turn below.

---

[174] Award, paragraphs 215-219.

150. Before the quantum Section, however, a further relevant passage occurs at the conclusion of the Section of the Award dealing with the applicable law.   Its relevance is that it, too, deals with the question of the applicability of the Price Cap, as a matter of law, to the assessment of liability and compensation.   After stating its disagreement with Venezuela's argument that the Cerro Negro Conditions "import the contractual limitations to PDVSA-CN's indemnity obligations under Clause 15 of the CNAA into the State's responsibility for breach of the Treaty," the Tribunal concludes as follows, in paragraph 225 –

> "The Tribunal recalls that it is a fundamental principle of international law that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty." Under this principle, international obligations arising from a treaty cannot be discarded on the grounds of national law. Among the legal systems on which the Award "shall be based" pursuant to Article 9(5) of the Treaty, the Tribunal has no doubt in concluding that this issue must be governed by international law. Consequently, the Eighteenth and Twentieth Conditions cannot exempt or excuse the Respondent from its obligations under the Treaty or under customary international law. Bearing this in mind, the Tribunal has considered the effect of the Eighteenth and Twentieth Conditions of the Cerro Negro Framework of Conditions in the section on quantum below."

As can be seen from the final sentence, the Tribunal's conclusion on this point, too, is directly linked to its subsequent discussion of the quantum of compensation, and it is all these portions of the Award taken together that form the kernel of the question which the Committee has before it for decision.

151. Venezuela has raised in the present proceedings various challenges to these linked portions of the Award.   The Committee summarizes them as follows. Venezuela submits: (a) that the Tribunal manifestly exceeded its powers by applying the wrong law to the assessment of the compensation due for the expropriation of the Cerro Negro investments; (b) that the Tribunal failed altogether to address itself to the prior question of the determination of the nature of the rights constituting the Cerro Negro investments, as a precondition to their evaluation, and thereby failed to support with adequate reasons a central element in its findings; (c) that the Tribunal gave no sufficient reasons, or alternatively contradictory reasons, for disregarding the compensation structure laid down by the Congressional Authorization and then in the

Association Agreement; (d) that, in acting as above, the Tribunal failed to address at all some of the Respondent's central arguments.

152. The Committee will not follow in its entirety the way in which the material has been addressed by either Venezuela or the Mobil Parties in argument before it, but will make its own analysis of the material in the manner it finds most appropriate and most convenient, under the following headings: (1) the applicable law; (2) the relevant international law; (3) the relevant national law; (4) the implications of the above for the assessment of compensation; (5) the quality of the Tribunal's reasoning.

### a)    The applicable law

153. As is well known, Article 42(1) of the ICSID Convention requires a tribunal to decide a dispute in accordance with such rules of law as may be agreed by the parties.   In the absence of such agreement, the tribunal is to apply the law of the respondent State "and such rules of international law as may be applicable."   The latter dispensation extends, however, only to a case where the parties have not themselves settled the applicable law.  Where the parties have done so, the provisions of the second sentence in Article 42(1) are displaced.

154. In the present case, the Parties have indeed agreed on the applicable law, via Article 9(5) of the BIT. The provisions of Article 9(5) bind Venezuela directly, as a Contracting Party to the BIT, and it is settled law that a foreign investor, when accepting a State's standing offer to arbitrate under a BIT, likewise accepts, as an element of that offer, such provisions as to applicable law as are contained in the BIT. Article 9(5) thus represents, for this Arbitration, 'the rules of law agreed by the parties.' This is made crystal-clear by the terms of the Article itself, which states that the arbitral award "shall be based on" and then goes on to provide as follows:

> "i. the law of the Contracting Party concerned;
> ii. the provisions of this Agreement and other relevant Agreements between the Contracting Parties;
> iii. the provisions of special agreements relating to the investments;
> iv. the general principles of international law; and
> v. such rules of law as may be agreed by the parties to the dispute."

Beyond that, the Article gives no indication as to a hierarchy or order of priority between these various sources of law, except to the extent that the conjunctive "and" implies that several, or indeed all, of these sources of law may come into play in the circumstances of a particular dispute.

155. These factors are duly reflected by the Tribunal in Section VI (Applicable Law) of the Award, at paragraphs 220-225. In paragraph 223 (the terms of which are set out in full in the footnote below),[175] the Tribunal determines that it will apply the BIT as well as the other agreed sources of law "where appropriate."[176] It observes that Article 9(5) does not itself allocate individual matters to particular sources of law, so that the determination remains one for the Tribunal itself to make. The Tribunal does so however in terms which are not altogether easy to understand, when it states that the determination it will make is "whether an issue is subject to national or international law." The penumbra of uncertainty as to exactly what the Tribunal has in mind by the two categories – apparently mutually exclusive and exhaustive – of 'national law' and 'international law' is then further obscured by the next following sentence, in which the Tribunal says that it will be determined, issue by issue, "whether the applicable international law should be limited to general principles of international law under Article 9(5) of the BIT or whether it includes customary international law."[177]

156. The main question is of course where this binary categorization leaves the BIT itself, and what implications that might have for the application of the provisions of the BIT to the merits of the dispute.  The particular importance of this question, for the purposes of these annulment

---

[175] " Accordingly, the Tribunal will apply the BIT and the other agreed sources of law where appropriate. Article 9(5) of the Treaty does not allocate matters to any of those laws. Accordingly, it is for the Tribunal to determine whether an issue is subject to national or international law. Further, if and when an issue arises, the Tribunal will determine whether the applicable international law should be limited to general principles of international law under Article 9(5) of the BIT or whether it includes customary international law. Moreover, with respect to the interpretation of the BIT, the Tribunal will resort to the Vienna Convention on the Law of Treaties, which both States have ratified, as a "relevant Agreement between the Contracting Parties"." Award, para. 223.

[176] It is not entirely clear from the grammar whether this qualifying phrase (with its necessary implication that a particular source might or might not be applied, according to circumstances) attaches itself only to the 'other agreed sources' or to the BIT as well.  The Committee interprets it as applying primarily to the other sources, i.e. that the Tribunal's intention was that the provisions of the BIT should always be applied whenever they were in point.

[177] Further potential confusion arises out of the use in this sentence of the Award in English of one verb in the conditional ('should be limited') while the next is in the indicative ('includes').

proceedings, is the finding by the Tribunal that comes a short while later on, in paragraph 225. Paragraphs 224 and 225 read as follows:

> 224. Article 9(5) of the Dutch Treaty quoted above includes "the law of the Contracting Party" and "the provisions of special agreements relating to the investments" among the sources of applicable law. In reliance on these provisions, the Respondent appears to argue that the Eighteenth and Twentieth Conditions of the Cerro Negro Framework of Conditions (i) relieve the Republic from its obligation to comply with the standards set forth in the Treaty, and/or (ii) import the contractual limitations to PDVSA-CN's indemnity obligations under Clause 15 of the CNAA into the State's responsibility for breach of the Treaty".

> 225. The Tribunal disagrees with this position. The Tribunal recalls that it is a fundamental principle of international law that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty." Under this principle, international obligations arising from a treaty cannot be discarded on the grounds of national law. Among the legal systems on which the Award "shall be based" pursuant to Article 9(5) of the Treaty, the Tribunal has no doubt in concluding that this issue must be governed by international law. Consequently, the Eighteenth and Twentieth Conditions cannot exempt or excuse the Respondent from its obligations under the Treaty or under customary international law. Bearing this in mind, the Tribunal has considered the effect of the Eighteenth and Twentieth Conditions of the Cerro Negro Framework of Conditions in the section on quantum below."

157. Here the Tribunal does make a specific determination of applicable law which, as the Committee reads matters, came to assume cardinal importance in the determination of the Cerro Negro dispute.  The determination, however, like the passages cited above, is in itself less than entirely clear: "Among the legal systems on which the Award "shall be based" pursuant to Article 9(5) of the Treaty, the Tribunal has no doubt in concluding that this issue must be governed by international law."  Judging from the sentence that follows: "Consequently, the Eighteenth and Twentieth Conditions cannot exempt or excuse the Respondent from its obligations under the Treaty or under customary international law," and from the way in which the Tribunal describes the Respondent's argument in paragraph 224, what the Tribunal has in mind by 'this issue' would appear to be the effect of the Congressional Authorization and the terms of the Association Agreement on the assessment of the compensation due under the BIT.  The Committee puts the matter in this contingent way because, despite the central importance of the point at issue,

the Tribunal does not itself explain the point with any great clarity; moreover, as will be shown below, the two intrusive references to "customary international law" are the source of still further uncertainty.[178]

158. What significance should be attached to the above will be discussed below. For the moment, it suffices to note that the only reasoning offered for this key finding is that in the two preceding sentences of paragraph 225 (see above). In these two sentences the Tribunal invokes, in two different wordings, the basic principle of international law that the state of a party's internal law cannot be advanced as valid justification for its failure to perform a treaty or, as in the second sentence, 'discarding on the grounds of national law international obligations arising from a treaty'. The Committee will also discuss further below how far this was in fact the issue in dispute between the Parties in the arbitral proceedings.

b)    The relevant international law

159. As will appear from the above, the exclusive sources of law for the determination of the dispute brought to arbitration are those listed in extenso in Article 9(5) of the BIT and are set out in paragraph 154 above. The listing contains two references to international law, one implicit, one explicit. The explicit reference, in sub-paragraph iv, is to "the general principles of international law" and is presumably to be understood as pointing in turn to one of the sources of law enumerated in Article 38(1) of the Statute of the International Court of Justice. The implicit reference to international law is that in sub-paragraph ii to "the provisions of this Agreement" i.e. to the BIT itself which, as an inter-State treaty, must necessarily be taken to constitute international law.[179] It is the Tribunal which makes its own addition to the Treaty list by adding in a mention of customary international law in paragraph 223 ("if and when an issue arises, the Tribunal will determine whether the applicable international law should be limited to general principles of international law under Article 9(5) of the BIT or whether it includes customary international law"), and reserving to itself the decision from case to case to "determine whether the applicable international law should be limited to general principles of international law

---

[178] See further paragraph 159 below.

[179] The sub-paragraph refers also to 'other relevant Agreements between the Contracting Parties,' but it would seem that none such were advanced in argument in the arbitration.

under Article 9(5) of the BIT or whether it includes customary international law." But the Tribunal gives no indication of where it derives the authority to make what looks like a modification – or indeed an expansion[180] – of the source rules laid down in the Article, nor does the Tribunal state what criterion it has in mind to use in order to decide (when the case arises) whether or not to 'include customary international law.' The significance of this for the Tribunal's Award will also be considered further below.

160. An important and direct determination of applicable law does, however, appear somewhat later in the Award, at paragraph 306, in which the Tribunal rejects the Mobil Parties' claim that the expropriation was unlawful. It draws as the conclusion from this that "The compensation must be calculated in conformity with the requirements of Article 6(c) of the BIT." As already indicated, the *ad hoc* Committee regards this as a key finding in the Award. There is no express reference to its being a choice of law determination under Article 9(5), or a determination in pursuit of what the Tribunal had already decided in this respect in the Section of the Award on 'Applicable Law' (paragraphs 153-155 above). But such an express reference was hardly necessary. The sentence appears immediately before Section VIII.C of the Award, in which the Tribunal deals with the 'Quantum of the Expropriation of the Cerro Negro Project,' and which opens with a description of the requirements in this regard laid down by Article 6 of the BIT: 'just compensation' and 'market value.' The manner in which the Tribunal followed through on this central determination of the applicable law will also be considered further below in the section entitled "The implications for the assessment of compensation".

c)    The relevant national law

161. As the Committee has already noted, perhaps the most troublesome finding of the Tribunal, for the purposes of these annulment proceedings, is its determination in paragraph 225 of the Award set out in paragraph 150 above. In crude terms, the Tribunal here decides that national (internal) law may not be invoked to avoid international obligations, whether arising under treaty or otherwise. The general principle is indeed a fundamental one, and its application in

---

[180] In Article 38(1) of the ICJ Statute, the sub-paragraph referring to 'international custom' stands separate and distinct from the sub-paragraph referring to 'general principles.'

respect of treaties is universally accepted,[181] as it is more generally.[182] The examples commonly given are those of an attempt *ex post facto* to override an established treaty obligation or other international obligation, or the case in which a State had failed to ensure, at the time of entering into a treaty, that its internal law was adequate to enable the treaty to be given full effect. The copious authorities listed by the International Law Commission in 2001 are all of that kind.[183] They typically involve the provisions of written legislation or the national Constitution.  Less clear, however, is precisely what, in this specific context, the Tribunal had in mind as 'national law.' The treatment in the Award of the Congressional Conditions establishes that, in the judgement of the Tribunal, the approval given by the Venezuelan Congress was approval of the proposed terms of the Association Agreement, and the Agreement, in turn, incorporated the conditions for that approval that had been laid down by the Congress in advance. The Mobil Parties themselves made much, in their argument before the Committee in these proceedings, of the fact that the intervention of the Congress merely confirmed what had been negotiated at length and agreed between the investors and PDVSA. But the Committee is hard put to see how this helps their case; it establishes only that the Congressional action, far from being a unilateral imposition contrary to the intentions or expectations of the foreign investors, was in fact in harmony with their intentions and expectations and served the purpose of putting these into legal effect at the time the investment was entered into. It does not therefore serve to explain why the limited legislative intervention which took place ought to be regarded as equivalent in character or effect to an attempt to override international obligations by the invocation of national law.

162. The Tribunal's finding on this point is not altogether easy to follow. That the Tribunal sets aside the terms of the Association Agreement (based as they were on the Congressional Conditions) as directly binding on Venezuela for the purposes of the arbitral proceedings is understandable enough if it should be taken as another way of saying that the governing law for the assessment of compensation was the BIT. The finding in paragraph 225, however,

---

[181] See article 27 of the Vienna Convention on the Law of Treaties 1969 ("A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. …").

[182] See Article 3 of the ILC's Draft article on Responsibility of States for Internationally Wrongful Acts 2001.

[183] See the Commentary to the ILC Draft Articles.

presupposes the existence of a <u>conflict</u> of some kind between Venezuela's internal law and its international obligations, and it is both the nature of that 'internal law' which the Tribunal had in mind and the nature of the supposed conflict which trouble the Committee. On the one hand, it appears to the Committee that at no stage has Venezuela sought to invoke any provision of its internal law as standing in the way of paying compensation for the expropriation as required by the BIT; as indicated above, the obligation to pay compensation has always been acknowledged, and the Tribunal finds expressly that the expropriation was not in itself unlawful or in breach of Venezuela's treaty obligations. By the same token, on the other hand, the Tribunal expressly finds that the offer of compensation did not in itself render the underlying expropriation a breach of the BIT – and this must carry with it the consequence that the Tribunal considered that the offer made, based as it was on the Congressional Conditions and Association Agreement, was not incompatible with the Treaty. The Tribunal says specifically that it "finds that the evidence submitted does not demonstrate that the proposals made by Venezuela were incompatible with the requirement of 'just' compensation of Article 6(c) of the BIT."[184]  If that is so, however, it becomes very hard to see in what way the invocation of the Congressional Conditions and Association Agreement can have been thought to be equivalent to an attempt to make the provisions of Venezuelan law prevail over Venezuela's international obligations. For that reason alone, the Committee will approach with caution any suggestion that the exclusion of the Congressional Conditions and Association Agreement as in themselves determinative of the question of the quantum of compensation also made the Price Cap irrelevant to the determination of the quantum by other means, i.e. those provided for in the BIT.

163.   The Committee notes also that a part of the Mobil Parties' case is based on the concept that the intention and effect of the contractual obligations under the Association Agreement was to provide for a partial (because price-capped) compensation from Lagoven or PDVSA, on top of the unrestricted compensation that would be due from the State, with the overlap being taken care of by the mechanism in Clause 15 for the avoidance of double recovery. The Committee has no need to decide the point, and observes merely that a structure of that kind is not readily

---

[184] Award, paragraph 305.

reconcilable with the actual terms of Clause 15, which both foresees that action against the State would happen first in time and specifies that its aim would be "mitigation" of the liability of Lagoven/PDVSA, not vice versa. Much the same applies to the Mobil Parties' case – in large measure accepted by the Tribunal – that, even if Clause 15 should properly be viewed as a contractual 'limitation of liability,' this did not enure to the benefit of Venezuela, since the Association Agreement was *res inter alios acta*, or (in the terms in which the argument was put) Venezuela was not a 'third party beneficiary' of Clause 15. While the Committee can understand the point behind the argument, it does not find – for the reasons set out below – that the argument is germane to the real point at issue in the Arbitration, namely what exactly was the investment that had been expropriated and how was it to be valued for compensation purposes.

    d)    <u>The implications for the assessment of compensation</u>

164. As described above, a key finding by the Tribunal was that the compensation due to the Mobil Parties had to be assessed in accordance with Article 6(c) of the BIT which lays down as the applicable standard that of 'just compensation' (*justa compensación* in the Spanish). The requirements of Article 6(c) (paragraph 142 above) are set out in full in paragraph 307 of the Award, and begin the Section on the Quantum of the Expropriation. No doubt partly as a result of the fact that there was no disagreement between the Parties that a discounted cash flow (DCF) approach was the right one to use (paragraph 308 of the Award), there is next to no analysis to be found in the Award of what else might be required by way of interpretation of Article 6(c) as the basis for its proper application. The overwhelming part of the discussion, as already indicated, is devoted to the detailed practical application of the DCF technique to the particular circumstances of the case. The analysis takes up nearly 60 paragraphs of the Award, and culminates in paragraph 368 with the determination of a net cash flow figure of US$ 1,411.7 million, which then becomes in due course the liability figure in (d) of the dispositive part of the Award at paragraph 404.   There is no other discussion of a general kind as to what factors or elements might have to be taken into account in order to arrive at what Article 6(c) requires by way of "the market value of the investments affected immediately before the measures were taken or the impending measure became public knowledge, whichever is the earlier."   The sole exception is a brief discussion at paragraph 365 of the

question of the timing of the evaluation, in which the Tribunal determines "that the compensation must correspond to the amount that a willing buyer would have been ready to pay to a willing seller in order to acquire his interests but for the expropriation."[185]

165. In other words, the structure of the Award is such that, by the time the Tribunal comes to its promised consideration of the possible effect of the Price Cap (see paragraph 143 above), which it does in a separate Section,[186] it has already determined a compensation figure. As paragraph 370 of the Award recites, the Claimants argued that the Price Cap was simply irrelevant and therefore inapplicable, and this is the view the Tribunal itself adopts in paragraph 373, with the consequence that its earlier compensation figure remains unaffected.

166. This represents another significant finding, and the Tribunal's reasons for it are given quite briefly, in paragraph 373 itself, as follows –

> "The Tribunal notes that the Twentieth condition of the Congressional Authorization does not impose a specific price cap, but provides for a price cap to be established in the Association Agreement. In the present case, Clause 15(1) of the Association Agreement makes a clear distinction between the action that the Foreign Party may initiate against Lagoven CN on the one hand, and the action that it may initiate against the Government on the other. The price cap contained in Clause 15(2)(a) is applicable only to the compensation payable by Lagoven CN. Since the Respondent in this proceeding is the Bolivarian Republic of Venezuela, not Lagoven CN, the Tribunal concludes that it may not oppose this price cap to the Claimants."

The Tribunal's conclusion, in other words, is not necessarily one of substantive irrelevance or inapplicability in law, but of non-opposability, as *res inter alios acta*. The finding is thus qualitatively different from the Tribunal's earlier finding in paragraph 225 of the Award (see paragraphs 150 and 161 above). And the point made here by the Tribunal, while valid as a matter of contract law, has no bearing on the argument whether the existence of a price cap as such was a relevant factor for the assessment of the compensation due under the BIT.

---

[185] The context was a difference of opinion between the experts on both sides as to whether a confiscation risk must be taken into account for the determination of the discount rate, and the Tribunal, having decided that it must, adjusts the discount rate accordingly.

[186] At paragraphs 369-374.

e)    The Tribunal's reasoning

167. Venezuela now raises before this *ad hoc* Committee two basic objections to these various findings by the Tribunal.

168. Venezuela says:  first, that an investment is, of its very nature, an item of property, that the ascertainment of what that property consists of is a necessary and inescapable precondition to any assessment of its value, and specifically of its 'market value' under Article 6(c) of the BIT, so that this is an essential prior step which the reasoning of the Tribunal missed out entirely; second, that property is not a quantity that is, or can be, created by international law, and that the only role of international law is to recognize property created and defined by national law, and then to draw from that whatever consequences may flow on the international plane, so that the Tribunal failed altogether to bring the proper analysis to bear on the scope of the expropriation in question, or on the law applicable to its consequences by way of compensation.

169. The Mobil Parties counter[187] that Venezuela never put this 'property' argument before the Tribunal in the arbitral proceedings, and assert, for their part, that "the dispute did not concern 'property rights' governed by domestic law but pertained exclusively to rights and obligations under the Treaty, which are governed by international law".[188] The Committee does not, however, believe that this is correct, since it is clear that the character of the rights at issue (whether they be called 'property rights' or by some other description) is inherent in the very nature of an 'investment,' even before the point is reached at which the appropriate remedy has to be determined for an interference with the investment.  The point at issue was therefore necessarily before the Tribunal. To say that an investment consists of rights created under national law is not the same as to claim that the only remedies available are those under the relevant national law.

170. Having given the matter its anxious consideration, the Committee is of the view that Venezuela is right, in principle, in each of its two contentions set out in paragraph 168 above. The

---

[187] See Counter-Memorial, at paragraphs 226-242.

[188] *Ibid.*, paragraph 242.

Committee will therefore have to consider whether the conclusions drawn by Venezuela are also correct, and in that case what effect it would have on the integrity of the relevant part of the Award, measured against the criteria in sub-paragraphs (b) and (e) of Article 52(1) of the ICSID Convention.

171. Before coming to that point, the Committee must, however, give its reasons for agreeing in principle with the two Venezuelan propositions.

172. The Committee takes as its starting point (as indicated above) that the classification of an investment as a form of property is indisputably correct.   Even if the property is incorporeal or intangible, and consists merely of a collection of rights, the proposition remains unaffected. This is so intuitive a proposition that it is not stated in the books, but that does not affect its inherent character. For present purposes, though, the question is, in effect, answered by the definition of "investments" given in Article 1(a) of the BIT:

> "For the purposes of this Agreement:
>
> (a) the term 'investments' shall comprise every kind of asset and more particularly though not exclusively:
>
> i. movable and immovable property, as well as any other rights in rem in respect of every kind of asset;
>
> ii. rights derived from shares, bonds, and other kinds of interests in companies and joint-ventures;
>
> iii. title to money, to other assets or to any performance having an economic value;
>
> iv. rights in the field of intellectual property, technical processes, goodwill and know-how;
>
> v. rights granted under public law, including rights to prospect, explore, extract, and win natural resources."

173. The chapeau to the sub-paragraph "every kind of asset," as well as the detailed examples that follow, bracket 'assets' together with tangible property and rights and titles of various kinds. In the present Arbitration, the 'investment' (so far as the Cerro Negro Project is concerned) englobes both rights over tangible physical assets and entitlements of an intangible kind.  The Tribunal adopts a similar definition of it in paragraphs 57-58 of the Award. The Committee does not see that there can be any reasonable basis for contesting that the bundle of rights constituting the Cerro Negro investment was created by or under Venezuelan law and, having

been so created, was then a type of property recognized and protected by international law in the form of the BIT. The Tribunal approaches the matter in exactly this manner in the paragraphs just cited. It is therefore not necessary for the Committee to resume the substantial body of writings mustered by Venezuela in these proceedings in support of their contention that this pattern is the universal norm; the Mobil Parties were not able to summon up any authority to the contrary, and the Committee regards the proposition as indisputable.

174. More important, though, is what follows from the above. Venezuela says that the property rights themselves that were acquired by the investors in making their investment were circumscribed by the provisions of the Congressional Conditions and their fulfilment in the Association Agreement, which together limited the compensation that would be due to them for future Government measures, and that the Tribunal simply omitted the necessary step of registering the real nature of the rights comprising the investment before proceeding to value them for the purposes of assessing compensation for their confiscation. The Mobil Parties appear to have no direct answer to this, but rest their argument on the well-known difference between contract claims and treaty claims.

175. It is plain to the Committee that, when it comes to the assessment of compensation for the Cerro Negro expropriation, the two critically essential elements in the Award's reasoning are the Tribunal's decision that the question is governed by the BIT, and the way in which the Tribunal put that decision into effect.

176. As already indicated, the Tribunal's decision that the question of compensation for the Cerro Negro expropriation is governed by the BIT and consequently that it must be assessed in accordance with, i.e. by applying, Article 6(c) of the BIT is both necessary and inevitable. If the Tribunal's decision that the question of compensation was to be governed by international law is properly to be understood as selecting the BIT, as a matter of applicable law, the decision is plainly right and not open to question. The difficulty in the reasoning underlying the Award is rather twofold: the way in which, once the choice had been made, Article 6(c) of the BIT was in fact applied;  and the concept of 'international law' utilized by the Tribunal in reaching and implementing its decision that compensation was to be governed by international, not

national, law. The two aspects are not entirely distinct from one another, but need to be approached separately.

177. The crucial issue – which became also the central issue in these annulment proceedings – was whether what the Tribunal refers to as the 'limitation on liability' in the Eighteenth and Twentieth Conditions, as incorporated into the Association Agreement, was relevant to the assessment of the compensation due, and if so how.   In the event, the Tribunal simply set this 'limitation' aside as not relevant, and thus took no account of it.   It did so at two places in the Award, and for two different sets of reasons.    The two sets of reasons are not literally contradictory, but there is a question as to their compatibility with one another.   Each of them has, however, to be appreciated in its particular context in the Award.

178. The first set of reasons is to be found at paragraphs 216 and 218 of the Award. Here the Tribunal decides that the ICC arbitration and the BIT Arbitration "concern the liability of different parties under different normative regimes." It also decides that, while the Association Agreement does incorporate a limit on the compensation due from PDVSA, "[n]o such limitation applies … to the State's responsibility under the BIT", and gives as the reason that the Government "was neither a party to the CNAA nor a third-party beneficiary." The context for these findings was (see above) the question the Tribunal had itself raised *ex officio* as to what impact (if any) the award that had in the meanwhile been issued by the ICC tribunal should have on the still pending dispute under the BIT. In this context, the decision by the Tribunal that the ICC arbitration was formally irrelevant to the issue before it is readily understandable. It is moreover a decision the Tribunal was competent to make and is not subject to appeal. What preoccupies the Committee, though, is whether a simple decision that the ICC award on the contract dispute did not in and of itself bring an end to the dispute under the BIT became transmogrified, whether consciously or not, into something much wider, and at a stage before the provisions of the BIT governing compensation had been addressed in the Award at all.  Both in paragraph 216 and in paragraph 218, the Tribunal prays in aid a source of law that is not within the listing in Article 9(5), namely 'international law' *tout court* (see paragraph 155 above). That the use here of 'international law' is not merely an imprecise shorthand for the BIT appears unmistakably from the language of paragraph 216 which, as set out above, refers to responsibility for breach of the BIT "and international law." The same

appears, though rather less explicitly, in the reference in paragraph 218 to a contractual clause becoming "transmuted into limitations of the State's responsibility under international law." No explanation is given of how or why a putative responsibility of the Respondent State under international law extraneous to the BIT might fall within the Tribunal's jurisdiction.

179. The second set of reasons given by the Tribunal for setting aside the relevance of the Price Cap can be found in the key passages at paragraph 225 of the Award; these are reflected in full at paragraphs 155-156 above and there is no need to repeat them here. Taking them once again, however, in their particular context, the Tribunal says (in paragraph 224) that what it is addressing is the argument that (i) the Eighteenth and Twentieth Conditions either relieve Venezuela from its obligation to comply with the standards under the BIT and/or (ii) import the corresponding limitation on liability into Venezuela's responsibility for breach of the BIT. In context, the answer given by the Tribunal in paragraph 225 is, once more, understandable – though it should be noticed that Venezuela has vehemently denied in these Annulment proceedings that it ever did advance these propositions in its defence in the Arbitration, and says that the Tribunal is repeating here the mis-description of its position put forward in argument by the Mobil Parties. The Committee's preoccupation is, however, once again that the rejection of two supposed propositions about 'overriding' treaty obligations, or setting them aside, became transmogrified into something much wider with potentially determinative effect for the interpretation and application of the BIT before the provisions of the BIT governing compensation had been addressed in the Award at all.

180. To summarize therefore, in the passages just analysed the Tribunal, in incidentally disposing of peripheral arguments supposed to have been directed at displacing the compensation provisions of the BIT, appears to have committed itself to general propositions about the relationship between 'national law' and 'international law' which appear in turn to have foreclosed in advance the proper application of the BIT to the case.   In brief: to determine that the Eighteenth and Twentieth Conditions do not displace Venezuela's international obligations is not at all synonymous with determining that they have no relevance for the ascertainment of the content and consequences of those obligations.

181. It seems to the Committee to be obvious that in an appropriate case the resolution of a disputed issue under international law can itself entail the application of national law, simply because that is what the international rule requires. The ILC, in §7 of its Commentary on draft Article 3 on State Responsibility says, "Especially in the fields of injury to aliens and their property and of human rights, the content and application of internal law will often be relevant to the question of international responsibility. In every case it will be seen on analysis that either the provisions of internal law are relevant as facts in applying the applicable international standard, or else that they are actually incorporated in some form, conditionally or unconditionally, into that standard."[189] That possibility is plainly allowed for in the choice of law regime of Article 9(5) of the BIT when it lists 'the law of the Contracting Party concerned' and 'the provisions of this Agreement' as the first two among the elements of law on which an arbitral award shall be based (paragraph 154 above). However that may be, it also appears from Venezuela's Memorial in these proceedings that this precise point had been put to the Tribunal by Venezuela when it argued, in its Counter-Memorial on the Merits, that the Claimants were trying to 'read out of Article 9.5 [of the BIT] the first and third sources of law' and insisted that, under the BIT, Venezuelan law had to be taken into account. That is, of course, radically different from an attempt to use its internal law to evade its obligations under the BIT, and the Committee has not been able to find anywhere in the Award in which Venezuela's actual argument was addressed.

182. After the passages discussed above, the Tribunal does not come to the assessment of the compensation due for the Cerro Negro expropriation until paragraphs 306 and following of the Award (see paragraph 162 above). As there indicated, the Tribunal lays down definitively – and in the Committee's view correctly – that the compensation "must be calculated in conformity with the requirements of Article 6(c) of the BIT." In form and in effect this is a determination of law. What ought necessarily to follow is the ascertainment of what those requirements are under the BIT and then their application *in specie* to the particular case in hand, and the Committee will now examine the way in which that was done.

---

[189] See also Crawford, *State Responsibility*, at p. 101 ("National law will often be relevant, whether because it is incorporated by reference in the international law rule, or because it is part of the factual matrix of the dispute.")

183. The process begins in paragraph 307 with a recital verbatim of the key requirements of Article 6(c), notably the standard of 'just compensation' and that its measure must be the market value "of the investments affected" immediately before the expropriating measures. It then transitions immediately (paragraph 308) to the DCF analysis said to have been agreed by the Parties as the basis for evaluation, and the next 60 paragraphs are given over to the detail of the DCF analysis, culminating (as indicated above) in the ultimate compensation figure announced in paragraph 368. At this point, the Award moves to the short excursus on the Price Cap discussed at paragraphs 142-143 above, leading to the conclusion that it may not be 'opposed to' the Claimants in the BIT Arbitration.

184. On the strength of the analysis above, the Committee is itself driven to the conclusion that, although the Tribunal devotes some attention to destroying two straw men (that the Price Cap is contractually binding in itself in the BIT Arbitration, or that the Price Cap can have the effect of displacing or overriding Venezuela's international obligations towards the investors), at no stage does the Tribunal give any consideration to what relevance the limitations on the investors' rights embodied in the Price Cap might actually have to the application of the mandatory criteria laid down in the BIT for compensation. At paragraph 306 the Tribunal makes the definitive determination for the purposes of the Award that the compensation due "must be calculated in conformity with the requirements of Article 6(c) of the BIT." These requirements are then recalled verbatim in paragraph 307, which the Tribunal rounds off with its own conclusion that the compensation "must correspond to the amount that a willing buyer would have been ready to pay to a willing seller at the time in order to acquire the expropriated interests." But the focus then shifts immediately to the detail of a discounted cash flow analysis, and there is no discussion at all of what should be understood, in the circumstances of the case, by the principal criterion of 'just compensation,'[190] or of what, in the particular circumstances, should be understood by the market value 'of the investments affected.' Nor indeed is any further development to be found of the Tribunal's own determination that the measure of market value is what a willing buyer would have been prepared to pay to a willing seller. The only consideration given to the Price Cap is in connection with the two straw men

---

[190] The discussion of this principal criterion is to be found in the Section on the lawfulness of the expropriation, at paragraph 305; but it is not particularized, nor is it followed through.

described above; there is no discussion of any kind of what effect the Price Cap (as a limitation on the investor's rights) might have had on 'market value' of the investment or on the intentions and calculations of the hypothetical willing buyer.[191] This is notwithstanding the fact that this would seem to be a necessary and inevitable element in any willing buyer/willing seller analysis, and the fact that (on the evidence of the Award itself: paragraph 370) that precise proposition had been put in argument by Venezuela. The only response to Venezuela's argument is the first of the two straw men, the one contained in paragraph 373 of the Award,[192] and which was, so it seems, the argument being put forward to the Tribunal by the Claimants. The Award records in paragraph 370 Venezuela's contention that the Claimants' argument does not address the real issue, and the Committee can only respectfully agree.

185. The Committee concludes this portion of its Decision by adverting to one related aspect of the Award.

186. The corresponding passages in the Award are the following (all emphases supplied) –

> "These proceedings concern the responsibility of the State for breach of the Treaty **and international law**." (paragraph 216)

> "Neither has the Respondent advanced any relevant argument that the limitations on PDVSA-CN's contractual liability under Clause 15 should be transmuted into limitations of **the State's responsibility under international law**." (paragraph 218)

> "… the Tribunal has no doubt in concluding that **this issue must be governed by international law**. Consequently, the Eighteenth and Twentieth Conditions cannot exempt or excuse the Respondent from its obligations under the Treaty **or under customary international law**." (paragraph 225).

187. Taking these passages in themselves and in their individual contexts it is hard to avoid seeing in them an implication that there exists notionally and *in spe* a given quantum of compensation for expropriation imposed 'by international law' from which it is not possible to detract by domestic legal means or by any other form of action other than on the international plane. If so, then the underlying concept remains unexplained; nothing can be found on the face of the

---

[191] Contrast the direct application of the willing buyer criterion to the quantum of compensation in respect of the La Ceiba Project at paragraph 385 of the Award.

[192] See paragraph 184 above.

Award to establish what the relationship is between the postulated liability 'under international law' and the compensation criterion expressly laid down in the BIT. Nor, even if there does exist some pre-existing notional obligation under 'international law' (which both paragraphs 216 and 225 treat as something different from the BIT), is there any reasoning to establish why that obligation should be justiciable in the arbitration at all, let alone why it should be taken to override the express provision to be found in the BIT. In other words, in its anxiety to dismiss any thought that national law can be invoked as a defence to the breach of an international obligation, the Tribunal ended up falling into an another version of exactly the same type of proposition, i.e. that some alternative source of international obligation can be invoked to displace particular rights and obligations established by treaty. Had the Tribunal set out to articulate the proposition directly, and to reason it through, it would immediately have realized that this proposition was as unsustainable, at the level of general principle, as the proposition which the Tribunal was setting out to reject.

## V. DECISION

188. The *ad hoc* Committee accordingly arrives at the following conclusions: -

a) The Tribunal manifestly exceeded its powers to the extent that it held that general international law, and specifically customary international law, regulated the determination and assessment of the compensation due to the Mobil Parties for the expropriation of their investment in the Cerro Negro Project, in place of the application of the provisions of the BIT.

b) Those parts of the Award that purport to be based on the existence, irrespective of the BIT, of a justiciable obligation on Venezuela towards the Mobil Parties in respect of the compensation due for the expropriation of their investment in the Cerro Negro Project, fail to state the reasons on which they are based.

c) Those parts of the Award that purport to set aside altogether the potential relevance, for the purposes of applying the provisions of the BIT, of the compensation provisions forming part of the Mobil Parties' investment in the Cerro Negro Project are unsupported by analysis and based on contradictory reasoning, and thus fail to state the reasons on which they are based.

71

189. The Committee accordingly finds that the portions of the Award dealing with the compensation due for the admitted (and lawful) expropriation of the Cerro Negro Project are so seriously deficient both in their reasoning and in the choice and application of the appropriate sources of law under the governing Bilateral Investment Treaty as to give rise to grounds for annulment under Article 52(1) of the ICSID Convention.   The Committee sees no need to enter further into the question whether either one of these deficiencies, taken on its own, would have justified the annulment of the relevant parts of the Award, since it is evident that the two deficiencies identified bear on exactly the same aspects of the Tribunal's decision and the reasoning behind it;  and indeed, as indicated above, the two deficiencies can hardly be separated from one another.   The consequence is that they reinforce one another, and in so doing they lead to a situation in which the relevant parts of the Award can be impugned both as a 'manifest excess of power' under Article 52(1)(b), and as a 'failure to state reasons' under Article 52(1)(e).[193]   The Tribunal exceeded its powers by failing to apply the proper law, and the 'manifest' nature of this failure is shown by the inadequacies in the Tribunal's reasoning for the choice of applicable law, in both its positive (the law chosen) and negative (the law rejected) aspects.  Conversely, the failure to state adequate and non-contradictory reasons is of central significance inasmuch as it had decisive effect on the choice and application of applicable law and thus on the Tribunal's decision on the principal point at issue (the assessment of the compensation due).

190. The Committee should not be understood by this Decision to be determining in what way either the Price Cap or the outcome of the ICC arbitration should be brought to bear on the assessment of compensation in the present dispute. That would lie beyond its competence, and is in any event a decision which the Committee is in no position to make. The Committee's decision is directed simply at the *a priori* exclusion in the Award of certain essential elements from the process of arriving at the compensation due pursuant to the terms of Article 6 of the BIT.

191. Given the limited nature of the annulment to be pronounced, the Committee considers it both necessary and useful to indicate more precisely, in the dispositive section which will follow, which aspects of the Award are annulled (and therefore which parts of the Award are left

---

[193] Cf. *Lucchetti v. Peru*, Decision on Annulment of 5 September 2007, at para. 72.

untouched by the Decision). It will be up to the Parties to take the necessary steps thereafter to put the resulting situation into practical effect. No doubt they will choose whatever method is most convenient and most efficient towards that end.

192. The stay of enforcement laid down in Procedural Order No. 2 of 28 July 2015 will, according to its terms, cease to have effect on the date of issue of the present Decision. The Committee specifically recalls in this connection the letter of 27 August 2015 from the Minister of Petroleum and Minerals of Venezuela conveying a formal and binding commitment on behalf of the Bolivarian Republic of Venezuela, in the event that Venezuela's present Application for Annulment is unsuccessful in whole or in part, to comply promptly with any or all parts of the Award that have not been annulled.

## VI. COSTS

193. Article 61(2) of the ICSID Convention, which applies to annulment *mutatis mutandis* pursuant to Article 52(4), gives the Committee discretion to allocate the costs of the proceeding between the parties as it deems appropriate.  As regards the allocation of the costs of these annulment proceedings, the Committee intends to follow the same approach as that of the Tribunal, and take into account the conduct of the Parties as well as the principle that costs should normally follow the event.

194. Both Parties, in their written submissions, have asked for the costs of these proceedings to be awarded in their favour, and each Party duly submitted a statement of costs in response to the Committee's request at the conclusion of the oral hearing. Venezuela, as Applicant, claimed a total of US$ 2,092,414 in costs and expenses, and the Mobil Parties, as Respondents, a total of US$ 701,617.30; in support of the amount claimed, Venezuela drew attention to its need to operate throughout in both the English and Spanish languages.

195. Applying to the outcome of these proceedings the approach indicated in paragraph 193 above, the Committee notes that Venezuela has been plainly successful over the main and most substantial issue, i.e. that relating to compensation for the Cerro Negro expropriation, which has in turn occupied the major part of both the written and oral argument. Against that must however be set the dismissal of its two other requests for annulment (jurisdiction and document production) which the Committee has found to have little substantive merit. In these

circumstances, the Committee considers that the only reasonable decision is to let the costs of the preparation and presentation of Parties' respective cases lie where they fall and to split the costs of the annulment proceedings, including the fees and expenses of the Members of the Committee and the costs of the Centre, between the Parties, with the result that each side will bear the costs of the preparation and presentation of its own case, and that the costs of the annulment proceedings, including the fees and expenses of the Members of the Committee and the costs of the Centre, will be shared equally between the Applicant and the Respondents. The ICSID Secretariat will provide the Parties with a detailed financial statement of the case account once all invoices are received and the account is final.

## VII. DISPOSITIF

196. On the basis of the reasoning above, the Committee decides: -

1) the request for the annulment of the Award on account of the Tribunal's assumption of jurisdiction is rejected;

2) the request for the annulment of the Award on account of the Tribunal's refusal to order document production is rejected;

3) the request for the annulment of the portion of the Award dealing with compensation for the expropriation of the Cerro Negro Project is upheld in part, as follows: paragraph 404(d) of the Award is annulled, together with certain paragraphs in Sections V, VI, and VIII of the Award bearing directly on the assessment of compensation and the basis therefor, that is to say paragraphs 216-218, paragraphs 223-225, and paragraphs 373-374;

4) for the avoidance of doubt, the Committee specifies that the following parts of the Award are not affected by sub-paragraph 3) above, namely paragraphs 297-306, paragraphs 307-367, the first sentence of paragraph 368, paragraphs 386-400, and paragraph 403, as well as paragraphs 184-213 and the Decision on Jurisdiction of 10 June 2010;

5) in accordance with the terms of paragraph 10.a of Procedural Order No. 2 of 28 July 2015, the stay of enforcement laid down in that Order will cease to have effect on the date of issue of the present Decision;

6) each Party shall bear the costs of the preparation and presentation of its own case.  The costs of the annulment proceedings, including the fees and expenses of the Members of the Committee and the costs of the Centre, shall be shared equally between the Applicant and the Respondents.

[*signed*]                                        [*signed*]

_____        _____
Tan Sri Cecil Abraham                           Professor Dr. Rolf Knieper
Member of the *ad hoc* Committee                Member of the *ad hoc* Committee
Date: February 23, 2017                          Date: February 28, 2017


[*signed*]

_____
Sir Franklin Berman
President of the *ad hoc* Committee
Date: March 3, 2017